**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

_____
)
DOW AGROSCIENCES LLC, *et al.*          )
                                        )
              Plaintiffs,               )
                                        )
        v.                              )        Case No. 8:09-cv-824-AW
                                        )
NATIONAL MARINE FISHERIES               )
SERVICE, *et al.*,                      )
                                        )
              Defendants.               )
_____)


**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

David B. Weinberg                      Warren U. Lehrenbaum
Eric Andreas                          David Menotti
WILEY REIN LLP                        CROWELL & MORING LLP
1776 K Street, NW                     1001 Pennsylvania Ave., NW
Washington, DC 20006                  Washington, DC 20004
(202) 719-7000                        (202) 624-2500


July 18, 2011

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.     The Controlling Law .......................................................................................... 2

        1.     The Requirements Of The ESA ............................................................ 2

        2.     FIFRA ..................................................................................................... 4

    B.     The Biological Opinion ...................................................................................... 6

        1.     The Draft BiOp ...................................................................................... 7

        2.     The Final BiOp .................................................................................... 11

STANDARD OF REVIEW ................................................................................................ 13

ARGUMENT ..................................................................................................................... 15

I.     NMFS' Analysis And Conclusions Do Not Meet Minimum Legal Requirements. ..................... 15

    A.     NMFS Set Concentration Levels That Are Much Too Low ............................. 16

    B.     The Expected "Exposure Concentrations" NMFS Relies Upon Are Unsupported And Wrong. ........................................................................................ 23

    C.     NMFS Failed To Demonstrate That Salmon Are Actually Exposed To Harmful Concentrations. ................................................................................... 29

II.     NMFS' RPA Recommendations Also Are Unsupported And Unlawful ....................................... 34

III.     NMFS' failure To Respond To Many Other Substantive Comments On The Draft BiOP Was Unlawful. ....................................................................................... 38

CONCLUSION .................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page**

*American Tunaboat Association v. Baldridge,*
    738 F.2d 1013 (9th Cir. 1984) ............................................................14

*Bennett v. Spear,*
    520 U.S. 154 (1997)................................................................... *passim*

*Beno v. Shalala,*
    30 F.3d 1057 (9th Cir. 1998) ......................................................14, 38

*Canadian Ass'n of Petroleum Producers v. FERC,*
    254 F.3d 289 (D.C. Cir. 2001).........................................................38

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).........................................................................13

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ..........................................14, 19, 22, 31

*Delta Smelt Consolidated Cases v. Salazar,*
    760 F. Supp. 2d 855 (E.D. Cal. 2010)................................14, 23, 25, 28

*Dow AgroSciences LLC v. NMFS,*
    637 F.3d 259 (4th Cir. 2011) ....................................................1, 4, 13

*Esch v. Yeutter,*
    876 F.2d 976 (D.C. Cir. 1989)..........................................................32

*Gifford Pinchot Task Force v. United States Fish and Wildlife Service,*
    378 F.3d 1059 (9th Cir. 2004) .........................................................36

*Grand Canyon Air Tour Coaliation v. FAA,*
    154 F.3d 455 (D.C. Cir. 1998) .........................................................38

*Greenpeace v. NMFS,*
    80 F. Supp. 2d 1137 (W.D. Wash. 2000).......................................14, 22

*Hawaii Longline Association v. NMFS,*
    281 F. Supp. 2d 1 (D.D.C. 2003).......................................................2

*Humane Society of the United States v. Department of Commerce,*
    432 F. Supp. 2d 4 (D.D.C. 2006).......................................................32

*IMS, P.C. v. Alvarez,*
    129 F.3d 618 (D.C. Cir. 1997) ...................................................................................37

*League of Wilderness Defenders v. Forsgren,*
    309 F.3d 1181 (9th Cir. 2002) .................................................................................39

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v.*
    *State Farm Mutual Automobile Insurance Co,*
    468 U.S. 29 (1983) ........................................................................................... *passim*

*National Audubon Society v. Department of Navy,*
    422 F.3d 174 (4th Cir. 2005) ...................................................................................38

*North Carolina v. FAA,*
    957 F.2d 1125 (4th Cir. 1992) .............................................................................2, 38

*Pacific Coast Federation of Fishermen's Ass'ns v. Gutierrez,*
    606 F. Supp. 2d 1122 (E.D. Cal. 2008) ...............................................................14, 22

*Pacific Coast Federation of Fishermen's Ass'ns v. NMFS,*
    265 F.3d 1028 (9th Cir. 2001) .................................................................................13

*Pacific Coast Federation of Fishermen's Ass'ns v.*
    *United States Bureau of Reclamation,*
    426 F.3d 1082 (9th Cir. 2005) ........................................................................ *passim*

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ............................................................................................14, 23

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006) .........................................................................13

*Sierra Club v. United States Army Corps of Engineers,*
    701 F.2d 1011 (2d Cir. 1983) .................................................................................14

*Sierra Club v. EPA,*
    162 F. Supp. 2d 406 (D. Md. 2001) ......................................................................13

*Sierra Club v. United States Army Corp. of Engineers,,*
    295 F.3d 1209 (11th. Cir. 2002) .............................................................................13

*Silva v. Lynn,*
    482 F.2d 1282 (1st Cir. 1973) .................................................................................39

*Transactive Corp. v. United States*,
    91 F.3d 232 (D.C. Cir. 1996) ............................................................................12

*United Distribution Cos. v. FERC*,
    88 F.3d 1105 (D.C. Cir. 1996) ..........................................................................38

*Washington Toxics Coalition. v. EPA*,
    Civ. No. 01-132, 2002 WL 34213031 (W.D. Wash. July 2, 2002) ........................6

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ............................................................13, 26, 27, 35

**DOCKETED CASES**

*Northwest Coalition for Alternatives to Pesticides v. EPA*,
    No: 10-cv-01919 (W.D. Wash. filed Nov. 29, 2010) ............................................1

*Northwest Coalition for Alternatives to Pesticides v. NMFS*,
    Civ. No. 07-1791 (W.D. Wash. filed Nov. 5, 2007)............................................11

**STATUTES, RULES AND REGULATIONS**

5 U.S.C. § 706(2)(A)............................................................................................13

5 U.S.C. § 706(2)(D)............................................................................................13

7 U.S.C. §§ 136-136y ............................................................................................2

7 U.S.C. § 136a-1..................................................................................................4

7 U.S.C § 136a-1(g)(2)(D)(i)..................................................................................5

7 U.S.C. § 136a(5) ................................................................................................4

7 U.S.C.§ 136a(c)(5)..............................................................................................4

7 U.S.C. § 136a(c)(5)(C)........................................................................................5

7 U.S.C. § 136a(c)(5)(D) .......................................................................................5

7 U.S.C. § 136j(a)(2)..............................................................................................4

16 U.S.C. §§ 1531-1544 ........................................................................................1

16 U.S.C. § 1532(19) ................................................................................................4

16 U.S.C. § 1536(a)(2) ........................................................................................2, 3, 14

16 U.S.C. § 1536(a)(3) ........................................................................................3, 39

16 U.S.C. § 1536(a)(4) ................................................................................................3

16 U.S.C. § 1536(b)(1)(A) ................................................................................................7

16 U.S.C. § 1536(b)(1)(B) ................................................................................................7

16 U.S.C. § 1536(b)(3)(A) ........................................................................................3, 37

16 U.S.C. § 1536(b)(4)(C) ................................................................................................4

16 U.S.C. § 1536(o)(2) ................................................................................................4

40 C.F.R. §§ 152-156 ................................................................................................4

50 C.F.R. § 17.3 ................................................................................................4

50 C.F.R. § 402.02 ........................................................................................3, 37

50 C.F.R. § 402.14(d) ................................................................................................11

50 C.F.R. § 402.14(g)(1) ................................................................................................3

50 C.F.R. § 402.14(g)(5) ................................................................................................3

50 C.F.R. § 402.14(g)(8) ................................................................................................3

59 Fed. Reg. 34271 ................................................................................................39

Fed. R. Civ. P. 56(c) ................................................................................................13

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Dow AgroSciences LLC ("DAS"), Makhteshim Agan of North America, Inc.

("MANA"), and Cheminova, Inc. USA ("Cheminova") are entitled to summary judgment vacating the

November 18, 2008 biological opinion by the National Marine Fisheries Service ("NMFS") that is the

subject of this lawsuit.  The reasons for this are threefold:  NMFS failed to use the best scientific and

commercial data available, failed to articulate a rational connection between the facts found and the

choices it made when assessing the impact of three insecticides on salmonid species in California and

the Pacific Northwest, and failed to respond to many substantive comments it received.  Plaintiffs

submit the following arguments and authorities in support of their Motion.

## <u>INTRODUCTION</u>

NMFS issued the biological opinion ("BiOp") at issue in this case under authority of the

Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.  That BiOp expressed NMFS' opinion on

the environmental impact in California and the Pacific Northwest of the authorization by the U.S.

Environmental Protection Agency ("EPA") of the use of three insecticides in California and the Pacific

Northwest.  It also presented NMFS' recommendations for further EPA regulatory action.

Failure by EPA to respond to NMFS' opinion and recommendations opens EPA and its staff to

further litigation and, ultimately, substantial civil and criminal penalties, including imprisonment.

*Bennett v. Spear*, 520 U.S. 154, 170 (1997).  Indeed, such a suit already has been filed.  *Nw. Coal. for*

*Alternatives to Pesticides v. EPA*, No: 10-cv-01919 (W.D. Wash. filed Nov. 29, 2010) (stayed pending

decision in this case by Order dated June 30, 2011).  The BiOp also puts private parties at similar risk.

*Dow AgroSciences LLC v. NMFS*, 637 F.3d 259, 266 (4th Cir. 2011).

It was critically important, therefore, for NMFS to have followed the law when it crafted the

BiOp.  Unfortunately, that did not occur.  The ESA required NMFS to use the "best scientific and commercial data available," and make findings demonstrating that it had done so.  16 U.S.C. § 1536(a)(2),(3).  NMFS did not.  The Administrative Procedure Act ("APA") and fundamental principles of administrative law required NMFS to articulate "a rational connection between the facts found and the choice[s] made" in the BiOp.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  NMFS did not.  Those same authorities required NMFS to respond to highly critical substantive comments on its draft of the BiOp provided for the record by EPA, several State agencies and Plaintiffs on its draft of the BiOp.  *North Carolina v. FAA*, 957 F.2d 1125, 1135 (4th Cir. 1992).  NMFS did not.

