STEPHEN D. MASHUDA (Bar #96052)
AMANDA W. GOODIN (Bar #96051)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax
smashuda@earthjustice.org
agoodin@earthjustice.org

KHUSHI DESAI (MSBA #17444)
Earthjustice
1625 Massachusetts Avenue, N.W., Suite 702
Washington, D.C.  20036
(202) 667-4500 | Phone
(202) 667-2356 | Fax
kdesai@earthjustice.org

*Attorneys for Proposed Defendant-Intervenors Northwest
Center for Alternatives to Pesticides, Pacific Coast Federation
of Fishermen's Associations, Institute for Fisheries
Resources, and Defenders of Wildlife*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | |
|---|---|
| DOW AGROSCIENCES LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 8:09-cv-824-AW |
| ) | |
| NATIONAL MARINE FISHERIES SERVICE, et al., ) | |
| ) | |
| Defendants ) | MEMORANDUM IN SUPPORT |
| ) | OF PROPOSED DEFENDANT- |
| and ) | INTERVENORS' CROSS- |
| ) | MOTION FOR SUMMARY |
| ) | JUDGMENT AND IN |
| NORTHWEST CENTER FOR ALTERNATIVES TO ) | OPPOSITION TO PLAINTIFFS' |
| PESTICIDES, et al., ) | MOTION FOR SUMMARY |
| ) | JUDGMENT |
| Proposed Defendant-Intervenors. ) | |
| ) | |

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

STANDARD OF REVIEW .............................................................................................. 6

ARGUMENT .................................................................................................................... 7

I.      NMFS CAREFULLY AND TRANSPARENTLY CONSIDERED A VARIETY OF DATA AND CORRECTLY APPLIED THE ESA'S PRECAUTIONARY MANDATE ........................................................................................................... 7

      A.     NMFS Considered Multiple Factors to Determine the Lethal and Sublethal Effects of These Pesticides. ................................................................... 8

      B.     NMFS Properly Considered Whether Its Analysis Under-Predicted Risk and Transparently Addressed Uncertainty ......................................... 10

      C.     EPA's FIFRA Risk Assessment Process Does Not Provide Equivalent Protection for Endangered Species. ................................................. 14

II.     NMFS EMPLOYED THE BEST AVAILABLE SCIENCE AND RATIONALLY EXPLAINED ITS METHODOLOGY AND DECISIONS IN THE BIOP. ................... 17

      A.     NMFS's Concentration Levels Were Based on the Best Science and Are Appropriately Precautionary ............................................................. 18

      B.     NMFS Relied on the Best Available Pesticide Use and Water Monitoring Data in Its Exposure Modeling. ......................................................... 25

      C.     NMFS Rationally Determined That Salmonids and Their Prey Would Be Exposed to Harmful Pesticide Concentrations. ................................... 32

III.    THE RPA WAS APPROPRIATELY PRECAUTIONARY AND PROTECTIVE. ....... 35

IV.    NMFS CONSIDERED ALL COMMENTS AND STUDIES SUBMITTED. ............... 38

CONCLUSION ................................................................................................................ 41

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

C<small>ASES</small>

American Textile Manufacturers Inst. v. Donovan,
    452 U.S. 490 (1981)..................................................................................................37

Arizona Cattle Growers' Ass'n v. Salazar,
    606 F3d 1160 (9th Cir. 2010) ..................................................................................27

Bennett v. Spear,
    520 U.S. 154 (1997)..................................................................................................37

Cabinet Resource Group v. U.S. Fish and Wildlife Service,
    465 F. Supp. 2d 1067 (D. Mont. 2006)...............................................................27, 28

Conner v. Burford,
    848 F.2d 1441 (9th Cir. 1988) .................................................................................30

Defenders of Wildlife v. Babbitt,
    958 F. Supp. 670 (D.D.C. 1997)..............................................................................13

Dow AgroSciences LLC v. NMFS,
    637 F.3d 259 (4th Cir. 2011) .....................................................................................6

Esch v. Yeutter,
    876 F.2d 976 (D.C. Cir. 1989)..................................................................................34

Greenpeace v. NMFS,
    80 F. Supp. 2d 1137 (W.D. Wash. 2000)................................................................30

Home Builders Assoc. v. U.S. Fish and Wildlife Serv.,
    529 F. Supp. 2d 1110 (N.D. Cal. 2007) ..................................................................26

Lujan v. National Wildlife Fed'n,
    497 U.S. 871 (1990)....................................................................................................7

National Wildlife Fed'n v. NMFS,
    422 F.3d 782 (9th Cir. 2005) ...................................................................................37

National Wildlife Fed'n v. Babbitt,
    128 F. Supp. 2d 1274 (E.D. Cal. 2000)...................................................................28

NW Coalition for Alternatives to Pesticides v. NMFS,
   Civ. No. 07-01791 (W.D. Wash. Nov. 5, 2007) ................................................................5

Oceana, Inc. v. Locke,
   674 F. Supp. 2d 39 (D.D.C. 2009) ................................................................................34

Ohio Valley Environmental Coalition v. Aracoma Coal Co.,
   556 F.3d 177 (4th Cir. 2009) ..........................................................................................6

Oregon Natural Desert Ass'n v. Tidwell,
   716 F. Supp. 2d 982 (D. Or. 2010) ..........................................................................40, 41

Pacific Coast Fed'n of Fishermen's Ass'ns v. NMFS,
   265 F.3d 1028 (9th Cir. 2001) ........................................................................................7

Sierra Club v. Marsh,
   816 F.2d 1376 (9th Cir. 1987) ................................................................................. passim

South Yuba River Citizens League v. Nat'l Marine Fisheries Serv.,
   723 F. Supp. 2d 1247 (E.D. Cal. 2010).......................................................................40, 41

Southwest Center for Biological Diversity v. Babbitt,
   215 F.3d 58 (D.D.C. 2000) ........................................................................................27, 40

Trout Unlimited v. Lohn,
   559 F.3d 946 (9th Cir. 2009) ........................................................................................14

TVA v. Hill,
   437 U.S. 153 (1978)........................................................................................6, 19, 37

Washington Toxics Coalition v. Dep't of Interior,
   457 F. Supp. 2d 1158 (W.D. Wash. 2006).............................................................. passim

Washington Toxics Coalition v. EPA,
   CV-C01-0132C (W.D. Wash.).......................................................................................37

Washington Toxics Coalition v. EPA,
   No. C01-132, 2002 WL 34213031 (W.D. Wash. July 2, 2002),
   aff'd, 413 F.3d 1024 (9th Cir. 2005)........................................................................ passim

**STATUTES**

5 U.S.C. § 706(2)(A)........................................................................................................13

7 U.S.C. § 136(bb) ...........................................................................................................15

7 U.S.C. § 136a(5) ................................................................................................................................15

16 U.S.C. § 1536(a)(2)..................................................................................................................6, 15, 40

16 U.S.C. § 1536(h) ..............................................................................................................................38

## REGULATIONS

50 C.F.R. § 402.02 ............................................................................................................................8, 30

50 C.F.R. § 402.14 ................................................................................................................................15

50 C.F.R. § 402.14(g) ............................................................................................................................8

50 C.F.R. § 402.14(g)(5)........................................................................................................................7

INTRODUCTION

Pesticides are lethal by design, and the widespread presence of several of these toxic chemicals in streams throughout the Pacific Northwest and California is jeopardizing the continued existence of nearly every species of endangered and threatened Pacific coast salmon and steelhead.  After years of litigation to compel the federal government to follow the law and protect salmon and steelhead from this substantial threat, the National Marine Fisheries Service ("NMFS") published a comprehensive Biological Opinion evaluating the extent to which some of the most toxic pesticides harm these fish. The Biological Opinion was the final product of extensive study by NMFS scientists, and in it NMFS based its conclusions on an exhaustive evaluation of the relevant scientific literature, data from all available sources, and numerous technical models.  The available data led NMFS to the unassailable conclusions that the three pesticides at issue in this case are jeopardizing the continued existence of Pacific coast salmon and steelhead and that protective measures were necessary to mitigate this harm.

Proposed defendant-intervenors Northwest Center for Alternatives to Pesticides, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Defenders of Wildlife, (collectively "NCAP") move for summary judgment and oppose the motion for summary judgment filed by the pesticide manufacturers Dow Agrosciences, LLC, Cheminova, and Makhteshim Agan North America, Inc. ("the Registrants").  Unhappy with the need to mitigate use of their products to protect imperiled salmon and steelhead, the Registrants attempt to paint NMFS as uninformed and unresponsive – but the record reveals this could not be further from the truth.  Contrary to the Registrants' hypertechnical arguments and mischaracterizations, NMFS transparently evaluated the impacts of these three deadly pesticides on imperiled Pacific coast salmon and steelhead populations in the Biological Opinion ("BiOp"), based its analysis on the best available science, and complied with the

Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA") when it found that these chemicals jeopardize the continued existence of all but one species of these fish and destroy or adversely modify critical habitat designated to support their survival and recovery.

Plaintiffs' Memorandum in Support of Motion for Summary Judgment ("Br.") largely repeats assertions those parties made – and which NMFS fully considered and addressed – during the consultation process.  While the Registrants attempt to transmute their disagreement with particular aspects of NMFS's analysis in the Draft BiOp into a wider condemnation of the Final BiOp, their arguments ignore the comprehensive analysis of all of the effects and risks posed by these chemicals, and instead rely on cherry-picked statements from the record and mischaracterizations of NMFS's analysis in the Final BiOp.  The Court should reject the Registrants' attempt to inappropriately second-guess the Final BiOp based on its selective disagreement with NMFS's scientific conclusions.

## BACKGROUND

Salmon and steelhead are disappearing across the landscape of the Pacific coast.  Once nearly too numerous to count, salmon and steelhead today persist at an alarming fraction of their historic abundance.  These remarkable fish are born in freshwater streams from California to Alaska and as far inland as central Idaho.  After varying amounts of time in freshwater, they migrate downstream hundreds of miles to the ocean where they range for thousands of miles, feeding and growing for several years before fighting their way back upstream to the same waters where they were born to spawn and die.  Along the way, these fish (collectively known as "salmonids") are vital prey for other fish, bears, eagles, whales, and humans.

By taking advantage of both fresh and salt-water habitats, these anadromous species' diverse survival strategies have enabled them to thrive for millennia in the ever-changing ecosystems of a region

prone to earthquakes, drought, mudslides, wildfire, floods, and volcanic eruptions.  For many populations of these fish, however, the strength of this diversity has been stretched to its limit by human activities such as dam building, irrigation, urban development, logging, mining, overfishing, and poor agricultural practices, including pesticide application practices.  The declines in what were once the world's largest runs of salmon and steelhead have led NMFS to protect 28 different populations of these fish in the lower 48 states as either threatened or endangered under the ESA.  Many other runs are already extinct.