Under these circumstances, the appropriate action for this Court is to vacate the BiOp and direct NMFS to prepare a legally proper one.  *Haw. Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1, 37 (D.D.C. 2003).  That is the relief Plaintiffs now seek.

## BACKGROUND

We briefly review in the next several pages key elements of the two statutes that gave rise to the facts in this case – the ESA and the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y – and then summarize the history and content of the challenged BiOp.

### A.   The Controlling Law

#### 1.   The Requirements of the ESA

Section 7 of the ESA, 16 U.S.C. § 1536(a)(2), requires EPA and other federal regulatory agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species . . . ."  16 U.S.C. § 1536(a)(2).  If

the agency determines that a proposed action may adversely affect an endangered or threatened species, or its critical habitat, it must seek the advice of a "consulting agency."  The consulting agencies are NMFS and the Fish and Wildlife Service ("FWS"), with the responsibility divided between them based on the species at issue.  *See id.* § 1536(a)(4).  NMFS and FWS are often collectively referred to as the "Services;" the agency seeking consultation is generally referred to as the "action agency."

The appropriate Service (here NMFS) is required to analyze the potential impact of the action agency's proposed action on endangered or threatened species and their habitat.  The Service then must provide the action agency (here EPA) with a written statement explaining the Service's analysis and conclusions.  *Id.* § 1536(b)(3)(A).  This written statement is referred to as a biological opinion or "BiOp."  The BiOp at issue in this case addressed the potential impact on certain salmonids (salmon and related fish, such as steelhead) of EPA's authorization of the use of three insecticides.

The ESA requires that a BiOp be based on the "best scientific and commercial data available." *Id.* § 1536(a)(2).[1]  To ensure this result, the Service must review "all relevant information provided by the [action] agency or otherwise available."  50 C.F.R. § 402.14(g)(1).  And where the action arises from a licensing decision, the Service must also involve any applicant in the consultation process.  16 U.S.C. § 1536(a)(3); 50 C.F.R. § 402.14(g)(5).

If the Service finds that the action will jeopardize the continued existence of a species or adversely modify critical habitat, the Service must identify "reasonable and prudent alternatives" ("RPAs") that are both "economically and technologically feasible" and will, in the Service's opinion, avoid such impacts.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.02.  The Service also must provide the

---

[1] *Cf.* 50 C.F.R. § 402.14(g)(8) (Services' joint implementing regulations) (NMFS "will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions taken by the [action] agency or applicant, including any actions taken prior to the initiation of consultation.").

action agency with an Incidental Take Statement ("ITS") that details the "impact of such incidental taking on the species" and describes "reasonable and prudent measures" ("RPMs") to "minimize such impact." 16 U.S.C. § 1536(b)(4)(C).[2]

2.    FIFRA

All pesticides placed into commerce in the United States must be "registered" by EPA under FIFRA.  7 U.S.C. § 136a(5).  In this licensing process, EPA approves the particular uses to which the pesticide may be placed, where it may be used, the lawful amounts of product that may be applied, and the appropriate application methods.  This information then is required to be displayed on the product's labeling.  It is illegal for anyone to use a registered pesticide in a manner inconsistent with its labeling. *See id*. § 136j(a)(2); 40 C.F.R. §§ 152-156.

The three insecticides at issue in this case have been registered for use in the United States for many decades.  They thus were among the products subject to "reregistration" when Congress amended FIFRA in 1988 to require that older products be subject to that new procedure.  7 U.S.C. § 136a-1.  Reregistration essentially involved EPA assuring that the support for all existing registrations was consistent with high quality, contemporary science, and that the restrictions imposed by labels assured, in light of that science, that the use of each product would impose no unreasonable adverse effects on the environment.  *See id.* §§ 136a(c)(5), 136a-1.

---

[2]  The ITS has considerable legal significance because it establishes a safe harbor by which regulated entities can avoid prosecution for "take."  *See Dow AgroSciences LLC v. NMFS*, 637 F.3d 259, 266 (4th Cir. 2011).  "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," 16 U.S.C. § 1532(19), as well as to degrade critical habitat, *e.g.*, 50 C.F.R. § 17.3 ("Harm in the definition of 'take'. . . include[s] significant habitat modification or degradation.").  Any person who knowingly "takes" an endangered or threatened species is subject to substantial civil and criminal penalties.  Through adherence to the RPMs, any resulting "take" of the species is not considered to be "a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

The reregistration process required registrants, including Plaintiffs here, to spend millions of dollars sponsoring scientific studies to update information.  That information addressed such matters as the amounts of the product at issue that reach non-target areas (such as rivers that might contain salmon) and the ecological implications of any such impacts.  *Id.* §§ 136a(c)(5)(C),(D).  The process culminated with EPA's issuance of a final reregistration eligibility decision ("RED"), which sometimes was preceded by an interim reregistration eligibility decision ("IRED").  These were issued for chlorpyrifos in 2001 (IRED) and 2006 (RED), for diazinon in 2002 (IRED) and 2006 (RED) and for malathion in 2006 (RED) and early 2009 (Revised RED).[3]  Administrative Record ("AR") 4206-4464, 5022-5159, 5660-5854.

If EPA finds through the reregistration process that previously approved uses of the product studied may have been having an unreasonably adverse environmental effect, reregistration can result in the imposition of significant new restrictions on future product uses.  7 U.S.C. § 136a-1(g)(2)(D)(i).  These restrictions, in turn, may significantly reduce the volumes of the products sold and where use occurs.  Reregistration of the three insecticides at issue in this case resulted in just such restrictions.  As a consequence, between 2000 and the issuance of the BiOp at issue here in 2008, diazinon use plummeted more than 60% in California and 90% nationwide.  AR 1432, 1424.  Significant reductions in chlorpyrifos and malathion use volumes also occurred, or were about to occur, as a result of the cancellation of dozens of previously-approved uses that occurred as a result of the reregistration process.  AR 1488-1489, 1525-1526, 1529-1531.

---

[3] While reregistration had been completed for chlorpyrifos and diazinon well before the BiOp was issued, and the revised RED for malathion did not issue until shortly after the final BiOp was released, the initial malathion RED, issued in 2006, specified over 40 use cancellations to reduce risk to species.  Those cancellations, which had been voluntarily requested by Cheminova prior to issuance of the final BiOp, were essentially identical to those specified in the revised malathion RED in 2009.  AR 1795-1796; *see also* Reregistration Eligibility Decision (RED) for Malathion (Revised May 2009) (available at www.epa.gov/oppsrrd1/REDs/malathion-red-revised.pdf).

**B.      The Biological Opinion**

The BiOp challenged here was the first of several sought by EPA after that Agency was ordered

by the U.S. District Court for the Western District of Washington in 2002 to consult with NMFS

regarding the potential impact of the registration of several dozen pesticides on endangered salmonid

species in California and the Pacific Northwest.  *Washington Toxics Coal. v. EPA*, Civ. No. 01-132C,

2002 WL 34213031 (W.D. Wash. July 2, 2002).  EPA formally requested NMFS' opinion as to

chlorpyrifos use on April 14, 2003 (AR 4203-4205), as to diazinon use on November 29, 2002

(AR 5019-5021), and as to malathion use on December 1, 2004 (AR 5658-5659).  These three

insecticides are all "organophosphates,"[4] and NMFS decided to address their potential impacts in a

single opinion.

A number of other BiOps arising from the *Washington Toxics* order have been published in the

two-and-a-half years since issuance of the one challenged here, and many more FIFRA-related BiOps

are in the pipeline.[5]  Hence, this case is being watched closely by both regulators and the regulated

community, and this Court's ruling can be anticipated to have considerable impact beyond the confines

of a single dispute.

---

[4] Organophosphates are organic compounds containing phosphorus.  Phosphates are the basis for many types of insecticides and herbicides.

[5] In response to the *Washington Toxics* order, EPA sent requests to NMFS regarding thirty-four other pesticides.  The Agency also is under separate court orders to consult with the Services with regard to the impacts of dozens of pesticides on a variety of other species, and has recently implemented a 15-year "registration review" process that probably will trigger hundreds of other consultations on thousands of combinations of species, pesticides and habitats.  *See, e.g.,* Stipulated Injunction, *Ctr. for Biological Diversity v. EPA,* No. C07-02794 JCS (N.D. Cal. May 17, 2010) (setting forth a schedule by which EPA must review the registrations of pesticides containing any of 75 active ingredients for their potential effects to one or more of 11 species and consult with the Services as necessary); Pesticides:  Registration Review available at http://www.epa.gov/oppsrrd1/registration_review/highlights.htm (noting that in "fiscal year 2011, 739 pesticide cases comprising 1,155 active ingredients are scheduled for registration review").  In addition, a suit was filed against EPA earlier this year seeking additional consultations regarding the impacts of 381 pesticides on 214 species long before EPA's current administrative schedule anticipates them.  Complaint, *Ctr. for Biological Diversity v. EPA*, No. 11-CV-293-JCS (N.D. Cal. Jan. 20, 2011).

1.      The Draft BiOp

NMFS began work on the BiOp challenged here in early 2008 (five years after EPA's first request) and released a 377-page draft on July 31, 2008.  AR 293A, 294-682.  Although the ESA requires that consultation with EPA generally be concluded within three months of a request for consultation,[6] the draft provided the first opportunity for anyone outside of NMFS to review the facts on which NMFS was basing its analysis or its preliminary conclusions.

Release of the draft was met with severe protests and criticism from EPA, several State governments and the Plaintiffs.  Among other things, the draft ignored all the reregistration actions EPA had taken since requesting consultation in 2002 and 2004.  These, as noted above, had significantly reduced the use of the three products in the States of concern, promised even further reductions, and had produced a variety of additional restrictions to limit the pesticides from reaching waterways.  These changes meant that the amount of pesticide reaching the environment now and in the future is far less than it historically has been.

The draft also revealed that NMFS was unaware of millions of dollars of studies on the potential direct and indirect effects of Plaintiffs' products on fish that EPA had required Plaintiffs to prepare (in accordance with strict, Agency-established protocols), and had little understanding of when salmonids actually were present in areas potentially affected by pesticide use.  Nonetheless, the draft proposed to find that the continued registration of chlorpyrifos, diazinon and malathion would jeopardize salmonids making up 28 evolutionarily significant units ("ESUs"), and would destroy or adversely modify critical

---

[6] The ESA requires the consulting agency to conclude formal consultation, and provide a written BiOp, within a 90-day period beginning on the date on which the action agency initiates consultation.  16 U.S.C. § 1536(b)(1)(A).  While the action agency and consulting agency may agree to extend formal consultation beyond 90 days, if the agencies extend the consultation period beyond 150 days, they must obtain the consent of the applicant.  *Id.* § 1536(b)(1)(B).

habitat for 26 of those ESUs.[7]

EPA, three of the affected States (California, Idaho and Washington) and Plaintiffs provided NMFS with extensive input on its draft.  It included written comments, copies of and/or citations to many scientific studies and data that NMFS had been unaware of or otherwise ignored, and in-person explanations by experts on the significance of those studies and data.  AR 1341-3502, 15767-19648, 1833-1838, 3507-3520, 3619-3620, 3630-3633.