In addition to forming the foundation of an entire natural system, salmon and steelhead are vital to the economy of the Pacific coast.  Just twenty years ago, for instance, salmon harvesting (both sport and commercial) contributed more than $1.25 billion in personal income to the U.S. economy from Washington, Oregon, Idaho, and northern California – an annual economic boon that supported an estimated 62,750 family wage jobs.[1]  As many runs are threatened with extinction, much of this economic benefit is now threatened as well.  Successful salmon and steelhead recovery efforts thus are integral to economic recovery in many Tribal, coastal, and inland fishing-dependent communities.

NMFS's and EPA's obligation under the ESA to protect threatened and endangered salmonids from toxic pesticides has been the subject of extensive litigation.  It is well established that pesticides harm salmon and steelhead by directly killing individual fish; killing the insects and other organisms that the fish prey upon; impairing their ability to find and return to their natal streams; and impairing swimming, predator avoidance, growth, fitness, and reproduction – yet for years, pesticides were registered for use throughout the Pacific Northwest and California without regard for their effects on

---

[1] Data from <u>The Economic Imperative of Protecting Riverine Habitat in the Pacific Northwest</u>, Pacific Rivers Council, Research Report No. 5 (January 1992), based on federal and state landing statistics.

threatened or endangered salmonids.

In 2002, several environmental and commercial fishing groups (including some of the intervenors here) challenged EPA's failure to consult with NMFS regarding the effects of its pesticide registrations under the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA").  The court held that EPA violated its duty to consult under ESA section 7(a)(2) for at least 54 specifically identified pesticides.  Washington Toxics Coalition v. EPA, No. C01-132, 2002 WL 34213031 at *8-9 (W.D. Wash. July 2, 2002), aff'd, 413 F.3d 1024 (9th Cir. 2005) ("WTC I").  The court ordered EPA to initiate consultations with NMFS regarding the 54 pesticides.  Id. at *10.  During the pendency of the consultations, the court prohibited EPA from authorizing uses of the pesticides within prescribed distances of salmon-bearing streams.  See WTC I, 413 F.3d at 1031 (outlining terms of district court injunction).  The Ninth Circuit Court of Appeals affirmed all aspects of the district court's orders, including the injunction limiting the uses of the pesticides.  WTC I, 413 F.3d at 1029.

By 2004, EPA had made threshold effects determinations for all of the 54 pesticides at issue in WTC I and had initiated consultations with NMFS on 37 of those pesticides that it deemed "may affect" listed salmon species.  As of 2006, NMFS had not completed any of the required consultations for the 37 "may affect" pesticides, due to critical flaws in EPA's risk assessment methodologies.  Instead, EPA, NMFS, and the U.S Fish and Wildlife Service adopted "counterpart regulations" specifically for pesticide consultations that effectively eliminated the expert biologists from the Services from the consultation process and allowed EPA to make its own biological determinations of the effects of pesticides on fish and wildlife.  To ensure that the consultations were based on the best available science and not on EPA's flawed risk assessments, the environmental and commercial fishing groups challenged those counterpart regulations.  Washington Toxics Coalition v. Dep't of Interior, 457 F. Supp. 2d 1158,

1193 (W.D. Wash. 2006) ("WTC II").  The Court vacated the regulations after holding that the agencies promulgated them "knowing of the substantial flaws in EPA's methodologies and knowing that these flaws were highly likely (if not certain) to result in an overall under-protection of listed species as compared to the general consultation regulations."  Id.  Neither the agencies nor the pesticide manufacturers pursued an appeal of this ruling.

In 2007, over a year after the court's order in WTC II, NMFS still had not completed consultation for a single pesticide subject to the WTC I injunction.  Several of the environmental and fishing groups returned to court yet again to compel NMFS to complete the 37 consultations.  NW Coalition for Alternatives to Pesticides v. NMFS, Civ. No. 07-01791 (W.D. Wash. Nov. 5, 2007).  On July 30, 2008, NMFS and the plaintiffs in that action entered into a settlement agreement establishing a schedule for NMFS's completion of consultation on all 37 pesticides within approximately four years.

On November 18, 2008 – six years after the courts compelled consultation on the use of these pesticides – NMFS issued the BiOp challenged in this litigation.  The BiOp concludes that the use of three common organophosphate pesticides (chlorpyrifos, diazinon, and malathion) would jeopardize the continued existence of 27 species of Pacific salmon and steelhead and would destroy or adversely modify the critical habitat for 25 of those species.  These three chemicals were prioritized for consultation first because these broad-spectrum organophosphate pesticides are widely recognized to be among the most toxic to fish and aquatic life.  NMFS issued a "Reasonable and Prudent Alternative" ("RPA") that established no-spray buffers along salmon waterways and required several other protective measures to avoid jeopardy.  To date, the changes required by the RPA have not been implemented by EPA or the Registrants.

STANDARD OF REVIEW

Under ESA § 7(a)(2), "[e]ach federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. § 1536(a)(2) (emphasis added).  The obligation to "insure" that an action avoids jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action.  See Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir. 1987).  As the Supreme Court has emphasized, "examination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities."  TVA v. Hill, 437 U.S. 153, 174 (1978).  "The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."  Id. at 184.  The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies."  Id. at 185.

Biological opinions prepared pursuant to § 7 of the ESA are final agency actions reviewable pursuant to the APA.  Dow AgroSciences LLC v. NMFS, 637 F.3d 259, 268 (4th Cir. 2011) (citing Bennett v. Spear, 520 U.S. 154 (1997)).  "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid.  Especially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'"  Ohio Valley Environmental Coalition v. Aracoma Coal Co., 556 F.3d 177, 192 (4th Cir. 2009) (quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983).  "When presented with conflicting evidence, courts must generally defer to the agency evaluation."  Ohio Valley, 556 F.3d at 201 (citing Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378

(1989)).  A biological opinion must be upheld if NMFS correctly applied the law and '"considered the

relevant factors and articulated a rational connection between the facts found and the choice made.'"

Pacific Coast Fed'n of Fishermen's Ass'ns v. NMFS, 265 F.3d 1028, 1034 (9th Cir. 2001) (citations

omitted).[2]

ARGUMENT

I.      NMFS CAREFULLY AND TRANSPARENTLY CONSIDERED A VARIETY OF DATA
        AND CORRECTLY APPLIED THE ESA'S PRECAUTIONARY MANDATE.

As it developed the BiOp, NMFS analyzed extensive water monitoring data, both published and

unpublished literature on the effects of these specific pesticides on all stages of the salmonid life-cycle,

utilized sophisticated models developed by NMFS scientists, EPA, and pesticide manufacturers, and

considered comments overwhelmingly supporting NMFS's analysis, see, e.g., AR 770, 767 (16,000

comments supporting NMFS's analysis), and responded to extensive input from the Registrants, EPA,

and others; including multiple meetings with the Registrants and review and analysis of thousands of

pages of information submitted by the Registrants.[3]

---

[2] In order to invoke the Court's jurisdiction, Registrants must demonstrate that they have standing.
While the complaint contains rhetorical assertions of economic harm due to a potential drop in the
market for their pesticides, the Registrants have offered no evidence to substantiate any harms to their
interests from the BiOp.  It is well-settled that allegations in the complaint do not suffice once the case
has moved beyond the pleading stage.  Lujan v. National Wildlife Fed'n, 497 U.S. 871, 884-85 (1990).
In the absence of such proof, this Court lacks jurisdiction and must dismiss this case.

[3] In light of this, the Registrants have evidently abandoned their Fourth Claim for Relief, Complaint at
¶¶ 38, 73-75 (alleging that NMFS violated the ESA because it did not sufficiently involve them early in
the process), but pepper their brief with protests that NMFS failed to adequately consult with them
before issuing the draft biological opinion.  See, e.g., Plaintiffs' Memorandum in Support of Motion for
Summary Judgment ("Br.") at 7, 11 & n.9.  These atmospheric complaints are a distraction without legal
or factual basis.  First, the ESA regulations require NMFS to provide a draft of a biological opinion to
the action agency and the applicant and to discuss its evaluation and the availability of RPAs with those
entities.  50 C.F.R. § 402.14(g)(5).  As the extensive record of meetings and correspondence between
EPA, the Registrants, and NMFS documents, NMFS fulfilled both of these requirements.  See infra at
38-40.  Moreover, it is the responsibility of the acting agency (here, EPA) to identify the applicants to

A.    NMFS Considered Multiple Factors to Determine the Lethal and Sublethal Effects of
These Pesticides.

NMFS followed a carefully structured approach to assessing the effects of these three toxic

pesticides on listed salmonids in the BiOp.  A brief overview of NMFS's comprehensive approach

brings into relief the narrow, limited grounds on which the Registrants continue to criticize NMFS's

thorough analysis.

NMFS started its analysis with a description of the environmental baseline for each species of

affected salmonids in accordance with the ESA's implementing regulations.  50 C.F.R. §§ 402.02,

402.14(g).  NMFS determined that these fish have been – and continue to be – harmed by the impacts of

a variety of ongoing and past actions, including habitat destruction from logging, agriculture, mining,

and urban development; loss of habitat and impaired migration from dams and hydroelectric

development; impacts from industrial, agricultural, and urban pollution (including pesticides); disease;

predation; overfishing; climate change; and poor hatchery practices.  AR 1024-1075.  NMFS

summarized that all of these actions have diminished water quality and habitat for the species across

their range and have led to the species' dramatic and continuing decline.  AR 1075.  NMFS concluded

that continued degradation would compound this harm and push the species further toward extinction.

AR 1075.

NMFS then turned to the evaluation of the specific impacts of these three pesticide registrations.

To assess their impacts, NMFS first performed an exposure analysis, which identifies what fish from

what populations and at what point in their lives are likely to be exposed to these pesticides.  NMFS

used two methods to assess exposure: it examined the best available water quality monitoring data for

NMFS, which EPA did not do until the draft BiOp was issued.  AR 712-713, 752.  See also AR 876
(NMFS's BiOp outlining timeline of EPA's identification of applicants).  The Registrants' complaints
about the timing are more appropriately addressed to EPA.

these pesticides, and also modeled the exposures likely to occur using a variety of methods – including some developed by EPA and pesticide manufacturers – using the best available usage data and the best available information about uses obtained from the current FIFRA labels.

Second, NMFS analyzed whether and how individual salmonids are affected by their exposure to these pesticides.  NMFS used available scientific information and models to evaluate whether and how a range of exposure levels would impact individual fish – either by directly killing them, or through a variety of sublethal effects that reduce the likelihood that the individuals will survive and/or reproduce. AR 893, 35, 1291.  These sublethal impacts can affect all freshwater life stages of these wide-ranging fish and include impaired migration and feeding behavior, impacts to growth and reproduction, endocrine disruption, and greater susceptibility to disease and predation.  See AR 1125-1155.  As part of this inquiry, NMFS also looked at the available data and considered the impacts that these insecticides have on the aquatic insects and other invertebrates that salmon – particularly young salmon – prey upon. See, e.g., id. at 1129-1130, 1133-1135, 1147-1154.  While much of this analysis was informed by quantitative data, NMFS appropriately considered uncertainty and gaps in the available data and ultimately drew "on a variety of quantitative and qualitative tools and measures to address risk." AR 893.