EPA's comments were particularly scathing.  The Agency started by informing NMFS that it had "serious questions and doubts about the support for NMFS' conclusion that these three pesticides jeopardize all of these species and adversely modify their critical habitat."  AR 1833.  After listing several criticisms, EPA then flatly stated that "[it did] not believe the available data supports NMFS' draft jeopardy conclusions."  AR 1838.  Among other things, EPA expressed concern that "much of the historical water quality monitoring data relied upon [in the draft BiOp] is outdated and inappropriate in the context of the [current and future] use of these pesticides," and that "[t]hese historical data more appropriately reflect pesticide use prior to substantive mitigation that has been put in place by EPA." AR 1835.

This was not EPA's only concern, however.  EPA also objected to NMFS' assumption, for purposes of analysis, that all juvenile salmon would be exposed to high concentrations of the pesticides at issue for continuous, extended periods of time.  AR 1835-1836.  "The Draft," EPA complained, "provides no explanation of how NMFS' assumptions [on this issue] can be characterized as realistic or reasonable."  AR 1836.

---

[7] An ESU is a "group of Pacific salmon or steelhead trout that is (1) substantially reproductively isolated from other conspecific units and (2) represent an important component of the evolutionary legacy of the species."  AR 1336.  In laymen's terms, this means a separate, distinct population within a species.

EPA also was concerned about NMFS' emphasis on "off-channel" habitat – that is, backwaters, tributaries and purportedly even some drainage ditches – and the Service's predictions of the amounts of pesticides that might be found in them.  EPA stated that there "seems to be an assumption [by NMFS] that these habitats are more vulnerable and likely to have higher exposures than those indicated in EPA's assessments, however, this assumption is not supported by any data and supporting analyses."  AR 1837. In addition, EPA challenged the degree of salmonid exposures resulting even if some amount of pesticides reached these areas.  Using the scientific terminology that describes where and when various fish life stages are found, "spatial and temporal" characteristics, EPA wrote that there "is no spatial or temporal analysis that relates the exposure evaluated to the species" and that "consideration of the spatial and temporal aspects of pesticide use appear to have been discounted in the Draft, and instead, there are assumptions that pesticide use is consistent throughout each watershed within the action area." *Id*.

EPA also criticized NMFS for "assum[ing] risk from the use of all three pesticides at their maximum application rates at the same location and time, [simply] because such practice is not prohibited on the label."  AR 1835.  EPA warned NMFS that "these occurrences would be quite rare" because, among other things, the three products are registered for many of the same uses and an individual grower uses only one of the products at any time.  AR 1837.  "The Draft," EPA continued, "does not provide analyses that establish the extent to which this assumption is realistic or reasonable, nor does the [d]raft articulate to what extent the finding of jeopardy is dependent upon this assumption." AR 1835.

The States joined in EPA's criticisms.  California's Department of Pesticide Regulation ("CDPR"), for example, determined that it could not reconcile NMFS' basing its exposure analyses on

hypothetical modeling "given the large volume of [monitoring] data that exist[ed] throughout California" (AR 3510) and that "[t]he Biological Opinion has not put pesticide concentrations into perspective with regard to fish habitat . . . although clearly these data are available." AR 3508. CDPR thus flatly rejected NMFS' proposed jeopardy and habitat destruction conclusions. For CDPR, the bottom line was that the BiOp "<u>must be based on the best available data and it isn't.</u>" AR 3509 (emphasis in original).

The Washington State and Idaho Departments of Agriculture expressed similar concerns. "Unfortunately," said the Washington Department, "it does not appear that any modeling representative of agricultural production in Washington State was conducted." AR 3632. There has been "no attempt to compare and contrast the worst case scenario with habitat conditions throughout the geographic/spatial range of the listed salmonids." *Id*. The Idaho Department agreed, noting that "the biological opinion is . . . based on older out dated pesticide labels . . . [that] have actually been changed by EPA establishing lower use rates, fewer uses, and the recent addition of restricted setbacks." AR 3619.

As explained more fully below in the context of the flaws in the final BiOp, Plaintiffs also filed extensive written comments on the draft BiOp. In addition, the Plaintiffs made several oral presentations to NMFS staff explaining their concerns and brought several highly-qualified experts, including the author of several key studies, to Washington to meet with NMFS staff. AR 796-801. Plaintiffs also provided NMFS staff with references to all of the studies of which NMFS previously had not been aware or had otherwise ignored, and copies of many of them. AR 717-718, 725-732, 802-804, 814, 1991-1994.

2.      The Final BiOp

NMFS originally released the draft BiOp, without any advance warning, on July 31, 2008.[8]  It

requested submission of comments on the draft a month later (by September 2, 2008).  AR 294-682,

692.   In the face of protests from Plaintiffs and governmental agencies that the period allowed to

evaluate and respond to the unanticipated draft was too short, especially in light of the vacation season,

NMFS ultimately accepted written comments until September 15, 2008.  AR 711.

Plaintiffs also requested an opportunity to meet with NMFS.[9]  The earliest that a meeting could

be scheduled was on the eve of Labor Day, August 29, 2008.  AR 1341-1343.  A number of scientific

and technical presentations were made at that meeting on behalf of the registrants, and supplemental

materials were subsequently filed.  Two other meetings also were held, with the last one occurring on

October 16, 2008.  AR 3470-3494.  Four weeks later, on November 18, 2008, NMFS released the final

BiOp.

Except for correcting the grievously incomplete and inaccurate description of the limitations

EPA had imposed on chlorpyrifos, diazinon and malathion use in the reregistration process, and

inclusion of a species-specific discussion of risk, the final BiOp was little changed from the draft.

AR 857-1340.  Its only substantive revision was to find jeopardy for only 27, instead of 28, ESUs and

adverse modification of habitat for 25, instead of 26, ESUs.  AR 1250.[10]  But the final BiOp

---

[8] EPA had requested consultation in 2002, 2003, and 2004.  *See supra* at 6.  In the face of NMFS's unresponsiveness, the plaintiffs who had brought the original *Washington Toxics* case in 2007 filed suit against NMFS seeking to require the Service to respond to EPA.  *Nw. Coal. for Alternatives to Pesticides, LLC v. NMFS*, Civ. No. 07-1791 (W.D. Wash. 2007).

[9] The ESA regulations contemplate the involvement of any applicants throughout the consultation process.  50 C.F.R. § 402.14(d).  NMFS failed to provide any opportunity for Plaintiffs to submit information until after the consultation process was substantially completed.

[10] NMFS changed its mind regarding the inclusion of the Ozette Lake sockeye in its jeopardy/adverse modification determination because this ESU occurs in a sparsely populated area with no crop land.  AR 1225.  However, NMFS failed to

overwhelmingly failed to address the significant other faults noted by commenters.  For example, NMFS did not attempt to correlate the location of the salmon to actual pesticide use, continued to rely on out-of-date water monitoring data, and failed to provide an explanation for the assumptions it made in its population model and elsewhere.

In addition, the final BiOp included a six-element RPA to be put in place within a year, and included an ITS and RPMs addressing the take of any individuals that might occur as a result of the action.  AR 1250-1255.[11]  The most troubling of these to Plaintiffs, their customers and State agencies was the first element of the RPA that would require EPA to prohibit product use by ground application within 500 feet, and aerial application within 1,000 feet, of any waterway that connected, directly or indirectly, at any time of the year, to any water body in which salmonids might be found at some time (including even drainage ditches).  AR 1251.  Implementation of these restrictions would have eliminated use of the three products in much of the agricultural areas of California and the Pacific Northwest, but the BiOp failed to discuss in any way the economic implications of these prohibitions as required.[12]

---

remove several similar ESUs for the same reasons.  An example is the California Coastal Chinook salmon, which occur in an area that is only 1% cropland, 52% forested, and only 5% urban development.  AR 1201.  As discussed below (*see infra* at 29-34), this is one of many examples of where NMFS failed to properly analyze risk in the context of where pesticide use is occurring relative to salmon habitat.  Moreover, NMFS' inconsistency in addressing analogous ESUs is itself a violation of law.  *Transactive Corp. v. United States,* 91 F.3d 232, 237 (D.C. Cir. 1996) (noting that "precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently.").

[11] The fact that NMFS saw no need that these restrictions be more promptly implemented suggests that, as a practical matter, NMFS realized that its recommendations were not of critical importance to salmonid survival.

[12] For instance, the Director of the Washington State Department of Agriculture recently testified to Congress that in the Skagit Delta in Western Washington, the 500-foot buffer would affect an estimated 48% of agricultural lands and the 1,000-foot buffer would affect an estimated 75% of agricultural lands.  *Joint Full Committee Oversight Hearing on "At Risk: American Jobs, Agriculture, Health and Species – The Costs of Federal Regulatory Dysfunction" Before the H. Comm. on Natural Res. and the H. Comm. on Agric.*, 112th Cong. (2011) (statement of Dan Newhouse, Director, Washington State Department of Agriculture) available at http://naturalresources.house.gov/UploadedFiles/NewhouseTestimony05.03.11.pdf.

**STANDARD OF REVIEW**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In a record review case under the APA, resolution does not require any fact finding by the court. "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).

BiOps issued by NMFS are subject to review under, and thus subject to the requirements of, the APA. *Bennett*, 520 U.S. at 175; *Dow AgroSciences,* 637 F.3d at 267; *Sierra Club v. U.S. Army Corp. of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (holding "challenges brought under [the ESA] are reviewed by the arbitrary and capricious standard, as defined in the [APA]"). The APA requires that the agency action not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001). Under this standard, an agency decision is to be set aside if "the agency . . . entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency. . . ." *Sierra Club v. EPA*, 162 F. Supp. 2d 406, 411 (D. Md. 2001) (internal quotation marks and citations omitted).

Most fundamentally, "the agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle*, 463 U.S. at 43 (internal quotation marks omitted); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir.