Third, NMFS then determined whether effects to individual fish from exposure would accumulate to affect the populations comprised of those individuals.  To complete this analysis, NMFS looked at a wide variety of information and studies and developed several sophisticated population models to gauge how combined individual exposure to these pesticides (both lethal and sublethal) would affect salmonids at the population level.  See AR 1289-1290 (describing model for population effects of sublethal impacts and separate acute toxicity model for lethal impacts); id. at 1190-1200.  It then

9

combined this quantitative model output with qualitative evidence about exposure impacts – including the effects of pesticides on swimming and homing behavior, loss of prey, additive and synergistic effects of combinations of two or more pesticides, and the effects from other ingredients toxic to fish that are included in pesticide products. Id. at 894, 1188-1191.

Fourth, where NMFS found effects at the population level, it assessed whether those population-level effects would affect the defined listed species.[4] Id. at 893. Based on this analysis and the data available, NMFS made its determination that EPA's registration and authorization of these pesticide labels "is likely to jeopardize the continued existence of these endangered or threatened species." Id. at 1249.

B.     NMFS Properly Considered Whether Its Analysis Under-Predicted Risk and Transparently Addressed Uncertainty.

Many of the Registrants' arguments boil down to the belief that NMFS overestimated the risk to salmonids through this process. At each step of its analysis, however, NMFS was confronted both with data that threatened to under-predict risk to salmonids and data that might over-predict risk. In the face of this scientific uncertainty, NMFS appropriately and transparently discussed the areas where the data and its analysis may have overestimated risk, as well as the many areas where it may have under-predicted risk. See, e.g., AR 1091 (discussing instances where EPA's model assumes greater use than currently permitted and may therefore overestimate risk). The Registrants focus their detailed complaints on a few isolated instances in which they believe NMFS did not sufficiently credit their data and arguments suggesting less risk, but the Registrants conspicuously overlook NMFS's extensive discussion of the many ways in which uncertainty and limitations in the current data and scientific

---

[4] NMFS completed a parallel analysis that looks at impacts to habitat necessary for salmonid survival and recovery when it evaluated impacts to critical habitat.

knowledge lead to exactly the opposite conclusions.  Indeed, the instances in which NMFS relied on data that was likely to under-predict the risk to salmonids are far more numerous than the allegedly overprotective assumptions selected by the Registrants.

NMFS's reliance on data that under-predicts risk include NMFS's acknowledgment that "[p]otential exposure of listed salmonids to chlorpyrifos, diazinon, and malathion may be underestimated for some uses given EPA's authorization for greater use of these pesticides than was assessed with" the modeling results EPA presented to NMFS.  AR 1091; see also WTC II, 457 F. Supp. 2d at 1185-1187 (discussing gaps in other EPA methods for predicting exposure).

NMFS also recognized and disclosed that many of the products containing these three pesticides are either applied after being mixed with other pesticides or are often applied in tandem with other pesticides.  Because it could not obtain comprehensive information about pesticide use from either EPA or the Registrants and others, however, NMFS explicitly stated that its approach would not capture exposure to and risk from ingredients in tank mixes.  AR 1114; see also id. at 1116 (concluding that "assessment of pesticide mixtures toxicity to aquatic life is needed given the widespread and common occurrence of pesticide mixtures, particularly in streams, because the total combined toxicity of pesticides in water is often greater than that of any single pesticide compound ….  Therefore, risk to listed species may be underestimated.").

Similarly, NMFS recognized that the effects of exposure to multiple pesticides in a salmonid waterbody were not necessarily linear.  As NMFS summarized in the BiOp, the available evidence shows that the "synergistic effects" of combinations of two or more pesticides in salmon streams is likely more than just the sum of the effects of the two chemicals measured separately – in combination, the chemicals have a multiplier effect.  See AR 1123 (noting that "certain combinations … were lethal at

concentrations that were sublethal in single chemical trials.").  NMFS went on to explain that its

inability to quantify these synergistic effects meant that its approach "is likely to under-predict toxicity

for some mixtures, particularly those containing malathion that likely produce synergistic rather than

additive responses."  AR 1166; see also id. at 1116 ("risk to listed species may be underestimated"

because exposure to other compounds and baseline stressors was not considered in EPA's analysis).

        In addition, these pesticides are the "active ingredients" in products that contain at least as many

"inert" ingredients by volume.  While the exact nature and content of inerts are not disclosed on package

labels and are often guarded as "confidential business information" by the product manufacturer, NMFS

noted that some of the more common and well-known ingredients are themselves highly toxic to

salmonids and/or their prey.  See, e.g., AR 1153-1154 (summarizing data available for nonylphenol, a

common surfactant included in many products containing these pesticides, showing that it "is of concern

to aquatic life, particularly salmonid endocrine systems involved in reproduction and smoltification.");

id. at 1114 (noting toxicity of two other "inert" ingredients).  NMFS concluded that:

> Inerts often make up more than 50% of the mass of pesticide products and millions of lbs.
> of products containing chlorpyrifos, diazinon and malathion are applied to the landscape
> each year (CDPR 2007).  This may equate to very large contaminant loads of inerts that
> may adversely affect salmon or their habitat.  The uncertainty regarding exposure to these
> ingredients must therefore be qualitatively incorporated into our analysis.

AR 1114.

        As these examples demonstrate, NMFS identified numerous areas where a lack of data hampered

its ability to evaluate the full range of effects of these pesticides and acknowledged that its analysis

therefore under-predicted the risk of harm to listed salmonids.  It also acknowledged those few instances

where the data it had might over-predict risk.  See, e.g., infra at 25-28.  NMFS dealt with this

uncertainty in precisely the manner mandated by the ESA.  The ESA requires NMFS not only to

disclose uncertainty, it requires the agency to ensure that any risk posed by that uncertainty is "borne by the project, not by the endangered species" because the ESA embodies an "institutionalized caution mandate[]." Sierra Club v. Marsh, 816 F.2d at 1386 (citations omitted); accord WTC I, 413 F.3d at 1035. Under the ESA, "Congress clearly intended that [NMFS] give the 'highest of priorities' and the 'benefit of the doubt' to preserving endangered species." Marsh, 816 F.2d at 1386 (citations omitted). The ESA's requirement that NMFS base its decision on the "best scientific and commercial data available" is consistent with this mandate because it requires "far less than 'conclusive evidence'" to compel protection of species. Defenders of Wildlife v. Babbitt, 958 F. Supp. 670, 679-80 (D.D.C. 1997). Here, NMFS transparently combined the available evidence and its informed judgments about the biological risks presented by factors like synergistic effects and "inert" ingredients with its quantitative analysis and modeling and then made a combined determination about the effects of these pesticides. See, e.g., AR 893 (explaining that "NMFS analysis is ultimately a qualitative assessment that draws on a variety of quantitative and qualitative tools and measures to address risk to listed resources").

NMFS's conclusions are unassailable in light of its extensive analysis and the ESA's precautionary mandate. NMFS thoroughly and comprehensively considered the effects of chlorpyrifos, malathion, and diazinon on listed salmonids in a multi-step analysis that relied on biological modeling, as well as all available scientific literature and monitoring data, and dealt with considerable uncertainty in a rational, precautionary, and transparent manner. It is the Registrants, as the parties seeking to invalidate protections for these admittedly imperiled species, that must demonstrate that NMFS's decisions are arbitrary and capricious or not in accordance with law. 5 U.S.C. § 706(2)(A). In the face of extensive data and analysis demonstrating the toxicity of these pesticides to salmonids and their prey, that burden requires far more than asserting an unsupported opinion about which way the uncertainty in

the science breaks and asking this Court to set aside the agency's decision.  Trout Unlimited v. Lohn,

559 F.3d 946, 956 (9th Cir. 2009) (holding that when there is a lack of scientific consensus, the court

would defer to agency's decision).

     C.     EPA's FIFRA Risk Assessment Process Does Not Provide Equivalent Protection for
Endangered Species.

Throughout their brief, the Registrants make much of the fact that EPA disagreed with aspects of

NMFS's draft BiOp and where EPA emphasized that it would have applied a different approach or

reached different conclusions in assessing risk.  See, e.g., Br. at 8-10.  But the Registrants overlook two

important reasons that EPA's criticisms carry little weight here.  First, Registrants fail to disclose – and

fail to appreciate the significance of the fact – that EPA's risk assessment process and analysis for

evaluating the impacts of these pesticides has already been found to contain "substantial flaws … highly

likely (if not certain) to result in an overall under-protection of listed species."  WTC II, 457 F. Supp. 2d

at 1193; see also id. at 1184 (finding that "EPA's risk assessment process is not only less protective than

Service determinations, there is overwhelming evidence on the record that ... EPA risk assessments …

would actually result in harm to listed species"); id. at 1182-93 (discussing in substantial detail an

extensive record documenting flaws in EPA's risk assessment process, including its failure to account

for sublethal effects, synergistic impacts, and effects of "inert" ingredients in pesticide mixtures,

including specific examples of pesticides at issue in this case).  As discussed above, NMFS was well

aware of the shortcomings in EPA's analyses and conducted its own substantial and independent expert

scientific assessment of the pesticides' effects on salmonids.  See id. at 1182 (citing extensive record

reflecting a "long history of disagreements between the Services and EPA" over adequacy of EPA's

assessment of pesticide impacts to species).  The Registrants disagree with NMFS's decision to do more

than unquestioningly accept EPA's assessments, but NMFS properly declined to rely solely on EPA's

demonstrably flawed FIFRA risk assessment process.

Second, EPA's registration and reregistration process under FIFRA focuses on different questions – and is based on different standards – than the real-world inquiry and precautionary approach required by the ESA.  EPA's assessments of the environmental effects of these pesticides during reregistration apply the standards established by FIFRA, which allows the sale of any pesticide that does "not generally cause unreasonable adverse effects on the environment."  7 U.S.C. § 136a(5).  To determine whether this requirement is met, EPA has interpreted FIFRA to allow a cost-benefit analysis that permits harmful pesticides to be registered if their economic benefits outweigh the environmental harms.  See 7 U.S.C. § 136(bb) (defining "unreasonable adverse effects").  To assess a pesticide's effect on wildlife, EPA's ecological risk assessment process focuses solely on the effects of the chemical at issue "and the registration of that chemical alone."  WTC II, 457 F. Supp. 2d at 1185.  EPA's single-chemical risk assessment process "is driven by laboratory tests, models of exposure and occasionally some monitoring information," id. at 1184, and does not encompass consideration of baseline conditions in watersheds, background concentrations of other pesticides, or a variety of sublethal impacts, id. at 1182-1185.