2010).  Failure to do so renders a BiOp arbitrary and capricious under the APA.  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1090-91, 1095 (9th Cir. 2005).  A court "cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals."  *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (citing *Motor Vehicle,* 463 U.S. at 57); *see also*, *e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) ("[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action.").

In the ESA context, determination of whether a decision by NMFS is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" also requires recognition of the ESA's mandate that BiOps be based on the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  The Supreme Court has instructed that this requirement is intended "to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."  *Bennett*, 520 U.S. at 176.[13]  NMFS simply "cannot ignore available biological information," *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), or avoid analyzing relevant data.  *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1149-50 (W.D. Wash. 2000).  Failure by NMFS to utilize the best available science, and make findings demonstrating that it has done so, is squarely a violation of the APA.  *See, e.g., Pac. Coast Fed'n of Fishermen's Ass'ns. v. Gutierrez*, 606 F. Supp. 2d 1122, 1144 (E.D. Cal. 2008); *Delta Smelt Consol. Cases v. Salazar*, 760 F. Supp. 2d 855, 870-71 (E.D. Cal. 2010).[14]

---

[13] Another objective of the best available science requirement under the ESA "(if not the primary one) is to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." *Bennett*, 520 U.S. at 176.

[14] Plaintiffs anticipate that NMFS will urge this Court to defer to its purported expertise.  This Court must be skeptical of such advice, however, because "the responsible agency has apparently ignored the conflicting views of other agencies having pertinent experience." *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983) (internal citations omitted); *cf. Am. Tunaboat Ass'n v. Baldridge*, 738 F.2d 1013, 1016-17 (9th Cir. 1984).

**ARGUMENT**

I.   **NMFS' ANALYSIS AND CONCLUSIONS DO NOT MEET MINIMUM LEGAL REQUIREMENTS.**

Three factual conclusions drive NMFS' finding that use of the insecticides at issue in this case jeopardize endangered species and their habitat.  As noted directly above, if any one of these is not supported by the record and based on the best commercial and scientific data available, the BiOp violates the APA and is unlawful.  And, to be adequate, that record must persuasively explain why NMFS rejected evidence inconsistent with its conclusions.  The BiOp here at issue fails each of these tests.

The first step in NMFS' characterization of the risks to salmonids and their critical habitat was its identification of important physical characteristics that could be affected by the insecticides at issue – what NMFS termed "assessment endpoints."  These included such things as survival, swimming ability, reproduction capacity, growth and smell ("olfactory-mediated behaviors").  The second was to compare those assessment endpoints to information on the amount of pesticide present at each stage of salmonids' development and in parts of habitat that control where salmonid prey (*i.e.*, the insects that salmonids eat to survive) occur.  AR 898-899.  NMFS summarized the assessment endpoints and effect concentrations for each pesticide in Table 59 of the BiOp.  AR 1155.  Third, if NMFS found that insecticide concentrations in the water exceeded the level at which an assessment endpoint was affected, it evaluated whether that risk to individual salmon was sufficient to warrant concerns about the continued survival of the population as a whole or, in the case of habitat, to adversely affect it. AR 1157-1161, 1169-1176.  In this context, NMFS ran a series of models to determine population

viability of each ESU. AR 1176-1191.[15]

In short, NMFS' methodology resulted in conclusions that low concentrations of chlorpyrifos, diazinon and malathion are harmful to salmon and the insects they eat; that use of the three insecticides would cause concentrations above those levels in some waters throughout all four states; that salmon, in some stage of their growth and development, actually would be in the affected waters at the time the excessive concentrations existed; and that the negative impacts would threaten survival of the species as a whole (or cause unacceptable damage to the species habitats). NMFS thus concluded that the survival of 27 out of 28 ESUs would be jeopardized. AR 1249-1250. However, as explained below, none of these conclusions meets the threshold tests for APA and ESA compliance.

**A. NMFS Set Concentration Levels That Are Much Too Low.**

A key step in NMFS reaching its "jeopardy" and "adverse modification" conclusions was the determination of the concentrations for each of the three pesticides at which the "assessment endpoints" NMFS had established would be adversely affected. AR 1155-1161. NMFS reached conclusions about the acceptable concentrations in its draft BiOp, and left these largely unchanged in the final BiOp. In doing so, however, NMFS ignored several relevant and determinative studies identified or submitted by DAS, MANA and Cheminova after release of the draft. NMFS thus violated both the ESA's "best available data" requirement and acted arbitrarily and capriciously in violation of the APA. In addition, NMFS never explained why it ignored the studies, or even documented that it had evaluated them. *See supra* at 11-12. Those failures also violated the APA.

[15] NMFS did not run similar models to determine any impact on critical habitat, but instead relied heavily on the assumption that use would impact prey species abundance. AR 1192-1194, 1246-1247.

For instance, NMFS chose a value of 2.8 µg/L (µg/L stands for micrograms per liter, sometimes written ug/L) as the lower end of the assessment endpoint for lethal ("acute") toxicity to salmon from exposure to malathion.[16]  AR 1134, 1155.  This value came from a study by Smith and Grigoropoulus (1968) that is now more than 40 years old.  AR 1742.  Moreover, as Cheminova explained in its comments and in meetings with NMFS, this study tested material that is not representative of products now on the market.  The formulation evaluated in the Smith and Grigoropoulus study was only 57% malathion and produced using methods that since have been refined:  the remaining 43% of its constituents were never identified.  AR 1742.  This is important because "[m]alathion toxicity to vertebrates is highly influenced by the impurity pattern of the material" and contemporary formulations of malathion have far fewer impurities and different ratios of active ingredient to other constituents. AR 1742-1743.

Cheminova did not simply identify this defect to NMFS:  it also identified four studies that evaluated current formulations and demonstrated the inapplicability of the Smith and Grigoropoulus findings.  Two studies by Gries and Purghart (2001a) and (2001b) were discussed at length in Cheminova's comments.  The studies used modern methods and up-to-date formulations, and their results contrasted sharply with the old study on which NMFS relied.  Rather than finding the lowest concentration of malathion of concern to rainbow trout (a salmon species) to be 2.8 µg/L, these studies found the levels to be 91 µg/L [17] for pure technical malathion and 740 µg/L for formulated product.[18]

---

[16] The term "LC50," which is often used when referring to toxicity levels, is the "statistically-derived concentration sufficient to kill 50% of the test population."  AR 1125.

[17] The study reported the level as 91 ppb, but that is the same as 91 µg/L.

[18] A "technical" product is one that is used only for purposes of manufacturing or formulating other pesticide products.  It generally contains a nearly pure concentration of the "active ingredient," which in this case would be chlorpyrifos, diazinon or malathion.  End-use products are those that are formulated using either the technical product, or a "manufacturing use"

The latter is essentially 250 times higher than the level of concern employed by NMFS.  AR 1743-1744.
As Cheminova's experts explained to NMFS, this was clearly consistent with improvements in product
synthesis and formulation that had been made in the four decades since completion of the Smith and
Grigoropoulus study upon which NMFS relied.  AR 1744.

A third study that Cheminova identified for NMFS, Cohle (1989), evaluated the toxicity of
malathion to rainbow trout early in the fishes' lives.  AR 1743-1744.  Cheminova and the independent
experts it had retained explained that this "early life-stage toxicity study" was particularly significant for
two reasons.  First, it showed that the chronic (as distinguished from the lethal or acute) toxicity level,
referred to as the No Observed Effect Concentration ("NOEC"), was as high as 21 ppb.  AR 1744.
Because the NOEC is always considerably lower than the acute toxicity level (*i.e.* LC50), this study
further demonstrated that the historically-derived 2.8 µg/L acute toxicity level employed by NMFS was
wrong.  *Id.*  Second, the Cohle study responded to a concern by NMFS in the draft BiOp that it could not
comment on the life-stage sensitivity of salmonids because it had not been provided with the necessary
information.  AR 1134.  The Cohle study was an early life stage toxicity study, and therefore addressed
the data gap identified by NMFS in the draft BiOp.  AR 1744.

The fourth study, Kuhajda *et al*. (1996), was a three-year field study led by a University of
Alabama professor.  AR 1559-1688.  It was not only identified by Cheminova:  Cheminova actually
provided NMFS with a copy of the study, in response to NMFS' request.  AR 802, 804.  The study was
conducted during an attempt by the United States Department of Agriculture ("USDA") to eradicate boll
weevil infestation in cotton growing areas in the U.S.  AR 1560.  According to the authors, this

product that is of high concentrations.  Typically, for example, a technical-grade product may contain 98% to 99% of the
active ingredient, while an end-use formulation may contain only a few percent of the active.  The fact that the technical-
grade malathion in the Smith and Grigoropoulus study was as low as 57% malathion further illustrates the problem with
NMFS' reliance on this study.

represented an absolutely "worst-case" scenario, because USDA had applied malathion adjacent to a small stream thirteen times alone in the first two years of the study, which is over twice the rate that would otherwise be legally allowed.  AR 1560, 1571, 1746, 1788.

The Kuhajda study demonstrated that repeated applications of malathion over two years had absolutely no significant effects on the overall fish population or aquatic invertebrate communities. AR 1560, 1583, 1747.  Moreover, this study was noteworthy because it found no affect on many of the same invertebrate species that NMFS identified in the BiOp as salmon prey items that are being directly harmed by malathion use (AR 1135, 1565, 1576-1578), which in turn was the basis for NMFS' finding of adverse modification of habitat.  AR 1192-1193.

However, despite the fact that Cheminova also brought a highly-qualified expert to meetings with the Service to explain these studies and their findings (AR 711, 798, 3475, 1515-1558), there is nothing in the BiOp, or anywhere else in the record, that explains why NMFS chose not to rely on them. NMFS' failure to use the best scientific and commercial data available here was in violation of the ESA. *Conner*, 848 F.2d at 1454.  Moreover, NMFS' failure to explain why it did not rely on these studies is arbitrary and capricious.  *Motor Vehicle*, 463 U.S. at 43 ("[an] agency must . . . articulate a satisfactory explanation for its action . . . .").

The same is true as to diazinon.  NMFS stated in the BiOp that very low concentrations of diazinon are acutely toxic to invertebrates that salmon prey upon.  AR 1134, 1155.  In support of this assertion, NMFS used an extremely low value of 0.03 μg/L as its low-end assessment endpoint for prey survival – a figure two orders of magnitude lower than that used by EPA in the biological assessment of diazinon risks to salmon the Agency had provided to NMFS.  AR 1155.  EPA had made passing reference to this value in its biological assessment (AR 4894-5018), but specifically rejected using it

because it appeared to be an aberration, and EPA had "not look[ed] at the original papers."  AR 4912.