By contrast, the ESA requires NMFS to determine whether a pesticide is likely to jeopardize the continued existence of a protected species.  16 U.S.C. § 1536(a)(2).  That determination requires a much more comprehensive look at the existing status of the species, the baseline conditions of their habitat, and requires NMFS to ask whether a pesticide's effects, when added to existing and likely future impacts to the species in their real-world habitat, are likely to jeopardize the species or adversely modify their critical habitat.  50 C.F.R. § 402.14.  See also WTC II at 1182-1185 (summarizing key differences between FIFRA process and ESA).  Rather than focusing solely on the toxicity of a single chemical, the

ESA requires NMFS to "frame [its] analysis by looking at the species and their relationships with the natural physical, biotic, and chemical environment." WTC II, 457 F. Supp. 2d at 1185. See also id. at 1192-93 ("the question of protecting listed species is a wider question than whether a particular active ingredient has a more or less direct effect on that species"); AR 14733 (peer-reviewed journal study explaining differences in FIFRA and ESA risk assessments). Because the ESA requires consideration of pesticide effects in the ecosystems where salmonids actually live, it affords another – and higher – level of protection to species on the brink of extinction. Moreover, the ESA directs federal agencies to "insure" that they do not cause jeopardy, requiring a more precautionary approach that does not permit the balancing EPA performs in its FIFRA process. See Sierra Club v. Marsh, 816 F.2d at 1386 (holding that risk "must be borne by the project, not by the endangered species"). See also infra at 35-37 (courts have been clear that balancing economic concerns is flatly prohibited under the ESA).

EPA's criticisms of NMFS's draft BiOp are rooted in its own ecological risk assessment process under FIFRA and an analysis of environmental effects that is far more narrow and less protective than the ESA requires.[5] NMFS, however, properly applied the more protective and precautionary standard that Congress has established for endangered species. The Registrants may prefer the less protective evaluation under FIFRA – but that policy concern is not an issue for this Court.

---

[5] As outlined in WTC II, NMFS has considered and addressed EPA's views repeatedly in the past. Indeed, the extensive record of back-and-forth between NMFS and EPA formed the basis of the Court's finding that EPA's FIFRA risk assessment process "would actually result in harm to listed species." WTC II, 457 F. Supp. 2d at 1184. Because of this extensive record regarding many of the issues that EPA raised in its comments on the draft BiOp, this is not a case where NMFS "'ignored the conflicting views of other agencies….'" Br. at 14, & n.14 (citing Sierra Club v. U.S. Army Corps of Engineers, 701 F.2d 1011, 1030 (2d Cir. 1983)). NMFS has engaged with EPA on many of these issues in the past, and did so again as part of this consultation.

II.     NMFS EMPLOYED THE BEST AVAILABLE SCIENCE AND RATIONALLY EXPLAINED ITS METHODOLOGY AND DECISIONS IN THE BIOP.

The Registrants miss the forest for the trees by ignoring the totality of NMFS's comprehensive analysis and the overall precautionary approach of the BiOp and focus their arguments instead on discrete components of the quantitative analysis that informed portions of NMFS's multi-step assessment of these pesticides' impacts.  In each instance, their complaints are misplaced.  First, the Registrants assert that NMFS "ignored" or failed to adequately consider specific studies proffered by Registrants, and improperly relied on others, when it considered what amounts of each chemical would impact salmonids.  Br. at 16-23.  Second, the Registrants argue that NMFS's estimates of the levels of pesticides likely to occur in salmonid waters was based on inadequately representative water monitoring data, and improper modeling methodology.  Id. at 23-28.  And third, the Registrants allege that NMFS used improper methods to determine whether and for how long salmonids were likely to be present in areas where pesticide levels were high enough to impact the fish.  Id. at 29-34.  In less detailed arguments, the Registrants also challenge the methodology used to set the protective buffer zones established in the RPA, id. at 34-37, contend that NMFS should have considered economic impacts of its RPA, id. at 35, 37, and complain that the agency did not cite in the BiOp specific studies identified to NMFS during the comment period, id. at 38-40.

None of the Registrants' technical disagreements with NMFS's methods or conclusions  bear even modest scrutiny, and do not – either alone or in combination –demonstrate that NMFS's conclusions were arbitrary and capricious.  To the contrary, the Registrants' critiques are all based on misunderstandings or mischaracterizations of NMFS's analysis in the BiOp, the evidence in the administrative record, or the law governing this consultation.

A.    NMFS's Concentration Levels Were Based on the Best Science and Are Appropriately
      Precautionary.

The Registrants' first take aim at particular numerical values in NMFS's analysis in an attempt to

paint the agency as unreasonably focused on conservative data and studies.  See Br. at 16-23.  The

Registrants argue that NMFS "chose" unreasonably low concentrations of the three organophosphate

pesticides at which salmonids and their prey would be harmed, id. at 17, but the Registrants' arguments

miss the mark both legally and factually.

NMFS considered an extensive body of scientific literature and data to determine what

concentrations of these pesticides would harm salmonids and their prey.  These studies found a wide

range of concentrations at which adverse effects would occur.  NMFS reported this wide range in its

summary of the best available science, and selected concentrations from within this range to use in its

subsequent quantitative modeling and to inform its consideration of qualitative factors in its jeopardy

conclusions.  Notably, the Registrants do not attack the concentrations NMFS actually selected to use in

the modeling.  Rather, the Registrants attack NMFS's mere inclusion and discussion of studies that

found harm at low levels.  NMFS correctly considered studies finding harm at low concentrations as

well as studies finding harm at higher levels, and selected an appropriately precautionary concentration

from within this range to use in subsequent analyses.

As an initial matter, NMFS appropriately selected concentrations to use in its modeling from the

lower end of the wide range of concentrations that differing studies concluded would harm salmon – and

Registrants do not contend otherwise.  As NMFS detailed in the BiOp, studies of lethal concentrations

(called "LC50" because they determine the level of a chemical that kills 50 percent of the test

population) are most useful when they include descriptions of the study design, a dose-response curve

showing levels at which the first specimens begin to die from exposure, information about the number of

tests run, and a report of the statistical variability (called a "confidence interval," similar to a margin of error) surrounding the results.  AR 1125-1126.  Because most of the studies that EPA or the Registrants provided, and that NMFS's literature review yielded, did not contain that information, NMFS complied with the ESA by "err[ing] on the side of the species in the face of these uncertainties and select[ing] LC50s from the lower range of available studies."  AR 1126.  See also id. (explaining that "[w]e evaluate the likelihood of concentrations that are expected to kill fish and apply qualitative and quantitative methods to infer population-level responses of ESA-listed salmonids within the *Risk Characterization* section.").  Such a precautionary approach is mandated by the ESA, which requires NMFS to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action.  Sierra Club v. Marsh, 816 F.2d at 1386; see also TVA v. Hill, 437 U.S. at 185.  NMFS considered a range of data, ultimately employed appropriately precautionary levels in its jeopardy analysis, and fully explained the reasons and methods it used to select those data.

Registrants ignore both this explanation and the concentrations that NMFS actually used in its modeling, and instead broadly assert – tellingly without citation to the BiOp – that NMFS "relied upon," "employed" or "used" the lowest reported concentrations in the BiOp.  See, e.g., Br. at 18, 19, 20, 22.  The Registrants attack a straw man by arguing that NMFS's "reliance" on these studies was inappropriate.  NMFS appropriately considered studies finding harm at both low and high concentrations, but it did not actually apply in its models the lowest level concentrations that the Registrants attack.

  *1.  NMFS rationally evaluated lethal concentrations of malathion.*

The Registrants first expend considerable effort arguing that NMFS should not have "used" a lethal concentration level of 2.8 ug/L for its evaluation of malathion.  But while that was the lowest end

of the range reported in the BiOp, it was not the value that NMFS used in its analysis.  To the contrary,

the BiOp and record show that NMFS actually applied a much higher LC50 of 30 ug/L in its modeling.

See AR 1179-1182 (Tables 62-65) (indicating an LC50 of 30 ug/L for chinook, coho, and sockeye

salmon, and a range from 1-100 ug/L); id. at 834-835 (NMFS scientists explaining that in response to

comments on the draft BiOp, NMFS in the final decision "[r]e-ran population models with new

malathion LC50 values (30 ug/L instead of 4.1 ug/L), removed discredited values, revised text");

AR 769 (scientist explaining process for new models to be run with values ranging up to 100 ug/L).  To

be sure, NMFS noted that the LC50 values from the scientific literature in EPA's own database ranged

from 2.8 ug/L to 234 ug/L.  AR 1134 (noting that "the lowest reported LC50 [from EPA's AQUIRE

database] was 2.8 ug/L and the highest LC50 was 234 ug/L for salmonids. . . .  Uncertainty remains as to

which LC50 is the most accurate given the large variability in reported salmonid LC50s, 2.8 – 234

ug/L.").  But the Registrants confuse one end of that range with the actual acute toxicity level that

NMFS employed in its modeling.  See, e.g., Br. at 18 (alleging incorrectly that NMFS "employed" 2.8

ug/L level).  The Registrants do not contest NMFS's use of an LC50 of 30 ug/L value in its modeling,

rendering their complaint about the 2.8 ug/L value much ado about nothing.[6]

The additional allegation that NMFS erred by ultimately choosing not to rely solely on four

studies that Cheminova advocated (with LC50 values higher than 30 ug/L) is nothing more than

Cheminova's disagreement with NMFS's expert assessment of the varying conclusions of differing

---

[6] Even the Registrants' attempt to undermine the study providing the 2.8 ug/L value falls short.  For example, Registrants allege that "this study tested material that is not representative of products now on the market."  Br. at 17.  That statement is referring to the fact that one manufacturer of malathion, Cheminova, has altered their process to limit the contaminant isomalathion.  Thirty-seven other companies held active registrations for malathion products at the time NMFS prepared the BiOp.  AR 888.  NMFS correctly recognized that the actions of one company do not represent the entire market.

studies.  Br. at 17-18.  NMFS met with the Registrants and discussed the findings of Cheminova's

studies, see, e.g., AR 711, considered their results as well as other available data, and rationally

explained the concentrations it chose to use in subsequent modeling.  While the Registrants may

disagree with NMFS's decision to look beyond the information the Registrants supplied and consider all

of the relevant data available in order to assess the toxicity of malathion, their disagreement does not

mean that NMFS failed to use the best available science and rationally explain its decision.