There is no indication in the record that NMFS, for its part, bothered to look at the original study that

produced the 0.03 value.  NMFS nonetheless relies on it.  Doing so, however, without further

investigation and evaluation was clearly arbitrary and capricious.[19]

NMFS also cited a value of 0.2 µg/L as a next possible low-end value for diazinon prey toxicity.

AR 1133.  But a study by Hall and Anderson (2005), which MANA provided to NMFS, shows that the

0.2 µg/L value is wrong by a factor of 10.  AR 2261-2267.  MANA even brought Lenwood Hall, the

author of that study, to meet with NMFS.  He explained the error on which NMFS' 0.2 data point was

based:  a math error had been made in the study on which NMFS relied for it, which Hall had

discovered.  AR 2262.  Nonetheless, NMFS continued to rely on the old, erroneous data point in the

final BiOp.  This too clearly violated APA standards.

As with malathion and diazinon, the toxicity values set in the draft BiOp for chlorpyrifos were

also challenged.  In its comments on the draft, CDPR could not fathom how NMFS had come up with

such a wide ranging spectrum of lethal toxicity for chlorpyrifos – from 0.8 ppb all the way to 2,200 ppb

(which is 2,750 times greater than 0.8).  CDPR bluntly admonished NMFS for failing to use the best

available data:

---

[19] In its assessment, EPA also noted that while one species of prey might be effected at low concentrations, it does not mean that more resistant prey species would not survive and serve as a salmonid food source.  As EPA explained:

> Because there is a plethora of aquatic invertebrate toxicity data for diazinon, there could be an argument that the less sensitive species would still be a food source at higher concentrations.  For example, the typically used Daphnia magna has a low LC50 of 0.8 ppb which would result in a concern level of 0.4 ppb in the water, and many invertebrate species commonly used as food by fish would still be expected to be available at considerably higher diazinon concentrations in water.  AR 4923.

Plaintiffs made the same point regarding NMFS' focus on a single species of invertebrate.  AR 3467 ("Salmonids feed on a variety of aquatic invertebrate[s] and the LC50s of these species vary in sensitivity by nearly five orders of magnitude.").  Nevertheless, even though EPA further concluded that "[t]here is merit in considering that many invertebrate species could still be available at higher concentrations," (AR 4924) NMFS never considered the significance of this fact, nor did it explain why it did not.

> More recent studies found effects at 3.2 and 4.8 ppb to fathead minnows (reduced growth).  An area of concern is the effects to invertebrates on which juvenile salmonids might feed.  The Biological Opinion reports LC50 values for chloropyrifos in the 0.005 - 0.8 ppb range to various invertebrates.  Other effects levels mentioned in the report were much higher (some over 10 ppb).  The above examples illustrate a major shortcoming of this Biological Opinion:  it must be based on the best available data and it isn't.  If the LC50 of chlorpyrifos to the salmonids was 2200 ppb, chlorpyrifos would be considered "moderately toxic" according to U.S. EPA guidelines and likely of little interest with regard to salmonid population health, while at 0.8 ppb, it is extremely toxic.  The Jarvinen study [which NMFS relies on in the BiOp at AR 1128] was conducted more than 25 years ago on a different species.  Study standards and protocols have changed significantly since that time.

AR 3509 (emphasis in original).

CDPR did not just criticize NMFS' reliance on incorrect data, however; it also provided NMFS with the correct information.  AR 3509.  But NMFS ignored this information, and provided no explanation why.  Again, NMFS violated the ESA and APA for failing to use the best science available and failing to explain why it did not.  *Pac. Coast,* 606 F. Supp. 2d at 1144.

Salmonids allegedly rely on their sense of smell (olfaction) to avoid being eaten by predators, so another important issue in evaluating the impact of the pesticides at issue here on species survival is whether exposure to them in water disrupts that sense.  In its draft, NMFS placed great weight on studies by Scholz *et al*. (2000), Moore and Waring (1996) and Sandahl, *et al*. (2004) that purport to show such an effect at very low concentrations.  AR 1133, 1143-1144, 1173.  In fact, however, information provided to NMFS by EPA, MANA and DAS demonstrated that these studies were unreliable.

For its part, EPA provided NMFS with information undercutting reliance on the Moore and Waring study.[20]  NMFS even admitted in the final BiOp that the Moore and Waring study was dismissed

---

[20] EPA stated that "the nature of their test system, direct exposure of olfactory rosettes, could not be quantitatively related to exposures in the natural environment."  AR 4903.  This is a polite, academic way of saying that the relationship purportedly

by EPA as unreliable, because it did not measure real-world effects.  AR 1133.  Nevertheless, NMFS

relied upon it, ignoring EPA's expert judgment, without providing any explanation as to why.  This is

again a failure by NMFS to articulate a reason for its actions and violates the APA.  *Pac. Coast*, 426

F.3d at 1091.

MANA agreed with EPA about the Moore and Waring study (AR 1466), and also provided

NMFS with a newer study by Palm and Powell (along with the raw data used in the analysis) that

undercut the Scholz study.  AR 1474-1483, 3008-3046, 3065-3086.[21]  Palm and Powell tried to replicate

the tentative findings of Sholtz through the use of a much more rigorous testing regime, but could not.

To the contrary, Palm and Powell definitively showed that predator avoidance is not impacted by

diazinon at low concentrations.  AR 3030, 1482.[22]  NMFS nonetheless ignored this study, contrary to

APA requirements.  *Cf. Conner,* 848 F.2d at 1454; *Greenpeace*, 80 F. Supp. 2d at 1150 (NMFS cannot

ignore "information that was available").

DAS provided NMFS with a critique of the remaining study on which NMFS relied in the draft

BiOp to support the conclusion that chlorpyrifos also has an impact on a salmon's ability to smell,

Sandahl, *et al*. (2004).  AR 1501.  DAS explained the fundamental flaw with this study:  it assumes that

salmon are exposed to chlorpyrifos for seven days at concentrations of at least 0.625 µg/L.  AR 1501.

---

shown in the data was suspect.

[21] At the time MANA gave that Palm and Powell study and explained its findings to NMFS, the study was pending publication in a peer reviewed journal.  It since has been published.  *See* Palm R, Powell D.  2009.  Alarm Substance Recognition and Predator Avoidance by Chinook Salmon (Oncorhynchus Tschawytscha) Following Exposure to an Organophosphate Pesticide.  Environmental Toxicology and Chemistry 29:1113-1122.

[22] Palm and Powell concluded counter to Scholz that their results "strongly suggest that exposure to environmentally relevant levels of diazinon for up to two hours does not significantly impair olfaction in salmonids."  AR 3027, 1480.  This study also provided the missing link about which EPA was concerned in its comments on Moore and Waring by showing no actual measurable effects on salmonids due to alleged olfaction impairment from diazinon.

But no monitoring or modeling data demonstrates this, and NMFS provided no evidence in the BiOp or

otherwise that salmon are exposed at such concentrations for any extended period of time, much less

seven continuous days.  Why NMFS nonetheless chose to rely on this assumption is unexplained in the

final BiOp, and this Court is unlawfully "compelled to guess."  *Chenery*, 332 U.S. at 196-97; *see, e.g.,*

*Delta Smelt*, 760 F. Supp. 2d at 894 (holding failure by the Services to explain its analysis in a BiOp is

"an abdication of the duty to satisfy the basic APA requirement that the agency articulate[] a rational

connection between the facts found and the choice made.") (internal quotation marks and citations

omitted).

> **B.** **The Expected "Exposure Concentrations" NMFS Relies Upon Are Unsupported And Wrong.**

NMFS' exposure and risk analyses and, as a result, its jeopardy conclusions arise from

conclusions about the levels of pesticides that are actually present in water in which salmonids are

found.  AR 1082-1110.  For example, NMFS initially compared "expected concentrations" to the levels

it had concluded could adversely impact salmonids (the "assessment endpoint" values discussed above)

to support its conclusion that the endpoints were being exceeded.  AR 1157-1161, 1169-1176.  It again

relied on the "expected concentrations" to justify the results of its projection of how exposures would

affect populations of salmonids at various stages of their growth and life cycle (the so-called "population

model").  AR 1178 ("When we compare the concentrations listed below to expected levels in salmonid

habitats described in the exposure section, it is highly likely that some portions of, or all of the

individuals within a population will be exposed at sometime in their juvenile lifestage.").  It did the

same in evaluating risk to critical habitat from exposure to chlorpyrifos, diazinon and malathion.

AR 1192-1194.

But there were fundamental flaws in NMFS' exposure analyses.  NMFS based them upon outdated, inaccurate water monitoring data, and upon highly criticized and inappropriate modeling methods.  We address both issues below, turning first to NMFS' reliance on outdated monitoring data.

As explained above (*see supra* at 7), drastic use cancellations and mitigation measures imposed by EPA in reregistration have substantially and significantly reduced the use and environmental impacts of all three pesticides now at issue.  Nonetheless, NMFS relied in the BiOp on the old data.

For example, NMFS stated as fact in the final BiOp that water-monitoring data show that, as a result of registration and use of diazinon products, salmon and their prey are exposed to concentrations of diazinon as high as 67.24, 36.8, 29.371, 3.80, 2.90, 2.89, and 1.5 µg/L in surface waters.  AR 1100-1105.  But this is not true.  All of these levels were measured years before the use cancellations and usage-rate reductions required by EPA's reregistration process.  AR 1100 (BiOp tables 45 and 46), 1101 (BiOp tables 47 and 48), 1103 (BiOp table 50), 1105 (BiOp table 51).  Indeed, EPA and MANA pointed out that the highest two values, 67.24 and 36.8 µg/L, came from studies that analyzed samples from more than a decade earlier.  AR 1452,[23] 4919.  The more recent monitoring data come nowhere near these high values and, in fact, are orders of magnitude lower.  AR 1443-1452.

These were not NMFS' only data errors, however.  As EPA explained in its comments on the draft BiOp:

> [M]uch of the historical water quality monitoring data relied upon is outdated and inappropriate in the context of the use of these pesticides.  These historical data more appropriately reflect pesticide use prior to substantive mitigation that has been put in place by EPA.

AR 1835.

---

[23] MANA raised additional concerns about NMFS' use of 67.24 µg/L besides the fact that it was more than a decade old.  MANA pointed out, for instance, that the sample analyzed came from a drainage ditch that was not a habitat for salmon, and that the analytical method used also was questionable.  AR 1452.  NMFS never addressed any of these issues.