> 2.  *NMFS rationally evaluated harmful concentrations of diazinon to both salmonids and their prey.*

The Registrants next focus on the lowest end of the reported range for diazinon's impacts to prey

(0.03 ug/L) in an attempt to fault NMFS's analysis, but here again, that is not the value that NMFS used

in its subsequent modeling.  Br. at 19-20.  Although the Registrants dutifully cite the only two instances

in which this number appears in the BiOp, AR 1134 and AR 1155, they tellingly cite nothing for their

assertion that "NMFS relies on it."  Br. at 20.[7]  Rather, the only value that NMFS employed in its

analysis of the impacts of diazinon to salmonid prey was an EC50 value (the concentration that

adversely impacts 50% of the study population) of 1.38 ug/L – a value nearly fifty times higher than the

data point the Registrants question.  AR 1304.[8]

---

[7] The Registrants selectively quote AR 4912 to support an assertion that EPA rejected this specific low
end of the range because EPA's scientist "had not look[ed] at the original papers."  Br. at 20.  That
document says no such thing.  The quoted statement is part of a larger disclaimer by EPA's scientist
about an examination of all of the studies and data from EPA's database – it's a catch-all, not something
specific to that particular study.  See AR 4912 ("As previously noted, there are very large amounts of
aquatic toxicity data for diazinon.  The following are summarized from the AQUIRE data base.  With a
very few exceptions, as indicated in the references section of this analysis, I did not look at the original
papers.  In the following tables 8-10, I only included the AQUIRE reference number because of the
extensive list.").

[8] The Registrants allege that NMFS ignored a study showing errors in the lowest-end value for impacts
to prey from diazinon.  Br. at 20 (discussing Hall and Anderson (2005)).  In addition to being focused on
a low-end estimate that NMFS ultimately did not use in its modeling, the Registrants ignore the record

Moreover, the EC50 value that NMFS did use in the modeling was appropriately based on its consideration of all of the best available science.  As NMFS explained in the BiOp, it chose this metric because there are a wide range of lethal values for the wide range of invertebrate species (mainly insects) that salmonids prey upon.  AR 1134, 1293, 1304.  The wide disparity in reported harmful concentrations for these invertebrates is due to the fact that different species in many different habitat conditions respond differently to concentrations of diazinon.  Rather than relying on any one specific species, or a single study, NMFS considered effects to the entire assemblage of prey rather than to just one species.  See, e.g., AR 777 (NMFS explaining why it focused on effect to prey assemblage as a whole including the fact that "not all species are available prey for all life stages.  Some of the juvenile transition stages have limited diets and those species need to be available," and that there was a lack of data on other species that "make up the bulk of salmonid diets").  Here again, the Registrants have misunderstood and are attacking NMFS for one value it considered, not the number that it actually used in the modeling.

> 3.      *NMFS rationally evaluated lethal and sublethal concentrations and effects of chlorpyrifos.*

Instead of attacking any specific chlorpyrifos concentration, the Registrants cite a confusing comment from the California Department of Pesticide Regulation to attack the range of LC50 values NMFS reported in the draft BiOp and to question its citation to a study of fathead minnows, presumably because the Department and the Registrants believe that study overestimates risk.[9]  Br. at 21.  In the

---

evidence that NMFS thoroughly considered the Hall study and in meeting with the author of that study, noted several shortcomings (e.g., lack of monitoring data "recognized as a limitation of the analysis by Hall," lack of a reference site, and an inability to tease out whether other stressors impact prey) that rendered the study unreliable.  AR 796-97.

[9] NMFS explained in the final BiOp that although it considered a study of fathead minnows, it also looked at other species and found that "[r]ainbow trout [a salmonid] and bluegill sunfish were equally

final BiOp, however, NMFS detailed that it examined ten studies that considered chlorpyrifos' impacts

to salmonids and explained that "[e]ighty percent of the reported LC50s fall in the 'very highly toxic'

category." AR 1127.[10]  Moreover, when it modeled population-level effects, NMFS did not utilize the

lowest lethal concentration for chlorpyrifos, but instead employed an LC50 of 3.0 ug/L.  AR 1179-1182.

Similarly, it used a EC50 value of 2.3ug/L for modeling impacts to prey species.  AR 1304.  Once again,

none of the low range values for chlorpyrifos that the Registrants object to were employed in NMFS's

modeling analysis.  As with diazinon and malathion, the Registrants' attack on individual studies among

the many that NMFS considered in the BiOp is a red herring.

The Registrants extend their selective attack to argue that NMFS could not properly conclude

that chlorpyrifos impacts salmonids' ability to avoid predators.  Br. at 21-22.  The Registrants question

some aspects of one peer-reviewed published study conducted by NMFS's biologists that determined

that organophosphate pesticides interfere with the nerve endings that enable salmonids to smell.  Br. at

22.  These olfactory nerves are responsible for, among other vital functions, a salmon's ability to

migrate (literally by smelling their way) from the ocean back to the stream or river of their birth.  AR

1121-1122, 1143-1146, 1166, 1173, 1188-1189 (describing importance of smell and impacts of pesticide

exposure).  It also helps them avoid predators and find mates.  Id.  The Registrants do not dispute that

chlorpyrifos, diazinon, and malathion impact salmonids' ability to smell, nor do they contest that

sensitive to acute concentrations of chlorpyrifos" while "[f]athead minnows appeared much less
sensitive to the same concentrations."  AR 1127.  It is difficult to understand how NMFS's consideration
of a study involving a species with higher tolerance for chlorpyrifos is overprotective.  If anything,
consideration of the higher values in the fathead minnow study is underprotective of more sensitive
salmonids.

[10] The high end of the range NMFS reported (2,200 ug/L) came from a single study.  AR 1127.  The
next highest result was 51 ug/L.  Each of the remaining studies NMFS reported found lethal
concentrations well below the values the Registrants emphasize.  See id. ("Eight of the ten LC50s were
below 8.3 ug/L, while the remaining two were 51 ug/L and 2,200 ug/L").

interfering with this vital function harms salmonid homing ability, reproduction, or ability to feed.  They

take issue only with NMFS's reliance on studies showing these pesticides impact salmonids' ability to

avoid predators.  Br. at 21.[11]  But even if the Registrants were correct – and they are not for the reasons

discussed next – this narrow disagreement with a single aspect of NMFS's analysis ignores the

significant role that smell plays in salmon migration, feeding, and especially the process of returning to

their natal streams to reproduce.  See, e.g., AR 1189 (noting that "[a]dults that do not return to natal

waters [to spawn] are a functional loss to recruitment of a population.").  The Registrants do not – and

cannot – provide any valid reason to second-guess NMFS's assessment of these pesticides' impacts to

these other essential behaviors.

In addition, the Registrants' argument is again based on a mischaracterization of the record.

Though the Registrants in their brief characterize the Palm and Powell study on which they base their

attack as unsuccessfully attempting "to replicate the tentative findings of Sholz," Br. at 22, the record

reveals otherwise.  In meetings with NMFS, "when asked about the study design, MANA acknowledged

that Palm did not attempt to replicate Sholz' methods."  AR 711.  See also id. (noting inconsistency

between industry's previous position "that it was inappropriate to rely on unpublished studies," and

industry's request that NMFS nevertheless "consider this [Palm] study.").[12]

---

[11] It is worth emphasizing, as NMFS's discussion in the BiOp highlights, that the Scholz (2000) study
the Registrants question is by no means the only study finding that these pesticides impact salmonids'
ability to smell.  For example, Scholz and others not only replicated the results of these findings in a
2006 study, AR 14730-14731, but they expanded the analysis to measure the additive and synergistic
effects of other pesticides on salmonid olfaction.  AR 14728-14735.

[12] The Registrants' assertion that NMFS erred by utilizing a study (Sandahl (2004)) for assessing effects
of chlorpyrifos on salmonids' sense of smell, Br. at 22, is merely a restatement of their incorrect
contention that NMFS relied on the wrong water quality monitoring data and assumptions in its
modeling of salmonid exposures.  See infra at 24-28.

B.      NMFS Relied on the Best Available Pesticide Use and Water Monitoring Data in Its
        Exposure Modeling.

The Registrants next take issue with NMFS's use of water quality monitoring data and the

modeling methodology it used to estimate the levels of pesticides likely to be present in salmonid

streams.  Br. at 23-28.  NMFS relied on two different methods to assess the concentrations of pesticides

to which salmon are likely exposed.  First, it looked at years of water quality monitoring data –

including the most recent data supplied by EPA, the Registrants, and State and Federal agencies – to

develop a picture of the real-world concentrations of these chemicals in salmonid waters.  While some

of this data predated recent use changes, NMFS recognized this limitation and appropriately accounted

for it.  Second, NMFS conducted extensive exposure modeling using a model developed by the pesticide

industry to supplement the data on real-world concentrations; this modeling allowed NMFS to

incorporate the most recent use changes to help better understand what concentrations would result from

levels of pesticide use allowed by the most current labels.  NMFS properly based its overall exposure

assessment on both of these sources as well as EPA's estimates and other qualitative factors.

        1.      NMFS relied on the best available water monitoring data.

The Registrants first complain that NMFS's predictions of salmonid exposure to the three

pesticides are invalid because NMFS utilized "old" water quality and pesticide usage data that does not

reflect some reductions in the registered uses of these pesticides in more recent years.  The Registrants

allege that NMFS "inexplicably … rel[ied] on peak values from the out-of-date water monitoring data to

assess risks to salmon."  Br. at 25.  This argument fails for at least two reasons.

First, NMFS relied on the best available water quality and water monitoring data in the BiOp,

including the most recent and relevant information available.  See, e.g., AR 1100-1110 (discussing water

quality and water monitoring studies); id. at 1168 (citing USGS National Water-Quality Assessment

Program and California Department of Pesticide Regulation data up to and including 2006); id. at 1031-1033.  Notably, the Registrants do not identify a body of more recent water monitoring data that NMFS failed to consider in the BiOp.[13]  The Registrants believe instead that NMFS should have ignored all water monitoring data that pre-dates recent use changes and relied solely on an unidentified limited number of very recent studies.  But NMFS rationally explained why ignoring certain available data is not tenable and why it was necessary and rational for the agency to consider a range of monitoring data – both historical and current.  AR 1109-1110.  As the agency noted, annual pesticide usage frequently fluctuates based on local regulations, crop patterns, and severity of pests.  Id.  While explicitly accounting for the fact that historical data may therefore not necessarily predict the future, NMFS explained why it was not necessary to completely disregard that data.  Id.  Historical data assisted in identifying areas where higher concentrations of these individual chemicals were likely to occur (e.g., areas with heavy agricultural use) and in highlighting areas where these and other pesticides are more likely to be found together (in any concentrations) in the water, having synergistic effects to salmonids.  See AR 1115-1116 (discussing study in agricultural Yakima River basin).  Moreover, because existing stocks of cancelled or altered pesticides may still be used, historical monitoring data

---

[13] The sole limited example Registrants highlight – two years of data from one river provided by the Idaho Department of Agriculture, Br. at 25 – does not demonstrate otherwise.  First, Idaho and the Registrants themselves elsewhere recognize that data from forested areas like the Clearwater River watershed in Idaho is not representative given that those areas support little agricultural use.  See Br. at 30 (citing Idaho Department of Agriculture comments at AR 3619-3620 asserting that there is little overlap between agriculture and salmon waters within Idaho).  Second, the Clearwater River data offers a very limited perspective; salmonids reach such rivers in Idaho only by migrating to and from the ocean through heavily developed and agricultural areas in Washington and Oregon where pesticide concentrations are indisputably higher.  While there is no indication that NMFS overlooked this single data point, its limited applicability renders it of little value.  See Home Builders Assoc. v. U.S. Fish and Wildlife Serv., 529 F. Supp. 2d 1110, 1121 (N.D. Cal. 2007) (holding that agency's decision to discount non-representative study was not arbitrary and capricious).

can be directly applicable in estimating concentrations of those pesticides until exiting stocks are depleted or uses phased out.  See AR 887, 1091.