California made the same point.

> *Another critical point to note is that <u>the Biological Opinion is based on</u>* <u>*data and pesticide labels that date from before 2002*</u>*.  Chlorpyrifos and diazinon labels have changed significantly since that time.  Changes include fewer use sites, lower application rates, and buffer zones, among others.*

AR 3508-3509 (emphasis in original).

So did the Idaho Department of Agriculture.  It even guided NMFS to the correct data.  The Department told NMFS that it had "conducted surface water pesticide sampling in tributaries to the Clearwater River in 2004 and 2006 and did not detect diazinon, chlorpyrifos, and malathion."  AR 3620.

DAS, MANA and Cheminova also vigorously objected to the use of the older data by NMFS.  AR 1491, AR 1444 ("Older diazinon monitoring data report higher concentrations than more current data and should not be used to assess ecological risk to salmonids.").

In response to this cascade of complaints, NMFS finally acknowledged in the final BiOp that several use cancellations and mitigation measures had occurred (AR 882, 884, 887, 1082), and that "[r]ecent data show a decrease in use of chlorpyrifos and diazinon in California that may be associated with restrictions on residential uses of those active ingredients."  AR 1109-1110.[24]  Nonetheless, without explanation, NMFS never made mention of Idaho's data and inexplicably continued to rely on peak values from the out-of-date water monitoring data to assess risk to salmon.  AR 1115-1119.

NMFS thus breached its duty under the ESA to use the best data available, and took action that was both arbitrary and capricious and not in accordance with the law.  *Delta Smelt*, 760 F. Supp. 2d at 870-71.  NMFS also was required to have "articulated a rational connection between the facts found and

---

[24] As noted above, NMFS was not even aware of the substantial changes in permissible uses when it prepared the draft BiOp. Although the final version more accurately recounted EPA's regulatory actions, the analytical portions of the final BiOp were little changed from the draft.

the choices made" in its analysis, *Pac. Coast,* 426 F.3d at 1090, but did not.  This failure also is

unlawfully arbitrary and capricious.[25]  *Wild Fish Conservancy,* 628 F.3d at 533.

     As noted above, NMFS also relied on modeling predictions that were incorrect.  The incorrect

output resulted both from use of inapplicable data, as just explained, and flaws in the model itself.

     NMFS' modeling was intended to portray pesticide levels in shallow water environments (which

NMFS commonly refers to as shallow off-channel habitats).  NMFS made its predictions on the basis of

its application of a computer model, known as "AgDrift."  AR 1099 (BiOp table 44).  As NMFS

explained, simulations using the AgDrift model "indicate that applications of several [pounds] active

ingredient per acre adjacent to some off-channel habitats could result in aquatic concentrations

exceeding [1,000 µg/L]."[26]  NMFS confirmed this later when it warned that its model runs "generated

additional exposure estimates for shallow off-channel habitats with predicted concentrations exceeding

1,000 ug/L for all three compounds."  AR 1117-1118.

     Plaintiffs vigorously complained about using the AgDrift model, pointing out several of its flaws

when used for the purposes NMFS employed it.  For example, inconsistent with real-world conditions,

---

[25] Another problem with NMFS' exposure analysis was that not only did it use the out-of-date monitoring data to allege that there is real world risk to salmon by each pesticide when considered individually, it also used it to allege that the risk to salmon was even greater when the maximum concentrations for each compound were added together.  AR 1173-1174, 1190-1191, 1837.  NMFS refers to this effect as "synergistic toxicity."  AR 1190.  To reach this conclusion, NMFS assumed that "co-occurrences" of maximum exposure concentrations taken from the older data actually occurs in the environment.  NMFS' reasoning was that it "found no restrictions that would prevent co-application or sequential applications of chlorpyrifos, malathion, or diazinon."  AR 1168.  EPA, however, was highly critical of this assumption that was carried over into the final BiOp from the draft.  AR 1837.  It stated for instance that it "would expect that these occurrences would be quite rare, but no consideration is given to the actual frequency of such an event."  *Id.*  EPA concluded that "there appears to be no basis to conclude that such effects are 'reasonably likely to occur' as a consequence of the Actions being assessed."  *Id.*  Again, NMFS' failure to provide a rational explanation for its assumption here is arbitrary and capricious.

[26] NMFS actually uses "1 mg/L" here, but this is the same as 1,000 µg/L.  Further, the values generated from the AgDrift model on Table 44 of the BiOp should not be confused with values for direct overspray as predicted by NMFS in Table 43.  AR 1096.  NMFS does not appear to rely on these values in assessing maximum concentration, nor could it.  Direct overspray, as NMFS admits, is not allowed for diazinon and chlorpyrifos.  AR 1095.  And while direct overspray is allowed in standing water for malathion, this is not salmonid habitat.  *Id.*

the model assumes "a consistent high wind speed, with spray deposition measured directly downwind in an area close to the treated field/orchard."  AR 3468.  Plaintiffs explained, however, that this is not consistent with conditions "[i]n real landscapes, [where] the norm is to have variable wind speed and direction, distributions of proximity distances relative to treatment site and location of surface water bodies."  AR 3468-3469; *see also* AR 1740-1741.

NMFS conceded this flaw, noting that "field validation studies and other research show drift is highly variable and influenced by site-specific conditions and application equipment."  AR 1096.

NMFS further explained itself why the model was unreliable:

> Several factors must be weighed when using these model estimates to describe the relative risk to salmonid habitats.  First, these estimates are generated for a level field with wind blowing directly toward aquatic habitats and with no interception of pesticide drift by riparian or other vegetation.  Many agricultural fields are not flat and wind may change directions quickly or may not be blowing directly into salmonid habitats.  Second, many aquatic habitats are flowing and are much larger than the off-channel habitat modeled in Table 66.

AR 1254.

Nonetheless, NMFS stuck by its output from the AgDrift model, and completely failed to explain how it was trustworthy in light its own concerns about the model.  This is plainly arbitrary and capricious.  *Wild Fish Conservancy*, 628 F.3d at 526 (finding that the Service was arbitrary and capricious because it "failed adequately to explain how [its] conclusion [could] be squared with its ultimate determination.").

Moreover, NMFS misused the model.  The AgDrift model only generated values over 1,000 µg/L when NMFS put into it values that assumed misuse of the pesticides at issue.  However, misuse is unlawful and not the action being evaluated.

For example, NMFS stated that "[s]imulations of airblast sprays of chlorpyrifos with a buffer of

50 ft at application rates of 1-2 lbs per/acre predict initial concentrations of 1-54 ug/L." It then stated that "the maximum application rate in citrus of 4-6 lbs/acre would produce a substantially higher exposure range." AR 1097. But that maximum rate has been cancelled in all but five California counties. AR 886. It thus would not apply at all in Oregon, Washington and Idaho. Moreover, as a result of the label changes imposed since reregistration, citrus's ground use requires a 25-foot buffer between crops and waterways. AR 4319. Nevertheless, even with a maximum application rate of 6 lbs, using NMFS' results from Table 44 in the BiOp, the highest achievable concentration is only 66 µg/L.[27] This is nowhere near the 1,000 µg/L (also referred to as 1 mg/L) NMFS alleges "could result." AR 1097. Similar errors are made in the final BiOp as to diazinon and malathion.[28] Unfortunately, these errors were critical to NMFS' conclusions because "[i]n order to ensure no likely jeopardy, [NMFS] consider[ed] the highest exposure any individuals of the population are likely to be exposed to." AR 1088. In the BiOp, NMFS used 1,000 µg/L as a "realistic exposure level" and benchmark for evaluating impacts on salmonids (AR 1118), but as shown, this is unjustified. As such, NMFS acted arbitrarily and capriciously.[29] *Delta Smelt*, 760 F. Supp. 2d at 907.

---

[27] How one gets 66 µg/L from Table 44 requires a quick explanation. The concentration values in the table are reported per pound applied. The very last row in Table 44 provides the values for ground application with a 25-foot buffer. Using the shallowest depth of water, 0.1 m, the concentration is estimated to be 11 µg/L. The maximum allowable rate for chlorpyrifos on citrus in the five California counties is 6 lbs, which multiplied by 11 µg/L equals only 66 µg/L.

[28] The same thing holds true for diazinon. NMFS admits that "[d]iazinon can be applied to most crops at rates of 1-4 lbs/acre by ground boom. Simulations with no buffer at those rates predict initial average concentration in the modeled habitat at 4-304 µg/L." AR 1097. Based on Table 44 (AR 1099) in the BiOp, there can only be a maximum potential exposure of 304 µg/L using NMFS AgDrift model for off-channel habitats. Thus, like chlorpyrifos, NMFS had to assume illegal use of diazinon to get to this number. Similarly for malathion, concentrations of 1,000 µg/L or greater are only possible for non-ULV uses on citrus, only in California, and at maximum label rates. AR 1098. While there has been one monitoring value reported for malathion at 1,000 µg/L (AR 1107, 1752) that value was the result of a Medfly eradication effort in 1981 – nearly 30 years before the final BiOp was released. AR 1532. It is also the only occurrence ever to be reported anywhere near that magnitude.

[29] To a more limited extent, NMFS also relied on a "farm pond" model (called "PRZM-EXAM") developed by EPA that predicted high exposure concentrations for listed salmon. AR 1087-1099. NMFS still considered output from this model

C.     **NMFS Failed To Demonstrate That Salmon Are Actually Exposed To Harmful Concentrations.**

The third fundamental error underlying NMFS' jeopardy conclusion was the Service's expectation that all listed Pacific salmonid ESUs will be found in waters where the pesticides are present at high concentration levels.  AR 1080.  The facts in the record that were before NMFS, but ignored in the BiOp, do not support this conclusion.

The shorthand term used by NMFS to describe the issue of where the salmon occur relative to the occurrence of pesticides in the water is the "temporal and spatial relationship" between the fish and the pesticides.  Initially, EPA doubted the jeopardy conclusion asserted in the draft BiOp because the BiOp completely failed to investigate or explain this relationship:

> There is no spatial or temporal analysis that relates the exposure evaluated to the species.  Further, consideration of the spatial and temporal aspects of pesticide use appear to have been discounted in the Draft, and instead, there are assumptions made that pesticide use is consistent throughout each watershed within the action area.  The Draft also seems to include the assumption that every water body in every watershed within the four States, is a salmon supporting water body and that use of all three pesticides around salmon supporting waters will be the same throughout the watershed and the same throughout all the watersheds.  EPA understands that substantial effort has been expended in Washington and Oregon to identify specific streams and rivers that support listed salmonids and these specific water bodies comprise a fraction of the stream network in those states.