Second, to the extent that the Registrants contend that NMFS is obligated to conduct or somehow obtain additional water-monitoring studies that solely reflect recent changes in pesticide use, their position cannot be squared with established law.  The ESA's requirement that NMFS rely on the "best scientific and commercial data available" does not obligate NMFS to "conduct independent studies," nor must NMFS "find and consider any information that is arguably susceptible to discovery."  Southwest Center for Biological Diversity v. Babbitt, 215 F.3d 58, 60-61 (D.D.C. 2000) (holding that district court erred by ordering Service to conduct independent goshawk population count in the face of "inconclusive data.").

Here, NMFS transparently acknowledged the limitations in the available water monitoring data, including the fact that some monitoring data might not be representative of current and future uses. AR 1109; 1116-1119.  The ESA "does not require that the [agency] act only when it can justify its decision with absolute confidence."  Arizona Cattle Growers' Ass'n v. Salazar, 606 F3d 1160, 1164 (9th Cir. 2010).  An agency may properly rely on even imperfect or incomplete data so long as it is the best available information.  See, e.g., Cabinet Resource Group v. U.S. Fish and Wildlife Service, 465 F. Supp. 2d 1067, 1083 (D. Mont. 2006) (finding that Service could rely on study even though "there are problems with the study, and it might have been better to have higher population numbers from which to work"); Southwest Center for Biological Diversity, 215 F.3d at 60 ("'[e]ven if the available scientific and commercial data were inconclusive, [the agency] may – indeed, must – still rely on it at that stage.'").  Here, the issue is not whether NMFS has relied "on the best conceivable scientific information," but whether the water monitoring data constitutes at least a portion of "the best *available*

information," and the Registrants have not carried their burden to show that it is not. Id. at 1085 (emphasis in original); see also National Wildlife Fed'n v. Babbitt, 128 F. Supp. 2d 1274, 1300 (E.D. Cal. 2000) ("the [ESA] permits the Service to take action based on imperfect data, so long as the data is the best available"). NMFS is not obligated to discard all data that is in some way limited or less than perfect, so long as it rationally accounts for any significant limitations. Because it did so here, the Registrants' arguments that NMFS erred by considering all the available data – including the pre-2005 water monitoring data – must fail.

        2.    *Exposure modeling.*

     While some of the water monitoring data pre-dates recent use restrictions, NMFS's analysis did not rely solely on the best available water quality monitoring data. It supplemented this data with an extensive exposure modeling analysis that examined the uses allowed by the most current FIFRA labels, considered the most recent usage data available, and recognized that some uses (primarily urban and residential uses) had been recently cancelled. AR 1082-1095. Contrary to the Registrants' complaints, then, NMFS explicitly did consider the changes in registered uses in the most appropriate way possible: by supplementing the water monitoring data with exposure modeling that incorporated the most recent label information to the maximum extent possible. See AR 1086 (acknowledging that "[m]any of the uses, application rates, and intervals evaluated in the BEs have been adjusted since EPA completed the REDs for these products in 2006"); id. at 1085-1086 (discussing uses in exposure modeling analysis, and acknowledging restriction in allowable rate of chlorpyrifos use in golf course applications and discontinued sale of termite products containing chlorpyrifos;[14] id. at 1090-1091. See also AR 781 (in

---

[14] For malathion, the Registrants gloss over the fact that the claimed use reductions (many of which were for indoor or urban uses) were not accomplished until nearly a month after NMFS issued the BiOp. Br.

preparing final BiOp, NMFS biologists "correct[ed] uses and rates so they are consistent with" latest

information and updated agency's exposure analysis, including re-running exposure model "to account

for new information"); AR 834-35 (summarizing changes in final BiOp analyses).

While NMFS incorporated the most current registration information as much as possible, the

information provided by EPA did not include all relevant information or uses found on pesticide labels.

AR 1090.  NMFS sought more comprehensive information from EPA regarding all of the uses allowed

under each current pesticide label, but EPA informed NMFS that it does "not maintain a master label

that is inclusive of all registered uses" and EPA refused to "provide a comprehensive list of all label

restrictions for consultations because it is not feasible for the agency to compile the information."  Id.

See also AR 879 (noting at least one instance where EPA did not respond to NMFS's request for more

information).  During meetings on the Draft BiOp, EPA acknowledged that it "does not have a pesticide

database that it would be comfortable saying is completely accurate."  AR 746.  See also AR 884 ("EPA

indicated that it lacks a database that is 100% accurate in terms of providing all current labels for

existing product uses" of chlorpyrifos).  NMFS appropriately disclosed and discussed the effects of this

uncertainty and lack of information on currently permitted uses, and adjusted its analysis accordingly.

AR 1090-1095.

To the extent that the Registrants are suggesting that uses allowed by the current labels differ

from uses in practice, NMFS has a mandatory duty to evaluate what is actually permitted by the label to

determine the effects of those uses over the 15-year life span of the BiOp.  The Registrants themselves

recognized this during the consultation process.  See AR 746 (Dow AgroScience representative stressing

---

at 7, 24.  The ESA's best available data requirement cannot be contorted to require NMFS to speculate
about what data future use changes might generate.

that while information can be found in other documents, "[t]he product label is the ultimate source, which indicates how the product has been legally approved for use."). The ESA does not require NMFS to analyze a hypothetical agency action, rather it charges the agency with evaluating the effects of the action presented for consultation. 50 C.F.R. § 402.02. "[T]he scope of the agency action is crucial because the ESA requires the biological opinion to analyze the effect of the *entire* agency action." Conner v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988) (emphasis in original) (rejecting BiOp that looked only at first stage of oil and gas leasing project). Courts have held repeatedly that "[a] biological opinion [that] does not address the full scope of the agency action is arbitrary and capricious because it necessarily fails to consider important aspects of the problem." Greenpeace v. NMFS, 80 F. Supp. 2d 1137, 1147 (W.D. Wash. 2000) (rejecting BiOp because it did not evaluate all activities permitted by interrelated fisheries management plans). In this case, the "action" EPA presented to NMFS is the fifteen-year registration of these pesticides for uses specified on the current labels. AR 1089-1099, 1199-1200. NMFS has a duty to evaluate the effects of the uses legally permitted by the current labels, not the shifting patterns of use that may result from individual growers' decisions or other temporary or voluntary measures. See AR 1119 ("[I]n order to ensure that EPA's action is not likely to jeopardize listed species or destroy or adversely modify critical habitat, NMFS analyzes exposure based on all uses authorized by EPA's action."). Because "biological opinions must be coextensive with the agency action," Conner, 848 F.2d at 1458, NMFS properly based its analysis on the current labels.[15]

The Registrants' contention that NMFS's exposure estimates are also based either on an

---

[15] To the extent that the Registrants are suggesting that products are used in a manner different than the labels, i.e., in quantities less than what is legally permitted, the solution is for the Registrants and EPA to update the labels to embody those changes and to mandate any additional use restrictions that they believe are or should be occurring. Unless and until the legally permissible uses on the labels change, however, NMFS is obligated to assess the impacts of the legally authorized use of these chemicals.

unreliable model or misapplication of that model are similarly off-base.  As a threshold matter, it is difficult to understand the Registrants' implication that AgDrift – a model that NMFS used to help estimate the amounts of pesticides drifting into salmon streams from ground and aerial spray – is flawed. Br. at 26-27.  That model was developed by industry and EPA and has been applied in other contexts. See AR 1084 (AgDrift is "a spray drift model developed by a consortium of pesticide registrants under a cooperative research agreement with EPA").  The Registrants' new-found skepticism that there are "flaws in the model itself" or that it fails to represent "real-world conditions," Br. at 26, appears opportunistic at best.

More important, rather than producing overprotective results as the Registrants allege, NMFS explained in the BiOp that reliance on the AgDrift model outputs alone likely underestimates the risk of these chemicals to salmon.  For example, NMFS concluded that even with the buffers – derived from AgDrift – required in the RPA, the agency

> would expect mortalities for each of the OPs, with the greatest number of mortalities for chlorpyrifos-exposed fish.  We would also expect other non-lethal fish endpoints to be affected.  Salmonid prey items would be severely affected by these concentrations. … Some juvenile salmonids would die from this exposure and other sub-lethal effects would also be expected.  Sensitive salmonid prey items would also be adversely affected ….

AR 1253.  NMFS concluded that "[w]hile the concentrations predicted by the modeling could result in unknown numbers of lethal and non-lethal takes of salmonids as well as reduction in prey ….  NMFS believes that these buffers will remove a substantial portion of risk attributed to pesticide drift." AR 1254.  In other words, NMFS did not believe that the AgDrift model results showed that the required buffers would avoid salmon mortality, nor would they always protect salmon from harm; "[r]ather, the RPA was developed to provide a mechanism to remove a substantial portion of the risk to salmonids from pesticide drift."  Exhibit 1 (letter from NMFS to EPA explaining that buffers in the "RPA w[ere]

not intended to achieve any particular target pesticide concentration.").  <u>See also</u> AR 1250 (explaining

that "[i]n the proposed RPA, NMFS is not attempting to ensure that there is no take of listed species.

NMFS believes take will occur . . . .").  Contrary to the Registrants' unsupported statements, Br. at 27,

NMFS did rationally and adequately explain why and how it utilized the AgDrift results, and explained

the qualitative factors that additionally informed its decision.[16]  The agency reasonably concluded that

achieving the concentrations predicted by the AgDrift modeling would reduce the risk to salmonids to

acceptable levels.  That the Registrants may have reached a different conclusion or accepted a higher

level of risk, does not serve to undermine the agency's findings.