AR 1837-1838.[30]

---

despite its obvious unsuitability (salmonids do not live in farm ponds), and its admission that EPA considered use of such data "worst-case" and even "unrealistic" for Pacific salmonids.  AR 1088.  Plaintiffs also informed NMFS of its concerns that the PRZM-EXAM model would result in unrealistically high estimates.  AR 1543-1544, 1460-1461.  In sharp contrast to EPA and Plaintiffs apprehensions, NMFS actually came to opposite conclusion, finding that the model would underestimate, instead of overestimate exposures.  AR 1089.  It supported this outcome by an incorrect statistical assessment of the conservatism of the outputs (AR 1737-1738), and by comparing PRZM-EXAM model results to the highest values obtained from the out-of-date water monitoring data.  *Id*.  But, as discussed above, any reliance by NMFS on such data is arbitrary and capricious, as is NMFS' position is all other respects.

[30] EPA was also concerned with NMFS' continued reliance on the importance of off-channel habitats:

Washington, Idaho and California authorities shared this concern:

> Further, since agricultural land use remains fairly constant there is
> adequate data to assess the spatial relationship of agriculture within
> Washington State to known salmon habitat identified by the Washington
> Department of Fish and Wildlife (WDFW).

AR 3631.

The percentage of land area where potential pesticide applications may occur in each Idaho

ESUs is very small.  With a combination of limited or no use of these three products and limited acres

for applications, we think that there is limited risk in the Idaho ESUs for these three pesticides.  The use

of the most current data for these Idaho ESUs is recommended to accurately assess the real world

potential exposure in Idaho ESUs.

AR 3619-3620.

> *In California, the monitoring by DPR and USGS has been done based on
> pesticide use.  DPR has the most comprehensive pesticide use reporting in
> the US.  All pesticide use in agriculture is reported by location,
> commodity, and date, in addition to many other reporting requirements.
> Several agencies use these data to pinpoint sampling site locations to
> ensure water monitoring will result in a worst case scenario with respect
> to water concentrations.  NMFS has ignored this selective, comprehensive
> sampling that has been ongoing in California nearly 20 years.  If there are
> 1,000 + samples from various waterways, it is not clear what perspective
> is missing.  NMFS then reports levels from runoff over sod, bare ground
> and other surfaces.  No salmonids are found in this habitat but the values
> are alarming.  However, when sampling in rivers and streams that may
> contain salmonids, the biological opinion chooses to minimize these
> results.  Actually, the opposite argument can be made.  The Biological*

---

There seems to be an assumption that these habitats are more vulnerable and likely to
have higher exposures than those indicated in EPA's assessments however, this
assumption is not supported by any data and supporting analyses.  In addition to missing
data regarding the spatial and temporal relevance of these habitats to individual species
and populations, also missing are any monitoring data to support the contention that the
exposure estimates provided for these habitats are reasonable.  [AR 1837.]

NMFS' failure to provide the support for this assumption requested by EPA in the final BiOp violates the APA.  *Chenery*,
332 U.S. at 197.

> *Opinion has not put pesticide concentrations into perspective with regard to fish habitat.*

AR 3508 (emphasis in original).

These same concerns also were raised by DAS, MANA and Cheminova.  AR 1441, 1504, 1729. In the final BiOp, however, NMFS stuck to its guns, deliberately and unlawfully turning its back on the best available scientific data, without providing any explanation or response to the numerous criticisms. This was a clear violation of the APA on two fronts.  *Conner*, 848 F.2d at 1454 ("We hold that the FWS violated the ESA by failing to use the best information available to prepare comprehensive biological opinions."); *Motor Vehicle*, 463 U.S. at 43 (holding that an agency is required to explain its actions).

This error is most clearly apparent in the context of application of the "population model."  *See supra* at 23-28.   A key assumption of this model is that at some point during the first year of their development, the *entire population* of salmonids will be exposed to potentially lethal concentrations of each of the pesticides at issue *for four continuous days*.  AR 1177, 1295 ("In the model an individual fish experiences a 4-day exposure once as a subyearling (during its first spring) and never again.  The pesticide exposure is assumed to occur annually.  All subyearlings within a given population are assumed to be exposed to the pesticide.").   But this is irrational.

EPA explained in its comments on the draft BiOP several aspects of this irrationality.  For one thing, the Agency noted, NMFS' use of a minimum four-day continuous exposure period of salmon to all three pesticides made no sense because "[i]t is more likely that the peak concentrations detected from monitoring decline over this period of time" rather than stay the same.  AR 1836.  EPA cautioned that "if there are data that support the assumption [that exposures remain constant over a four-day period], they should be provided in the [BiOp].  If there are no such data, that too should be made clear."  *Id*. Similarly, Cheminova's comments noted that "NMFS does not appear to have given any consideration

of appropriate values for different averaging periods.  Clearly, the instantaneous grab samples are not

representative of 4-day periods . . . .  More clarity is needed about what is being assumed."  AR 1751.

Nonetheless, the final BiOp failed to provide any supporting data or any explanation that would support

its assumption despite the criticisms it received.  NMFS' apparent refusal to provide the basis for the

four-day assumption in its model is arbitrary and capricious on its face.  *Pac. Coast*, 426 F.3d at 1090-95

(holding NMFS arbitrary and capricious for failing to articulate a basis for a key assumption).

EPA also warned NMFS about an error inherent in another assumption made by NMFS in its

population modeling:  that the entire population modeled would be exposed to high concentrations.

EPA stated that "[t]his seems unreasonable, particularly at the higher exposures, given the infrequency

of those concentrations in the monitoring data sets."  AR 1836.  Virtually all the other commenters made

the same point.  In the final BiOp, however, NMFS provided no response or support for its approach,

which again was completely arbitrary and capricious.

As noted above, the BiOp at issue was the first of a series relating to the effects of several dozen

pesticides on salmonids.  Any doubt that NMFS failed to address EPA's concerns in the final BiOp was

eliminated by EPA's comments on the second draft BiOp of that series, which was issued in March,

2009.[31]  In the context of that BiOp EPA stated:

> It appears that several generic issues we [EPA] raised relative to a
> previous NMFS opinion (July 31, 2008, draft biological opinion re:  three
> organophosphate pesticides) were not addressed in this Draft relative to
> the three carbamate pesticides: carbaryl, carbofuran and methomyl.  As a
> result, our comments reiterate some points made in response to the
> previous draft opinion. . . .

---

[31] A court may consider extra-record evidence "where evidence arising after the agency action shows whether the decision was correct or not . . . ."  *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989); *see, e.g., Human Soc'y of the United States v. Dep't of Commerce*, 432 F. Supp. 2d 4, 15 (D.D.C. 2006) (court considered extra-record evidence "hav[ing] a direct bearing on the correctness of the agency's decision.").

***

The population models employed by NMFS examine effects to salmonid populations resulting from a range of carbamate concentrations over a 4-day averaging period. *It is not clear on what NMFS is basing its assumption that these types of exposures are present for four days. It is more likely that the peak concentrations detected from monitoring decline over this period of time; however, if there are data that support the assumption, they should be provided in the draft biological opinion.* If there are no such data, that too should be made clear. Furthermore, the spatial and temporal relevance of these exposure values is not explained. This is significant because the NMFS model results indicate that at the lower exposures assessed, there is no population-level effect. This raises a question about the underlying assumptions in the population modeling. It appears to be assumed that a significant number of individuals are expected to be exposed to the concentrations evaluated. This seems unreasonable, particularly at the higher exposures, given the infrequency of those concentrations in the monitoring data sets.

Letter from Debra Edwards (EPA) to James H. Lecky, Director (NMFS) at 1, 4 (Apr. 10, 2009) available at http://www.epa.gov/espp/litstatus/effects/comments-2nd-draft.pdf (emphasis added).[32]

NMFS' history with the subsequent salmonid BiOps also sheds another light on the error here. In its latest salmon final BiOp (the "Fourth BiOp"), NMFS abandoned its population modeling in favor of an alternative temporal and spatial analysis of risk.[33] Here's how NMFS describes the new process:

The first step of our analysis identifies those physical, chemical, or biotic aspects of proposed actions that are likely to have individual, interactive, or cumulative direct and indirect effects on the environment (we use the term "potential stressors" for these aspects of an action). As part of this step, we identify the spatial extent of any potential stressors and recognize that the spatial extent of those stressors may change with time. The spatial extent of these stressors is the "action area" for a consultation.

The second step of our analyses identifies the listed resources (endangered and threatened species and designated critical habitat) that are likely to

---

[32] A copy of this letter is attached as Exhibit 1 to the Declaration of Nick Peterson ("Peterson Decl.).

[33] National Marine Fisheries Service, Endangered Species Act Section 7 Consultation, Biological Opinion, Environmental Protection Agency Registration of Pesticides 2,4-D, Triclopyr BEE, Diuron, Linuron, Captan, and Chlorothalonil (June 30, 2011) available at http://www.nmfs.noaa.gov/pr/pdfs/consultations/pesticide_opinion4.pdf.

> occur in the same space and at the same time as these potential stressors. If we conclude that such co-occurrence is likely, we then try to estimate the nature of co-occurrence (these represent our Exposure Analyses). In the exposure analysis, we try to identify the life stage and life history of the individuals that are likely to be exposed to an action's effects and the populations or subpopulations those individuals represent. Spatial analyses are used to overlay each species range with land types that pesticides are used on including agriculture, urban/residential, forested, and right of ways, to evaluate co-occurrence of pesticides and salmonids.

*Id*. at 67.

This change was applauded by EPA in its comments on the draft of the Fourth Biop:

> EPA believes that NMFS' enhanced use of spatial and temporal analysis focused on specific use patterns represents an important improvement in NMFS' methodology to determine whether specific ESUs/DPSs have the potential to be exposed to levels of concern for a given pesticide. EPA continues to believe that the spatial and temporal relevance of individual use patterns is vital to making spatially explicit risk decisions and limiting the impact of mitigation options on growers and other pesticide users, while still achieving protections for listed species.