C.      <u>NMFS Rationally Determined That Salmonids and Their Prey Would Be Exposed to
        Harmful Pesticide Concentrations.</u>

The Registrants next attack NMFS's population model for assuming that salmonids would be

exposed to pesticides for up to 96 hours.  Br. at 31-32.  While the Registrants call this assumption

"irrational," it is a common metric used in evaluating toxicity to fish and other aquatic life.  For

example, EPA used 96-hour exposures in assessing effects to aquatic life in its own risk assessments for

these pesticides.  <u>See</u>, <u>e.g.</u>, AR 4275 (EPA's Clorpyrifos RED summarizing that "[c]hronic risk

quotients were calculated using an exposure period ranging from 96 hours to 21 days.");  AR 4912-4913,

---

[16] The Registrants' focus on 1,000 ug/L is misplaced.  Br. at 28.  First, the 1,000 ug/L value comes from <u>both</u> the monitoring data and exposure estimates EPA provided and the AgDrift model results.  AR 1117-1118 (explaining that "[w]e assume that the exposure estimates provided by EPA in the BEs and additional modeling and monitoring information provided above represent realistic exposure levels for some individuals of the listed species.").  <u>See also</u> AR 1118 (noting EPA's BEs reported concentrations between 6-1,000 ug/L).  Second, NMFS explained that it considered this wide range of concentrations because there were "[s]ubstantial data gaps in EPA's exposure characterization includ[ing] exposure estimates associated with product uses on many crops and particularly, on non-crop uses," <u>id.</u>, and because "exposure estimates for other chemical stressors including other ingredients in pesticide formulations, other pesticide products authorized for co-application, adjuvants, degradates, and metabolites are not available or are non-existent."  AR 1118.  Because this unavailable data likely masks additional risk to the species, NMFS erred on the side of caution and "analyze[d] exposure based on all uses authorized by EPA's action."  AR 1118- 1119.

Table 8 (EPA's aquatic life risk assessment for diazinon noting that "durations of tests ranged from 24 hours to 21 days" and table summarizing acute toxicity of diazinon to fish species using a "96-hour LC50").  Moreover, NMFS's population model relied on other assumptions that are likely underprotective – for example, it assumes that the population is only exposed to pesticides once in their entire life span, when in reality salmonids may experience multiple exposures, both as juveniles and adults.  See, e.g., AR 1190 (concluding that "[w]e can not specify the number of adults lost to a given population in a given year.  However, it is reasonably certain to occur given the expected exposures."); 901 (listing effects to adult salmon from exposure to these pesticides); 1143-1146, 1188-1189 (detailing impaired homing and predator avoidance in both adult and juvenile salmon).  To account for the fact that a model cannot incorporate the precise pattern of shifting exposures salmonids experience, including multiple exposures of changing concentrations and duration at various life stages, NMFS appropriately chose a single 96-hour exposure to use in its modeling.

Even apart from the fact that a 96-hour exposure assumption is well within the range of routine assumptions for assessing effects from these pesticides, the Registrants' myopic focus on this single assumption in one of NMFS's models fails to acknowledge that NMFS did not base its determination of population-level effects on any one model alone.  AR 1176 (explaining that NMFS's risk assessments "translate individual fitness consequences to potential population-level effects using both quantitative and qualitative methods.").  Similarly, NMFS's jeopardy conclusions were not based on a single model or a single piece of information but rather on both quantitative and qualitative evidence documenting the lethal effects of high concentrations of these chemicals and the myriad sublethal and indirect effects – such as reduced reproductive success, impacts to salmon prey, and interference with swimming and homing behavior – caused by exposure to even non-lethal levels of these pesticides.  AR 1177-1191,

1245.

There is similarly no merit to the Registrants' suggestion that NMFS lacked a basis for assuming that multiple pesticides may be found in the same waterbody because it is unlikely that a single user would apply all three pesticides at the same time. Br. at 26 & n.25 (citing EPA's skepticism, AR 1837, that all three pesticides would be applied simultaneously at a maximum rate on a given field). But consistent with the real-world inquiry mandated by the ESA, NMFS's finding is rooted in data collected from the habitat where the species live – from watersheds that include multiple different land owners and pesticide uses, resulting in multiple chemcicals reaching those waters where fish live. NMFS explained that:

> Another dimension of pesticides and degradates in the aquatic environment is their simultaneous occurrence as mixtures (Belden et al. 2007). <u>Mixtures result from the use of different pesticides for multiple purposes within a watershed or groundwater recharge area.</u> Pesticides generally occur more often as mixtures than as individual compounds.

AR 1032 (emphasis added). <u>See also</u> AR 14728-14729 (peer-reviewed study summarizing data on co-occurrence of two or more of organophosphate and/or other pesticides, including at least two pesticides at issue in this case).

The Registrants next improperly invoke extra-record evidence in the form of subsequent BiOps and correspondence to support their argument that NMFS's methodology in this BiOp was somehow unsound. Br. at 32-33 (citing EPA's comments on Second BiOp and NMFS's recently-issued Fourth BiOp). But courts have made clear that submission of post-decisional evidence to second-guess the ultimate correctness of an agency's substantive decision is impermissible. <u>See</u> <u>Oceana, Inc. v. Locke</u>, 674 F. Supp. 2d 39, 45 (D.D.C. 2009) (finding language that Registrants cite from <u>Esch v. Yeutter</u>, 876 F.2d 976, 991 (D.C. Cir. 1989), Br. at 32, & n.32, is *dicta* and recognizing only four exceptions to record review, none of which apply to Registrants' evidence).

Even if the Court were to consider this extra-record evidence, however, NMFS's subsequent decision to refine its approach in light of different chemicals or additional information is in no way a reflexive indictment of its methodology in this BiOp. To the extent EPA or the manufacturers of these other chemicals may provide additional reliable and legally permissible data to NMFS, the agency may consider it.[17] Moreover, it is significant that although these subsequent decisions involve different chemicals with different effects on salmonids, and employed a different approach, NMFS still found jeopardy from their use and required RPAs to mitigate the harm. See, e.g., "Fourth BiOp" (cited in Registrants Br. at 33, n.33) at 773-774, 776-779 (jeopardy and adverse modification determinations and RPA for several herbicides). It is therefore unclear what animates the Registrants' belief that another approach would produce a different result or require less protection for the effects of chlorpyrifos, diazinon, or malathion.

III.     THE RPA WAS APPROPRIATELY PRECAUTIONARY AND PROTECTIVE.

Because, based on the agency's comprehensive analysis, NMFS determined that these pesticides harm salmonids to a degree that jeopardizes their continued existence, the agency outlined an RPA that, on the whole, it found would avoid jeopardy and adverse modification of critical habitat. The Registrants challenge only the no-spray buffers required by NMFS's RPA as "unsupported" and too broadly applicable. See Br. at 34-36 (arguing that NMFS focused its modeling too heavily on off-channel shallow-water habitat used by vulnerable juvenile salmonids). In focusing on only one input in

---

[17] While the Registrants may favor aspects of the approach taken in the Fourth BiOp, NCAP has elsewhere outlined why NMFS's consideration of voluntary measures not required by product labels in that BiOp does not comply with the ESA. See NCAP's comments on draft BiOp (June 3, 2011) at 2-4 available at http://www.regulations.gov/#!documentDetail;D=EPA-HQ-OPP-2008-0654-0397. See also supra at 29-30 (explaining that the legally permitted uses on the labels are the "action" that NMFS must consider in consultation). The controversial nature of aspects of NMFS's approach in the Fourth BiOp – a separate final agency action subject to judicial review – underscores the impropriety of relying on that decision to second-guess the validity of the agency's conclusions in this case.

NMFS's AgDrift modeling, however, the Registrants once again fail to appreciate that the buffers were not based on that model alone.  NMFS explained in the BiOp that the RPA as a whole (including the no-spray buffers) was designed to address the harms stemming from its findings that

> (1) the action will result in exposure to other chemical stressors that may increase the risk of the action to listed species including unspecified inert ingredients, adjuvants, and tank mixes; (2) exposure to chemical mixtures containing chlorpyrifos, diazinon, and malathion and other cholinesterase-inhibiting compounds result in additive and synergistic responses; (3) exposure to other chemicals and physical stressors (e.g., temperature) in the baseline habitat will likely intensify response to chlorpyrifos, diazinon, and malathion.

AR 1250.  The RPA was not geared simply to achieve any one specific concentration of pesticides in any specific waterbody, and as discussed above, NMFS did not require the buffers to eliminate specific concentrations predicted by the AgDrift model.  Instead, the agency required these buffers to reduce the overall risk – both the number of times and the number of places – that these harmful concentrations would occur throughout salmonid habitat.  See supra at 31-32.  Indeed, NMFS first proposed an RPA that would ban application of these chemicals within salmonid habitat.  AR 759.  It also initially found that larger buffers would be necessary.  AR 777 (discussing initial modeling results showing 2,600 feet buffer for aerial application and 1,000 feet for ground application); see also supra at 31-32.  Despite its concern that these buffers would not always avoid all harm and take of salmonids, NMFS attempted to ensure the buffers would be protective enough, erring on the side of species in the face of some uncertainty.  See supra at 12-13 (citing numerous instances the analysis in the BiOp underpredicts risk to salmonids).  This is a prudent and rational course of action; and one that is required by the ESA.  Marsh, 816 F.2d at 1836-1837.

The Registrants' related contention that NMFS should have considered the "economic implications of including buffers as an element of the RPA" is based on a misunderstanding of the ESA.

Br. at 37.[18]  Neither NMFS nor this Court is permitted to balance allegations of economic impairment to

the manufacturers against the harm to threatened and endangered salmon.  The ESA simply does not

provide for such considerations when dealing with species threatened with extinction.  TVA v Hill, 437

U.S. at 184 ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend

toward species extinction, whatever the cost.").  See also National Wildlife Fed'n v. NMFS, 422 F.3d

782, 794 (9th Cir. 2005) (rejecting argument that court should weigh alleged economic impact against

harm to the species); WTC I, 413 F.3d at 1035 (a district court is "not required to balance interests in

protecting endangered species against the costs of the injunction when crafting its scope.").[19]

       In addition, whether an alternative course of action is technologically or economically feasible[20]

---

[18] The single piece of testimony Registrants rely on to support their sweeping claims about the amount
of land affected by the BiOp, see Br. at 36 and 12, n.12, is not only impermissible extra-record evidence,
it is wrong.  Opinions about the acreage affected by the BiOp are based on several flawed assumptions,
including: (1) that all areas near salmon waters are currently in agricultural production; (2) that these
three pesticides are currently used on all of those lands and; (3) that there are no alternatives – whether
other chemicals or agricultural practices – to these pesticides that would allow that agriculture to
continue.  To the extent the Court examines this extra-record evidence, the Court should also consider
the attached Declaration of Ed Whitelaw, an economist who explains in detail the numerous flaws in the
studies that the testimony relies upon.  Exhibit 2 (Declaration of Ed Whitelaw ) (filed Apr. 13, 2004) in
Washington Toxics Coalition v. EPA, CV-C01-0132C (W.D. Wash.).

[19] Registrants read too much into dicta from Bennett v. Spear, 520 U.S. 154, 176 (1997), which
concerned prudential standing, not the consideration of economic interests in a biological opinion under
the ESA.  While Bennett held that economic interests fall within the zone of interests of the ESA's best
available science provision, it did not hold that NMFS must consider economic factors when conducting
its analysis or prescribing an RPA.  Indeed, the dicta in Bennett stands for nothing more than the
proposition that the use of the best available science ensures – as an ancillary benefit – that ESA
implementation is based on the best science and therefore does not needlessly impose economic impacts.
It is not a prohibition on causing economic effects, nor is it a requirement that agencies perform an
economic analysis before proposing an RPA.