Letter from Steven Bradbury, Ph.D., Director, Office of Pesticide Programs (EPA) to Lecky, Director, Office of Protected Resources (NMFS) at 2 (June 14, 2011) available at http://www.epa.gov/oppfead1/endanger/ litstatus/nmfs-draft-4-1comment.pdf.[34]   These facts make it absolutely clear why this Court should vacate the BiOp and direct NMFS to redo it using the methodology it has now acknowledged to be correct (and, of course, the correct data). *Id.*

## II.    NMFS' RPA RECOMMENDATIONS ALSO ARE UNSUPPORTED AND UNLAWFUL.

Plaintiffs believe that the analysis set forth above provides a sufficient basis for this Court to vacate the BiOp, and that analysis of its many other flaws is therefore unnecessary. Nonetheless, we address in this section why, even if NMFS' jeopardy conclusions were lawful, NMFS' inclusion of excessive no-use buffers around habitat as an element of its RPA is arbitrary and capricious.

---

[34] *See* Peterson Decl., Ex. 2.

NMFS' RPA included six elements.  Five, such as restrictions on applications when wind speeds were too high and a requirement that strips of non-crop vegetation be installed between fields and waterways (AR 1254), were not particularly disruptive or problematic.  For example, vegetative strips were required in California, prior to NMFS' review.  AR 1435-1436.  But inclusion in the BiOp of a ubiquitous prohibition on the use of the three products within 500 feet of waterways when making ground applications of pesticides, or 1,000 feet where aerial applications were employed, substantially threatens the value of these products to growers, and thus sales by Plaintiffs.  AR 1251-1254.  And, as explained below, NMFS unlawfully never even considered this fact.

Their impacts aside, however, NMFS' requirement for 500 and 1,000 foot "buffers" was not lawfully supported by the BiOp.  The requirements were based on assumptions plugged into the AgDrift Model that, as noted above, even NMFS admits were unrealistic.  *See supra* at 27.  The buffer requirement was set by modeling spray drift concentrations expected to occur in an off-channel habitat assumed to be only 10 meters wide and 0.1 meters deep (about 30 feet by 4 inches).  AR 1253.  But NMFS admitted that "many aquatic habitats are flowing and are much larger than the off-channel habitat modeled."  AR 1254.  This means that, even if all inputs into the modeling were accurate (which, as we have explained above, they were not), the predictions are not pertinent to the vast majority of salmon habitat, but only to small areas purportedly used by juvenile salmon.  AR 908.

In other words, even though the model input was a water body about 30 feet across and only 4 inches deep with low flow, the same buffers were required by NMFS on a main stream channel that might be 10 feet deep and flowing rapidly.  The facts thus do not square with the requirement to have buffers everywhere.  *See Wild Fish Conservancy*, 628 F.3d at 529 ("In sum, the Service was 'obligated to articulate a rational connection between the facts found and the conclusions made.'  It did not do so.")

(citation omitted).  Further, NMFS has not articulated a reason why this would be considered rational.

*See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1072 (9th Cir. 2004).

Second, NMFS defined waterways as to which the buffers would be required far too expansively.

For example, NMFS included such things as intermittent streams and drainage ditches as habitat to

which the buffers would apply.  AR 1251.  This definition was so broad such that a huge percentage of

the cropland on which the three pesticides at issue might be used would be off limits.  As noted above,

these are considerable:  the 500-foot buffer would affect an estimated 48% of agricultural lands, and the

1,000-foot buffer would affect an estimated 75% of agricultural lands in one part of Washington State.

*See supra* at note 12.  Similar impacts will be felt elsewhere.  NMFS' Northwest Regional Office, in

fact, described just how widespread the impact would be across the four States as a result of the listing

of salmon and steelhead.  As illustrated in the map below, it calculated that 61% of Washington's, 55%

of Oregon's, 26% of Idaho's, and 32% of California's land area would be affected.[35]



---

[35] *See* Land Area Affected by Endangered Species Act Listings of Salmon & Steelhead (Oct. 2010) available at
http://www.nwr.noaa.gov/Regional-Office/upload/ESA-land-area-10-10.pdf.

The economic impacts of these realities is exacerbated by two related facts.  First, if a farmer cannot use a particular insecticide on a portion of his land, but can use another, he is more likely to choose that alternative for use on all of his land.  Second, as noted above, this BiOp was the first to be prepared by NMFS under the *Washington Toxics* order.  As a result, NMFS' view of the potential effects on salmonids of the use of many insecticides that compete with chlorpyrifos, diazinon and malathion have yet to be stated.  Consequently, those products would not have the extensive buffers demanded here by NMFS, even if they ultimately proved, in NMFS' analysis, to be more problematic than the three at issue here.[36]

There is no evidence in the BiOp or the record that NMFS gave any consideration to the practical and economic implications of including buffers as an element of the RPA.  This was clear error.  The ESA and the Services' joint implementing regulations define RPAs, in part, as those alternative actions that are economically and technologically feasible.  *Bennett* 520 U.S. at 177 ("[E]conomic consequences are an explicit concern of the Act . . . ."); 50 C.F.R. § 402.02; 16 U.S.C. § 1536(b)(3)(A) (defining RPAs as those that "can be taken" by an "applicant in implementing the agency action").  Even if the Supreme Court had not directly spoken to this requirement, NMFS' failure to determine whether the buffer requirements were economically feasible alone would be fatal to the BiOp's lawfulness.  *IMS, P.C. v. Alvarez,* 129 F.3d 618, 621 (D.C. Cir. 1997) (noting that "it is a well-settled rule that an agency's failure to follow its own regulations is fatal" to that action) (internal quotations and citations omitted).

---

[36]  Although other products affected by the *Washington Toxics* order are subject to 60-foot (ground) and 300-foot (aerial) buffers until the Biological Opinions addressing them are complete, this use is far less disruptive than the 500-foot and 1,000-foot buffers included in the instant RPAs.

### III.   NMFS' FAILURE TO RESPOND TO MANY OTHER SUBSTANTIVE COMMENTS ON THE DRAFT BIOP WAS UNLAWFUL.

The several instances described above in which NMFS completely ignored and failed to address substantive comments and studies are simply a few examples from a much larger list.  Nothing in the BiOp, or even the larger record, reveals that NMFS responded to the nearly 130 studies and other information either identified by, or provided to, NMFS by EPA, the States and Plaintiffs.  *See* Table of Studies Identified by Registrants; Table of Studies Identified by CDPR.[37]

NMFS' wholesale disregard of so much pertinent information violates the fundamental requirement of reasoned administrative decision making, which requires that NMFS "demonstrate the rationality of its decision-making process [and] respond[] to those comments that are relevant and significant."  *Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998); *see also, e.g., Beno*, 30 F.3d at 1075 (reversing agency decision because the record "contain[ed] a rather stunning lack of evidence that the Secretary gave plaintiffs' objections [due] consideration.").

As in other regulatory determinations, where a federal administrative agency receives comments on a draft BiOp, it "must respond to comments which, if true, would require a change in an agency's proposed [action]."  *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1169 (D.C. Cir. 1996) (internal quotations and citations omitted).  NMFS may "neither research[] in a cursory manner nor sweep[] negative evidence under the rug."  *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005).[38]  NMFS' obligation to explain its decision is inherent in the ESA's requirement that agencies act

---

[37] *See* Peterson Decl., Ex. 3 & 4.

[38] *See also Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299 (D.C. Cir. 2001) ("Unless the [agency] answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned."); *North Carolina v. FAA*, 957 F.2d 1125, 1135 (4th Cir. 1992) ("[Agencies must] reasonably respond to those comments that raise significant problems.").

"in cooperation with" those parties that would be affected by a given BiOp.[39]  NMFS' failure to meet

this fundamental administrative law obligation is especially important in light of the strong criticisms it

received from EPA:  "Where sister agencies pose comments such as this, the responsible agency must

respond." *League of Wilderness Defenders v. Forsgren*, 309 F.3d 1181, 1192 (9th Cir. 2002) (*citing*

*Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973)).

If these fundamental principles were not enough to condemn this BiOp, NMFS' wholesale

failure to comply with its own regulations and guidance would be.  In addition to the errors noted above

regarding NMFS' failure to rely on several studies that represented the best available data (*see supra* at

15-34), and its failure to consider the economic implications of RPAs, the BiOp ignores NMFS'

established information quality policies.  In 1994, NMFS adopted a policy "to ensure that decisions

made by [it] under the [ESA] represent the best scientific and commercial data available." 59 Fed. Reg.

34271 (July 1, 1994).  That policy required that NMFS:  (1) "evaluate all scientific and other

information that will be used . . . to prepare biological opinions;" (2) "gather and impartially evaluate

biological, ecological, and other information that disputes official positions, decisions, and actions

proposed or taken by [NMFS];" and (3) "require biologists to document their evaluation of information

that supports or does not support a position being proposed as an official agency position on . . .

interagency consultation."  *Id*.  None of this was done here.

Changes in its approach that NMFS has made as it has proceeded with other salmonid BiOps are

instructive as to this issue.  When it issued the Fourth Salmon BiOp, for example, instead of turning its

back on the law and its own policy, NMFS attached a detailed response to comments as an appendix to

that document.  *See* Fourth Salmon BiOp, Appendix 1.

---

[39] 16 U.S.C. § 1536(a)(3).

In contrast, nothing in the BiOp or anywhere else in the record demonstrates that NMFS evaluated most of the comments it received, or the nearly 130 pertinent studies and other information provided to it before it issued the final version of the BiOp.  This failure, in and of itself, demonstrates that the BiOp and its conclusions and recommendations are arbitrary and capricious, and should be vacated.

## CONCLUSION

For the foregoing reasons, DAS, MANA and Cheminova's Motion for Summary Judgment should be granted, and the BiOp vacated and set aside.

Respectfully submitted,

_____/s/ *David B. Weinberg*_____
David B. Weinberg (Bar # 29485)
Eric Andreas (*pro hac vice*)
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000
(202) 719-7049 (fax)

Joseph R. Alberts, Esq.
Michael Grisham, Esq.
Dow AgroSciences, LLC
9330 Zionsville Road
Indianapolis, IN 46268

*Of Counsel for DOW AGROSCIENCES LLC*

*Attorneys for Plaintiffs DOW AGROSCIENCES LLC and MAKHTESHIM AGAN OF NORTH AMERICA, INC.*

Mark Hough, Esq.
Makhteshim Agan of North America, Inc.
4515 Falls of Neuse Road
Suite 300
Raleigh, NC 27609

*Of Counsel for MAKHTESHIM AGAN OF NORTH AMERICA, INC.*

_____/s/ *Warren U. Lehrenbaum*_____
Warren U. Lehrenbaum (Bar #28924)
David Menotti (*pro hac vice*)
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)

July 18, 2011

*Attorney for Plaintiff CHEMINOVA, INC. USA*