[20] The dictionary definition of "feasible" means "'capable of being done, executed, or effected.'"
American Textile Manufacturers Inst. v. Donovan, 452 U.S. 490, 508-509 (1981) (quoting Webster's
Third New International Dictionary of the English Language at 881 (1976)).  A standard is economically
feasible if it can be implemented while allowing an industry to maintain "long-term profitability and
competitiveness." Id. at 530, n.55.  Feasibility involves an overall assessment of whether something can

is an inquiry made only for the purpose of determining whether there is an alternative course of action available that can avoid jeopardy, it is not a requirement that the agency consider impacts to a company's profit margin.  If NMFS finds that there is no feasible RPA, then the action must stop altogether; it may only proceed if the proponent receives an exemption from the Endangered Species Committee.  16 U.S.C. § 1536(h).

IV.     NMFS CONSIDERED ALL COMMENTS AND STUDIES SUBMITTED.

In addition to its specific complaints – all of which lack merit – the Registrants also generally assert that NMFS failed to respond to the "nearly 130" studies they and others provided.  Br. at 38.  But the Registrants' arguments are directly contradicted by the record and lack support in the governing law.

The Registrants' repeated contentions that NMFS failed to consider or respond to studies and comments cannot be squared with the record.  Instead, the record reveals that NMFS thoroughly considered the materials provided by the Registrants and modified the final BiOp accordingly, where appropriate.  Once EPA identified the Registrants as "applicants" to NMFS, scientists from NMFS met with the Registrants and EPA to discuss the draft BiOp.  See AR 709-713 (meeting notes).  At this meeting, the Registrants each gave oral presentations and provided NMFS with written materials and studies that they believed relevant to NMFS's analysis.  See id.  Following the meeting, NMFS scientists requested complete copies of a number of studies referenced by the Registrants during the oral presentations so NMFS could review them more thoroughly.  See, e.g., AR 717, AR 725, AR 728. Indeed, the NMFS scientists even requested the raw data sets from some of these studies.  AR 719. NMFS developed a detailed set of questions in response to the material provided by the Registrants, see

be accomplished, it does not require a cost-benefit analysis nor does it provide a back-door route to introduce the kinds of profitability considerations proffered by the Registrants into the development of an RPA.

AR 727, AR 739, AR 715, and scheduled two follow-up meetings to discuss these questions with the Registrants and EPA, AR 745-752; <u>see also</u> AR 796-801 (meeting notes).  Following these additional meetings, NMFS again requested additional information from the Registrants so that they could thoroughly consider their comments.  <u>See</u> AR 802, 803.

Not only did NMFS thoroughly consider the studies the Registrants submitted and the data underlying these studies, NMFS scientists reworked critical modeling analyses, where appropriate, to incorporate relevant information submitted by the applicants.  AR 769 (NMFS scientist reviewed malathion comments and, on the basis of those comments, revised the parameters of the population model and conducted a new analysis); AR 781 (NMFS scientist went through the draft BiOp to correct the uses and use rates to include new information provided by the applicants, and re-ran modeling to account for the new information).  Indeed, NMFS substantively changed the final BiOp in multiple ways to incorporate material submitted by the applicants.  <u>See</u> AR 834-35 (summarizing changes to exposure analysis, response analysis, and other changes in response to material submitted by applicants).

Of course, NMFS did not modify the final BiOp in response to every study the Registrants submitted, nor was it required to do so.  Some of the information that the Registrants provided was not relevant to NMFS's analysis.  For example, much of the new data and comments provided by the Registrants related to non-agricultural uses of the pesticides in question, and so did not impact much of the analysis in the BiOp.  AR 753; <u>see also</u> AR 756 (most of the comments from the Registrants are "focused on the use of particular studies rather than the scientific procedures used for analysis.  The applicants are also pushing to use certain monitoring data rather than modeling data and monitoring data they claim are not applicable."); AR 769-70 (NMFS scientists "reviewed materials sent by EPA and the three applicants.  None of the Dow comments within the eight volumes were specific to the draft BIOP.

The Dow materials were primarily information generated over years by the registrants to support reregistration of products. . .”); AR 796 (NMFS has questions about some of the applicants’ studies because “Dow and Mana provided 3 file boxes of documents, but did not explain why the materials were applicable or how they thought they should be used.”).

In sum, the record demonstrates that NMFS thoroughly reviewed the materials the Registrants submitted, see AR 763 (ongoing assignments for NMFS scientists: “reviewing studies and comments provided by EPA and applicants”); AR 818 (same), prioritized responding to the Registrants comments, AR 761, and modified the final BiOp in response to the applicants’ materials where appropriate, AR 769, AR 834-35.  As to the remainder, NMFS appropriately determined that these studies and materials were either redundant with data or information the agency already considered or based on unreliable study design.

Not only does the Registrants’ argument lack support in the record, it also relies on an erroneous understanding of the ESA’s mandate that biological opinions be based on “the best scientific and commercial data available.”  16 U.S.C. § 1536(a)(2).  This requirement “merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.”  Southwest Ctr. for Biological Diversity, 215 F.3d at 60 (internal quotations and citations omitted).  “While the NMFS cannot ignore relevant biological information, it is another thing altogether to require that they cite every potentially relevant study, especially such studies that do not constitute the best available science in the estimation of the expert agency.”  Oregon Natural Desert Ass’n v. Tidwell, 716 F. Supp. 2d 982, 997 (D. Or. 2010).

It is the Registrants’ burden to show that an allegedly overlooked study is “‘in some way better than’ the evidence NMFS actually relied on.”  South Yuba River Citizens League v. Nat’l Marine

Fisheries Serv., 723 F. Supp. 2d 1247, 1273 (E.D. Cal. 2010) (internal citation omitted) (rejecting argument that NMFS was required to discuss explicitly a particular study of historic population decline because plaintiffs failed to explain how or why that study was superior to NMFS's discussion of population decline in the BiOp).

Merely noting that the BiOp does not cite to every study identified by the Registrants or other commenters does not establish that these studies are in any way better than the studies on which NMFS relied.  Oregon Natural Desert Ass'n, 716 F. Supp. 2d at 997.  Indeed, the Registrants offer no specific argument demonstrating that the 130 studies they invoke are relevant to NMFS's decisions at all – let alone constitute the best available science.  The Registrants have failed to carry their burden to show that these studies constitute the best available science and cannot make a threshold showing that NMFS erred by failing to rely on them.  South Yuba River Citizens League, 723 F. Supp. 2d at 1273.

CONCLUSION

At the end of the day, the Registrants' arguments amount to little more than a thinly-veiled disagreement with NMFS's ultimate conclusion that their products are severely harming threatened and endangered salmon and steelhead.  This Court should deny the Registrants' motion for summary judgment because mere disagreement with the agency's conclusions does not suffice to demonstrate that NMFS's BiOp is arbitrary, capricious, or otherwise not in accordance with the ESA.  NCAP respectfully requests that the Court grant its cross-motion for summary judgment and dismiss the Registrants' complaint.

Respectfully submitted this 22nd day of August, 2011.

s/  Stephen D. Mashuda
STEPHEN D. MASHUDA (Bar #96052)
AMANDA W. GOODIN (Bar #96051)
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
(206) 343-7340 | Phone
(206) 343-1526 | Fax
smashuda@earthjustice.org
agoodin@earthjustice.org

KHUSHI DESAI (MSBA #17444)
Earthjustice
1625 Massachusetts Avenue, N.W., Suite 702
Washington, D.C.  20036
(202) 667-4500 | Phone
(202) 667-2356 | Fax
kdesai@earthjustice.org

*Attorneys for Proposed Defendant-Intervenors, Northwest Center for Alternatives to Pesticides, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and Defenders of Wildlife*

CERTIFICATE OF SERVICE

I am a citizen of the United States and a resident of the State of Washington.  I am over 18 years

of age and not a party to this action.  My business address is 705 Second Avenue, Suite 203, Seattle,

Washington 98104.

I HEREBY CERTIFY that on August 22, 2011, I electronically filed the following documents:

1.      Memorandum in Support of Proposed Defendant-Intervenors' Cross-Motion for
        Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:

David B. Weinberg
Eric Andreas                                        ☐ via facsimile
Wiley Rein, LLP                                     ☐ via overnight courier
1776 K Street, N.W.                                 ☐ via first-class U.S. mail
Washington, D.C.  20006                             ☐ via hand delivery
(202) 719-7000 | Phone                              ☐ via e-mail
dweinberg@wileyrein.com                             ☒ via electronic service by Clerk
eandreas@wileyrein.com
*Attorneys for Plaintiffs Dow AgroSciences LLC and*
*Makhteshim Agan of North America, Inc.*

David E. Menotti
Warren U. Lehrenbaum                                ☐ via facsimile
Crowell & Moring LLP                                ☐ via overnight courier
1001 Pennsylvania Avenue, N.W.                      ☐ via first-class U.S. mail
Washington, D.C.  20004                             ☐ via hand delivery
(202) 624-2500 | Phone                              ☐ via e-mail
(202) 628-5116 | Fax                                ☒ via electronic service by Clerk
dmenotti@crowell.com
wlehrenbaum@crowell.com
*Attorneys for Plaintiff Cheminova, Inc. USA*

Meredith Lisa Flax
James A. Maysonett                              ☐ via facsimile
U.S. Department of Justice                      ☐ via overnight courier
Wildlife & Marine Resources Section             ☐ via first-class U.S. mail
Environment & Natural Resources Division        ☐ via hand delivery
P.O. Box 7369, Benjamin Franklin Station        ☐ via e-mail
Washington, D.C.  20044-7369                    ☒ via electronic service by Clerk
(202) 305 0404 | Phone
(202) 305-0216 | Phone
(202) 305-0275 | Fax
meredith.flax@usdoj.gov
james.a.maysonett@usdoj.gov
*Attorneys for Federal Defendants*

Stacey VanBelleghem
Latham & Watkins LLP                            ☐ via facsimile
555 Eleventh Street, N.W., Suite 1000           ☐ via overnight courier
Washington, D.C.  20004                         ☐ via first-class U.S. mail
(202) 637-2200 | Phone                          ☐ via hand delivery
(202) 637-2201 | Fax                            ☐ via e-mail
stacey.vanbelleghem@lw.com                      ☒ via electronic service by Clerk
*Attorney for Proposed Amicus Curiae CropLife*

AND I FURTHER CERTIFY that I have mailed by United States Postal Service the documents

to the following non-CM/ECF participants:

None

I, Catherine Hamborg, declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of August, 2011, at Seattle, Washington.

Catherine Hamborg