In the United States District Court
for the District of Maryland

|  |  |
|---|---|
| DOW Agrosciences LLC, *et al.,* | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 8:09-cv-824-AW |
| | ) |
| National Marine Fisheries Service, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

**Federal Defendants' Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment**

# Table of Contents

I.   Introduction ......................................................................................................................... 1

II.  Background .......................................................................................................................... 6

   A.   The Endangered Species Act ..................................................................................... 6

III. Standard of Review ............................................................................................................. 7

IV.  Argument ............................................................................................................................ 9

   A.   NMFS rationally concluded that these pesticides are toxic to salmon and steelhead (and their prey) even at very low concentrations. .............................................................................. 9

      1.   The acute toxicity of malathion to salmon: Gries and Purghart, Cohle, and Kuhajda ............. 16

      2.   The acute toxicity of diazinon to salmon and steelhead prey: Hall and Anderson .................. 19

      3.   The acute toxicity of chlorpyrifos to salmon ........................................................... 20

      4.   The salmon olfaction studies: Palm and Powell ....................................................... 21

   B.   NMFS rationally concluded that salmon and steelhead (and their prey) are likely to be exposed to toxic concentrations of these pesticides. ............................................................................. 22

      1.   NMFS rationally relied on mathematical models to develop a realistic range of exposures. .... 24

         a.   NMFS rationally relied on the AgDrift model. ................................................... 25

         b.   NMFS used the AgDrift model correctly. ............................................................ 26

         c.   NMFS rationally relied on the results of EPA's PRZM-EXAMS model. ............................ 31

      2.   NMFS also rationally relied on the available water monitoring data to develop a realistic range of exposures. ..................................................................................................................... 32

      3.   NMFS's population models rationally assume that salmon are exposed for 96 hours. ............. 37

      4.   NMFS confirmed that salmon and steelhead are likely to be in nearby aquatic habitats when these pesticides are being applied. ..................................................................................... 39

   C.   NMFS rationally concluded that buffers will protect salmon and steelhead from these pesticides. ................................................................................................................................. 41

1.     NMFS rationally concluded that these buffers will protect the most vulnerable salmon and steelhead habitat. ........................................................................................................................... 42

2.     NMFS rationally concluded that these buffers must protect not only salmon habitat, but also waterways that drain into salmon habitat. ....................................................................................... 43

3.     NMFS was not required to analyze the economic effects of these buffers on the Pesticide Manufacturers. ...................................................................................................................................... 43

D.   NMFS was not required to respond to the Pesticide Manufacturers' comments. .......................... 48

V.   Conclusion ................................................................................................................................................ 50

## I.     INTRODUCTION

Section 7 of the Endangered Species Act ("ESA") requires Federal agencies to ensure that the actions that they authorize, fund, and carry out are not likely to jeopardize the continued existence of any threatened or endangered species (or destroy or adversely modify the designated critical habitat of those species).  16 U.S.C. § 1536(a)(2).  It also requires Federal agencies to fulfill that obligation "in consultation with" the United States Fish and Wildlife Service and the National Marine Fisheries Service ("NMFS"), the Nation's experts on threatened and endangered species.  *Id.*  Here, EPA has registered three pesticides—the chemicals chlorpyrifos, diazinon, and malathion—under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").  So it consulted with NMFS to get NMFS's expert advice on the effects that these pesticide registrations will have on 28 species of threatened and endangered Pacific salmon and steelhead (collectively, "salmonids") and their designated critical habitat.

NMFS described its analysis and reported its conclusions in the extensive "biological opinion" that is being challenged in this case.  AR 857-1340.  Completing that biological opinion required NMFS to overcome daunting scientific challenges.  The scope of the action that NMFS had to analyze is immense.  These three pesticides are used in hundreds, "if not thousands," of products.  AR 1090.  They are applied in huge quantities—literally millions of pounds of these active ingredients have been applied over millions of acres throughout the United States.  AR 884 (noting that, from 1997-1998, 21 to 24 million pounds of chlorpyrifos were applied over 8 million acres); AR 886 (noting that, from 1987 through 1997, over 13 million pounds of diazinon were applied each year); AR 889 (noting that 11 to 13 million pounds of malathion were used in 2000).  They are widely used throughout California, Idaho,

Oregon, and Washington, the four Western states where these species of salmon and steelhead live.  AR 1116.

And because these pesticides are so widely used, their effects are far-reaching.  Pesticide contamination in the Nation's freshwaters is "ubiquitous . . . ."  AR 1115.  From 1992 to 2001, the United States Geological Survey ("USGS") took samples from hundreds of streams across the United States, and it detected pesticides in "most areas sampled with substantial agricultural or urban land uses."  AR 1031.  In fact, more than half of the agricultural streams and more than three-quarters of the urban streams that the USGS sampled contained concentrations of pesticides that exceeded the benchmarks that EPA has set for the protection of aquatic life.  AR 1033.  Importantly, the three pesticides at issue in this case—chlorpyrifos, diazinon, and malathion—were among the pesticides that were most commonly detected.  AR 1031.  They were found in 26%, 40%, and 6%, respectively, of the streams tested in California, Idaho, Oregon, and Washington.  AR 1101.  Many of those streams are habitat for salmon and steelhead that are protected by the Endangered Species Act.

But it is not just these pesticides that are widespread—so are salmon and steelhead.  These species "migrate hundreds or thousands of miles during their lifetime" and "use a wide range of freshwater, estuarine, and marine habitats . . . ."  AR 1080, 1116.  NMFS could not exclude any of that habitat from its analysis because these pesticides are ubiquitous—it had to assess the effects of these pesticides on "all freshwater, estuarine, marsh, swamp, nearshore, and offshore marine surface waters" in California, Oregon, and Washington, and "all freshwater surface waters in Idaho."  AR 903.

NMFS had to undertake that analysis despite the limited and imperfect scientific data that is available.  For example, we know that these pesticides are toxic to salmon and steelhead and that fish that are exposed to even small doses can be killed.  *See, generally,* AR 1127-38.  We also know that,

2

even at less than lethal doses, these pesticides can still impair the ability of salmon and steelhead to reproduce, stunt their growth, kill their prey, and confuse their sense of smell (which they rely heavily on). *Id.* But there is not enough data to define the exact doses necessary to produce these toxic effects and, even if there were, the toxicity of these pesticides varies widely from species to species and even by environmental conditions. *See, e.g.,* AR 1128 (noting that chlorpyrifos is 50 times more toxic at 18°C than 2°C). This is further complicated by the fact that these three pesticides all share the same mechanism of toxicity—they are all "acetyl cholinesterase inhibitors" that kill by impairing the "neurotransmission" of the same chemical in the brain. AR 881. As a result, salmon and steelhead that are exposed to mixtures of these pesticides (or any of the several dozen other pesticides that are also "acetyl cholinesterase" inhibitors) may experience the toxic effects of higher doses. AR 881.

And while we know that these pesticides are frequently detected in the watersheds that these species use, we do not know exactly where every salmon and every steelhead is at any given time. AR 1080, 1188. Similarly, while we know what uses these pesticides are registered for, we have only limited data on how they are actually being used in the field—we do not know when and where they have been or will be applied, or in what quantities. AR 1188. Thus, while we know that salmon and steelhead will be exposed to these pesticides, it is difficult to predict the exact concentrations that they will be exposed to or exactly how many of them will be affected. *Id.* Even where water samples have been taken from salmon habitat and tested for pesticides, those studies still do not tell us everything because the samples were usually not taken just after the pesticides were applied (or near where they were applied), and they probably do not measure the "peak" concentrations of these pesticides in salmon habitat. AR 1085-86.

So the ESA required NMFS to analyze the effects of hundreds of different uses of these pesticides over the next 15 years on all life-stages of 28 species of salmon and steelhead in nearly every aquatic habitat in four States, all using the limited and imperfect scientific data available. A challenging problem, to be sure, and here is how NMFS attacked it: first, it used two peer-reviewed mathematical models to simulate the lawful use of these pesticides and estimate the concentrations of these pesticides that will reach salmon and steelhead habitat. AR 1083-1099. NMFS was especially concerned about the effects that these pesticides will have on the backwaters used by juvenile salmon steelhead, which are often shallow and slow-moving and have only a limited ability to dilute pesticide contamination. AR 1095-99. Then NMFS reviewed data from water monitoring studies to see what concentrations of these pesticides have actually been detected. AR 1100-1110. Using these three lines of evidence (the two models and the monitoring studies), NMFS identified a realistic range of concentrations that salmon and steelhead will be exposed to.

Next, NMFS reviewed the available toxicity data and identified a range of concentrations that will have lethal or other adverse effects on salmon and steelhead and their prey. AR 1120-55. Taking those two pieces together—exposure and toxicity—NMFS found that individual salmon and steelhead are likely to be exposed to doses of these pesticides that will have toxic effects. AR 1157-60 (Figures 39-41). In particular, NMFS found that these pesticides are likely to reach lethal concentrations in shallow water habitat, where they will kill "many immature salmonids" and significantly reduce the abundance of their prey. AR 1158. A series of field reports attributing fish kills to pesticide contamination further confirmed that conclusion. AR 1160-65.

That was not the end of NMFS's analysis. Having concluded that these pesticides would harm individual salmon and steelhead, it then used a mathematical "population" model to simulate how whole

populations of these species would be affected. AR 1176-92; *see also* AR 1289-1321. NMFS found

that, at the concentrations that are expected to occur in salmon and steelhead habitat, these pesticides

will—at best—slow recovery efforts for these species and—at worst—increase their risk of extinction

"substantially." AR 1178. NMFS also found that these pesticides will sharply stunt the growth of

juvenile salmon and steelhead. AR 1183-87. The consequences, NMFS determined, will be "severe."

*Id.*

Finally, NMFS looked at each of these salmon and steelhead species to determine whether they

were likely to be in the same place at the same time that these pesticides are usually applied. AR 1200-

44. Putting all of these pieces together, NMFS concluded that EPA's registrations for chlorpyrifos,

diazinon, and malathion are likely to jeopardize the continued existence of all but one of these ESA-

listed Pacific salmon and steelhead species. AR 1245, 1249. Because it reached this "jeopardy"

conclusion, it also suggested a "reasonable and prudent alternative" to EPA's proposed action that will

avoid jeopardy. AR 1250-55. And because these pesticides are still likely to "take" some salmon and

steelhead even if EPA adopts that proposed alternative, NMFS also included an "incidental take

statement" in the biological opinion. AR 1256-61.

NMFS's analysis is exhaustive and thoroughly documented in the biological opinion, which is

more than 400 pages long. Its "jeopardy" conclusion is rational and fully supported by the "best

scientific and commercial data available." Three pesticide manufacturers, plaintiffs in this case, now

challenge that biological opinion, arguing that NMFS was wrong because these pesticides are harmless.

*See, e.g.,* Pl. Mem. at 19 (arguing that malathion has "absolutely no significant effects" on fish

populations). But the Pesticide Manufacturers are only able to make that overly-optimistic claim

because they have ignored the effects of these pesticides, especially on vulnerable shallow water habitat

5

and the sensitive juvenile salmon and steelhead that use it. Because the Pesticide Manufacturers have not shown that any of NMFS's analysis or conclusions were "irrational" or "arbitrary and capricious" or that NMFS ignored the "best scientific and commercial data available," and for all of the reasons discussed below, their motion for summary judgment should be denied, and summary judgment on all claims should be entered on behalf of the Federal Defendants.

## II.   BACKGROUND

### A.   The Endangered Species Act

The Endangered Species Act ("ESA") is the primary law governing the federal government's protection of threatened and endangered species. 16 U.S.C. §§ 1531-1544. Under Section 7(a)(2) of the ESA, each Federal agency must ensure, in consultation with NMFS, that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of its designated critical habitat. 16 U.S.C. § 1536(a)(2). In doing so, the agencies must use "the best scientific and commercial data available." *Id.* § 1536(a)(2); *see also* 50 C.F.R. § 402.12(d).

The courts have explained that this requirement to use the "best scientific and commercial data available" requires NMFS to consider all available biological information. *Heartwood Inc. v. U.S. Forest Serv.*, 380 F.3d 428, 436 (8th Cir. 2004) ("[a]ll that is required of the agencies is to seek out and consider all existing scientific evidence relevant to the decision at hand . . . . They cannot ignore existing data.") (citation omitted); *Kandra v. United States*, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001) (holding that "an agency cannot ignore available biological information"). Courts "presume[ ] that agencies have used the best data available unless those challenging agency actions can identify relevant data not considered by the agency." *Kandra*, 145 F. Supp. 2d at 1208.

But the courts have also held that "[w]hat constitutes the 'best' available science implicates core agency judgment and expertise to which Congress requires the courts to defer; a court should be especially wary of overturning such a determination on review." *San-Luis & Delta Mendota Water Auth. v. Salazar*, 693 F. Supp. 2d 1145, 1151 (E.D. Cal. 2010) (*quoting Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103 (1983)); *see also Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 205 (4th Cir. 2009). Under that deferential standard, "an agency has wide discretion to determine the best scientific and commercial data available for its decision-making." *San-Luis & Delta Mendota*, 693 F. Supp. 2d at 1157 (*citing Southwest Ctr. for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 523 n.5 (9th Cir. 1998)).

Finally, while NMFS must consider the "best" available science, that does not mean that the data must be perfect. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992) ("When an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination "arbitrary and capricious.") (citations omitted); *Building Industry Ass'n v. Norton*, 247 F.3d 1241, 1246-47 (D.C. Cir. 2001) (holding that reliance on studies that may be imperfect, standing alone, does not run afoul of the ESA best scientific data available standard as the Act requires only that the Service "utilize the 'best scientific . . . data available,' not the best scientific data possible.") (emphasis omitted).

## III.    STANDARD OF REVIEW

The Administrative Procedure Act ("APA") defines both the standard for judicial review here and the scope of that review. The standard of review is the familiar "arbitrary and capricious" standard—NMFS's biological opinion may be overturned only if the Court concludes that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §

706(2)(A).  The Court's review under this standard is "narrow," and it may not substitute its own judgment for the judgment of the agency.  *See Darden v. Peters*, 488 F.3d 277, 284-85 (4th Cir. 2007). Rather, the Court's only task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors."  *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

This standard is "at its most deferential" where, as here, the agency is making "complex predictions within its area of special expertise."  *Ohio Valley*, 556 F.3d at 205 (citing *Baltimore Gas*, 462 U.S. at 103).  "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  *Id.* (quoting *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).  Finally, "[w]hile an agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made, courts will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *1000 Friends of Md. v. Browner*, 265 F.3d 216, 238 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (quotations omitted); *see also Bowman Transp. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-86 (1974).

The APA limits the scope of judicial review here to the administrative record.  5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party.").  The "task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court."  *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985).  Because the Court's review is confined to the administrative record under the APA, "no *de novo* proceeding may be held."  *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963)

(citations omitted).  Rather, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  But if an agency has not provided an explanation of its action that is sufficient to allow effective judicial review, the Court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." *Camp v. Pitts*, 411 U.S. at 142-43; *see also Florida Power*, 470 U.S. at 744 (holding that, "if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it," then the "proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

IV.   **ARGUMENT**

   A.   **NMFS rationally concluded that these pesticides are toxic to salmon and steelhead (and their prey) even at very low concentrations.**

   NMFS reviewed the results of a multitude of studies to determine how toxic these pesticides are.  It found that the evidence overwhelmingly shows that these pesticides are toxic to salmon and steelhead at very low concentrations.  *See, generally*, AR 1120-1155.  Many of the studies that NMFS reviewed report the "acute" toxicity of these pesticides as a median lethal dose, that is, the dose that will kill half of the tested population over some specific period (typically 96 hours).  The median lethal dose is also known as the "Lethal Concentration, 50%" and is commonly abbreviated "$LC_{50}$."  These studies evaluated the toxicity of these pesticides under different test conditions (and tested different species) and thus reported a range of $LC_{50}$s for these pesticides.  After NMFS reviewed the range of responses by different species under different conditions, the $LC_{50}$s that it ultimately used to evaluate potential effects to salmon and steelhead were 3.0 parts per billion (or "ppb") for chlorpyrifos (which is the same as 3.0

µg/L), 30 ppb for malathion, and 90 ppb for diazinon.  AR 1304 (Table 3).  These are very small doses: a part per billion is the equivalent of adding about a half teaspoon to an Olympic-size swimming pool.

These very low doses are not the minimum detectable doses of these pesticides or the minimum doses that will affect salmon and steelhead.  To the contrary, these are the doses that will **kill** half of the exposed salmon and steelhead.  And because these are **median** lethal doses, the sensitive salmon and steelhead in a population may be affected and killed at much lower concentrations.  AR 1157. Moreover, many of these studies were not conducted on the most sensitive lifestage of the tested species so, again, there may be adverse effects and even fatalities at much lower doses.  AR 1125.

NMFS also reviewed the results of a multitude of studies that analyzed other adverse effects, including effects to salmon and steelhead reproduction, growth, development, "olfaction and olfactory-mediated behavior" (that is, the salmon's and steelhead's sense of smell), and the survival, growth, and reproduction of the prey of these species.  AR 1127-55.  NMFS found that the invertebrate prey of these salmon and steelhead, in particular, were affected by very low doses of these pesticides (between 1 and 3 ppb), which is not surprising since these pesticides are sold as insecticides.  AR 1304 (Table 3).

Together, NMFS used all of these studies to identify the range of doses at which toxic effects occur, AR 1158-60 (Figures 39-41), as well as the specific values that it used in its population models, AR 1304 (Table 3).  It summarized its toxicity findings for different "assessment endpoints" (such as survival, growth, and reproduction) and described its "degree of confidence" in those findings.  AR 1155 (Table 59).  Due to the wide range of values reported by these studies and the significant uncertainties involved, and because the ESA requires NMFS to "err on the side of the species," NMFS selected "$LC_{50}$s from the lower range of available studies."  AR 1126.  That decision was rational and consistent with the "best available scientific and technical data."

The Pesticide Manufacturers disagree. They believe that these pesticides are harmless to salmon and steelhead, and their prey, even in large doses. They believe that it was "irrational" for NMFS to rely on the array of studies showing very low $LC_{50}s$ for these chemicals. And they advance several arguments to try to support those untenable claims.

First, they argue that NMFS "ignored" a series of "nearly 130" "relevant and determinative studies" and "other information" submitted by the Pesticide Manufacturers themselves (and other registrants) and by the State of California's Department of Pesticide Regulation ("CDPR"). Plaintiffs' Memorandum in Support of Motion for Summary Judgment, Docket No. 58-1 (July 18, 2011) ("Pl. Mem."), at 16, 38. These studies, the Pesticide Manufacturers claim, demonstrate that these pesticides are much less toxic to salmon and steelhead. *See, generally*, Pl. Mem. at 16-23. They contend that NMFS "violated both the ESA's 'best available data requirement' and also . . . 'acted arbitrarily and capriciously in violation of the APA" by "ignoring" these studies. Pl. Mem. at 2, 14, 16, 19.

But the Pesticide Manufacturers are wrong—NMFS did not ignore these studies. As NMFS repeatedly states in the biological opinion, it reviewed and considered the "information and comments provided . . . by the registrants," AR 872, including "[p]esticide registrant generated data" and the "[i]nformation and data provided by the registrants . . . ." AR 894. *See also* AR 1120 (noting that NMFS considered "information and data provided by the registrants identified as applicants," as well as "comments and information . . . on the draft Opinion . . . ."). The comments submitted by the Pesticide Manufacturers identifying and discussing these studies are included in the administrative record. *See, e.g.,* AR 1341-43, 1689-1832, 1839-52. NMFS also met with the Pesticide Manufacturers (or conferred with them by phone) four times, and these studies were discussed at those meetings. AR 874-879.

Just because NMFS considered these studies, however, does not mean that it was required to assign the same weight to them as the Pesticide Manufacturers. As NMFS explained, it reviewed a great many studies but "assigned the most significance" to those that analyzed the effects of pesticides on salmon and steelhead, that measured an "endpoint of concern" (such as survival, growth, or reproduction), that used one of the three pesticides at issue here, and that "had no substantial flaws in the experimental design." AR 1138; *see also* AR 1120 (noting that "[t]he most relevant study results are those that directly address effects to an identified assessment endpoint derived from experiments with salmonids, preferably listed Pacific salmonids or hatchery surrogates, exposed to the stressors of the action."). For the reasons explained in detail further below, the studies submitted by the Pesticide Manufacturers did not satisfy those criteria or were simply redundant.

The Pesticide Manufacturers also argue that, even though NMFS considered these studies, the biological opinion is still invalid because NMFS "never . . . documented that it had evaluated" them.[1] This is not true because, as discussed above, the biological opinion explicitly states that NMFS considered these studies. *See, e.g.,* AR 872, 894, 1120. And even if it were true, the Pesticide Manufacturers cannot prevail on their claims simply because NMFS did not explicitly discuss—in the text of the biological opinion itself—each and every one of the hundreds of studies that they submitted. Nothing in the ESA or its regulations imposes such a requirement. In fact, the ESA and its regulations expressly define the elements that NMFS must include in its biological opinion, and all that they require is that a biological opinion include "a **summary** of the information on which the opinion is based." 16

---

[1] Pl. Mem. at 15 (arguing without support that the "record must persuasively explain why NMFS rejected evidence inconsistent with its conclusions."); Pl. Mem. at 16 (arguing that NMFS violated the APA because it "never . . . documented that it had evaluated" these studies); *see also* Pl. Mem. at 19 (arguing that the biological opinion is "arbitrary and capricious" because NMFS did not "explain why it did not rely on these studies . . . ."); Pl. Mem. at 38 (claiming that "[n]othing in the BiOp, or even the larger record, reveals that NMFS responded to the nearly 130 studies and other information . . . .").

U.S.C. § 1536(b)(3)(A) (emphasis added); 50 C.F.R. §§ 402.14(h)(1).  Nothing in the statute or its regulations states or even suggests that NMFS is require to "document" all of the studies that it reviewed in the process of writing a biological opinion.  Nor is there any such recommendation in the joint "Consultation Handbook" that NMFS has issued together with the United States Fish and Wildlife Service.  United States Fish and Wildlife Service & National Marine Fisheries Service, *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities under Section 7 of the Endangered Species Act* (Mar. 1998).

There is also no provision of the APA and no principle of administrative law that requires NMFS to discuss all of these studies explicitly.  To the contrary, the APA expressly states that this Court "shall review the whole record" (or "those parts of it cited by a party") in determining whether this biological opinion is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706.  The "focal point for judicial review" is not simply the biological opinion, but "the administrative record," and the standard is not whether the agency has made express findings about every possible issue, but rather whether the findings that it did reach are "sustainable on the administrative record made . . . ."  *See Camp v. Pitts*, 411 U.S. at 142-43.  Even an agency action of "less than ideal clarity" must be upheld as long as "the agency's path may reasonably be discerned." *Bowman Transp.,* 419 U.S. at 285-86 (citation omitted).  Moreover, where the agency's analysis is unclear (for example, where a "voluminous record [did] not contain a single sentence reflecting the reasons why [the agency] found the final RPAs to be adequate"), the Court "looks to the record as a whole . . . to determine whether [the agency] acted arbitrarily and capriciously."  *Greenpeace v. NMFS*, 55 F. Supp. 2d 1248, 1265 (W.D. Wash. 1999).

The Pesticide Manufacturers cite a handful of cases, but none of those cases held that NMFS is required to explicitly "document" every scientific study that it considers, even the studies that it does not rely on. Instead, those cases stand for the simple (and undisputed) proposition that an agency may so totally fail to explain itself, in both its decision document and the administrative record, that the court cannot "reasonably discern" the agency's path and must remand that decision back to the agency for further explanation. *See, e.g., Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 46 (holding that agency decision was "arbitrary and capricious" because agency failed to consider aspect of problem); *Delta Smelt Consol. Cases v. Salazar*, 760 F. Supp. 2d 855, 870-71 (E.D. Cal. 2010) (same); *Pacific Coast Fed'n*, 606 F. Supp. 2d at 1144 (same). By arguing that NMFS was required to explicitly address every study that the registrants submitted, the Pesticide Manufacturers are trying to throw a series of hurdles in front of the agency in the hope that it will not be able to reach the conclusion overwhelmingly supported by the scientific evidence—that these pesticides harm salmon and steelhead, and their prey, even at very low doses. But their argument fails because it is not supported by the ESA, its regulations, the APA, or the principles of administrative law.

And even if the Court were to conclude that it cannot determine what NMFS did with the studies submitted by the Pesticide Manufacturers, the proper remedy would not be to vacate this biological opinion. It would be to have NMFS present further explanation of its treatment of these studies, either through a declaration or a limited remand.[2] Here, NMFS has already provided that further explanation in the form of a declaration from Dr. Anthony W. Hawkes, a toxicologist and one of the authors of this

---

[2] *See Florida Power*, 470 U.S. at 744 (holding that, "if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it," then the "proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Camp v. Pitts*, 411 U.S. at 142-43 (holding that where there is "such failure to explain administrative action as to frustrate effective judicial review," the remedy is not to "hold a *de novo* hearing," but rather to "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.").

biological opinion.[3]  Declaration of Anthony W. Hawkes ("Hawkes Decl.") (attached hereto as Exhibit

1) ¶¶ 1, 4.  As Dr. Hawkes explains, NMFS did not "ignore submissions, issues raised, or comments."

*Id.* ¶ 6.  To the contrary, Dr. Hawkes "personally reviewed all of the comments submitted by EPA and

the Pesticide Registrants on our draft [biological opinion]." *Id.*  ¶¶ 4, 6.  In fact, NMFS reviewed more

than 500 scientific documents in preparing this biological opinion, including "peer-reviewed journal

articles, books, and unpublished reports," and it cited over 400 articles in the final biological opinion

and its appendices. *Id.* ¶ 5.

NMFS did not cite every study that it considered because many "were either not pertinent to the

risk hypothesis or were not of sufficient quality to merit citation." *Id.* ¶ 8.  Some of these studies

addressed human health effects, which were not relevant here, or "contained substantial experimental

design problems." *Id*.  Others "simply duplicated information and data provided by other sources." *Id*.

NMFS did not cite those studies because they "had limited utility for the analysis in the BiOp." *Id*.  In

addition, many of the documents cited by the Pesticide Manufacturers were not actually studies, but

rather were letters, regulatory documents, and comments. *Id.* ¶ 9(b).  Where those documents cited

---

[3] As discussed above, the Court's review of this biological opinion is generally limited to the administrative record, and Dr. Hawkes' declaration is not part of that administrative record (because it was not completed until after the biological opinion was finished).  The Court may still consider it because the Supreme Court has recognized that it is appropriate for the Court to obtain additional explanation "from the agency" where necessary to permit effective judicial review. *Camp v. Pitts*, 411 U.S. at 142-43.  By submitting this declaration, however, the Federal Defendants are not inviting the Pesticide Manufacturers to submit declarations from their own, competing experts so that the Court may preside over a "battle of the experts."  That would be wholly improper because, under the deferential standard of review that applies here, it is up to NMFS—not the Court—to weigh competing expert opinions and scientific data.  Thus, any expert testimony that the Pesticide Manufacturers might submit is irrelevant because the Court's task is not to weigh the evidence of itself, but rather to determine whether the agency acted rationally based on the evidence in the administrative record. *Lands Council v. McNair*, 537 F.3d 981, 993-94, 1000 (9th Cir. 2008); *see also, e.g., Price Rd. Neighborhood Ass'n v. United States Dep't of Transp.*, 113 F.3d 1505, 1511-12 n.1 (9th Cir. 1997) (affirming district court's exclusion of expert studies submitted by plaintiffs).  The fact that the Pesticide Manufacturers' experts may disagree about the "correctness or wisdom" of NMFS's biological opinion is irrelevant because "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 1511 (citing *Greenpeace Action*, 14 F.3d at 1332).  The Supreme Court itself has recognized this difference between the Federal Defendants submitting "additional explanation" through "affidavits" and an impermissible "*de novo* hearing." *Camp v. Pitts*, 411 U.S. at 142-43.

studies or data, NMFS relied instead on the primary sources. *Id.* Thus, the Pesticide Manufacturers'

argument fails because both the biological opinion and Dr. Hawkes' declaration demonstrate that NMFS

did not ignore these studies.

Second, the Pesticide Manufacturers challenge a handful of studies that reported very low $LC_{50}$s

(or other effects thresholds) for these pesticides, arguing that these studies are unreliable. As the courts

have held, the question of what studies make up the "best" available science "implicates core agency

judgment and expertise to which Congress requires the courts to defer; a court should be especially wary

of overturning such a determination on review." *Delta Smelt Consol. Cases*, 760 F. Supp. 2d at 871; *see

also Baltimore Gas*, 462 U.S. at 103 (a court must be "at its most deferential" when an agency is

"making predictions, within its area of special expertise, at the frontiers of science."). Nonetheless, we

respond to each of these arguments in turn below.

### 1. The acute toxicity of malathion to salmon: Gries and Purghart, Cohle, and Kuhajda

As NMFS noted in the biological opinion, a wide range of $LC_{50}$s have been reported for the

effects of malathion on salmon and steelhead: "the lowest reported $LC_{50}$ was 2.8 µg/L and the highest

$LC_{50}$ was 234 µg/L for salmonids." AR 1134. The Pesticide Manufacturers argue that the lowest

reported $LC_{50}$—2.8 µg/L—is invalid because it came from a study that is "more than 40 years old" and

that tested malathion containing toxic impurities that is "not representative of products now on the

market." Pl. Mem. at 17-19. They also claim that four more recent studies, Gries and Purghart (2001a)

and (2001b), Cohle (1989), and Kuhajda (1996) show that malathion, as applied, has "absolutely no

significant effects on . . . overall fish population or aquatic invertebrate communities." *Id.*

These arguments fail because NMFS expressly acknowledged that "[u]ncertainty remains as to

which $LC_{50}$ is the most accurate given the large variability in reported salmonid $LC_{50}$s . . . ." AR 1134.

And while it included the 2.8 µg/L value in its summary of the range of reported $LC_{50}$s, it did not actually use that value in its population model. Instead, it used a value of 30 µg/L—more than ten times higher. AR 1134; AR 1304 (Table 3) (stating that NMFS used a "fish lethality $LC_{50}$" of 30 µg/L for malathion). So even if the Pesticide Manufacturers were right, and that value was unreliable, it would not have changed NMFS's analysis.

The Pesticide Manufacturers' argument also fails because, as discussed above, NMFS considered all of the "more recent" studies that they have cited. In fact, the results of the Cohle study are summarized in the biological opinion itself (although the study is not cited by name). AR 1135 (describing the results of a malathion chronic toxicity test with rainbow trout); *see also* AR 5383, 5831. And the record also shows that the Kuhajda study was received and reviewed by NMFS. AR 802.

Again, even if the Court were to conclude that NMFS had not adequately discussed these four studies, the proper remedy would be to remand the matter back to NMFS for further explanation, and NMFS has already provided the necessary explanation in Dr. Hawkes' declaration. Dr. Hawkes explains that NMFS considered, but did not cite, the Gries and Purghart studies because they simply "reported an $LC_{50}$ within the range already considered" and thus "did not provide any significantly new information for the analysis." Hawkes Decl. ¶ 23. He explains that NMFS found the Cohle study to be of limited use because it did not address "life-stage sensitivity" and because it was a study of chronic, not acute, toxicity. *Id.* ¶ 25.

And he explains that NMFS reviewed the Kuhajda study, but found that it had "significant experimental design problems." *Id.* ¶ 20. Specifically, the Kuhajda study purported to study the effects of malathion by comparing fish and invertebrate populations in a nearby creek before and after malathion was applied. *Id.* ¶ 20. But NMFS found that malathion had already been applied several

times near the creek before the study even began, making it not so much a "before-and-after" study as an "after-and-after" study. *Id.* NMFS concluded that it could not rely on the study because it "lacked a reference area that was comparable to the treated sites." *Id.*

All of these determinations involve scientific and technical issues that are within NMFS's scientific expertise and are entitled to deference from the Court. Finally, the Pesticide Manufacturers claim that the lowest reported $LC_{50}$ for malathion—2.8 µg/L—should be ignored because that study "tested material that is not representative of products now on the market." Pl. Mem. at 17. But as Dr. Hawkes points out, while the products tested in that study may not be representative of the products produced by the plaintiffs in this case, there are 37 other companies that hold active registrations for more than 100 malathion products. Hawkes Decl. ¶ 21. So while it may be true that the Pesticide Manufacturers now produce a more refined "technical" malathion that contains less impurities, that does not necessarily mean that the "end-use" products formulated by other manufacturers and actually applied in the field also contain less impurities. *Id.* Moreover, the level of impurities in a malathion product also depends on how the product was stored, which the Pesticide Manufacturers do not control. *See* AR 891. Finally, the malathion products that are applied in the field also contain many other ingredients (besides malathion and its impurities) that contribute to their toxicity. Hawkes Decl. ¶ 21. For all of these reasons, NMFS concluded that it was not appropriate to rely exclusively on these more recent studies that tested only the "technical" malathion produced by the Pesticide Manufacturers (although it did consider those studies and gave them the appropriate weight). *Id.* ¶ 20. That scientific judgment is entitled to deference. Taken together, none of the Pesticide Manufacturers' arguments show that it was "arbitrary and capricious" for NMFS to include the 2.8 µg/L $LC_{50}$ in its biological opinion or for it to give less weight to the studies cited by the Pesticide Manufacturers.

### 2.     The acute toxicity of diazinon to salmon and steelhead prey: Hall and Anderson

There is a wealth of evidence that diazinon is acutely toxic to aquatic invertebrates even at very low concentrations. AR 1133-34. Those aquatic invertebrates includes species like "amphipods, mayflies," and others, that are the prey of juvenile salmon and steelhead. AR 1133. As NMFS noted in the biological opinion, the $LC_{50}$s reported for these aquatic invertebrates for diazinon have ranged from as low as 0.03 µg/L to as high as 2,500 µg/L. AR 1133-34.

The Pesticide Manufacturers argue that NMFS should not have considered the lowest reported value in this range—0.03 µg/L—because EPA did not rely on it and because "[t]here is no indication in the record that NMFS . . . bothered to look at the original study . . . ." Pl. Mem. at 19-20. They also argue that it was "arbitrary and capricious" for NMFS to include another low $LC_{50}$—0.2 µg/L—because they claim that it was based on "a math error" and has been shown by a more recent study, Hall and Anderson (2005), to be "wrong by a factor of 10." Pl. Mem. at 20.

But even if those two reported values were unreliable, it would not have changed NMFS's analysis. While NMFS included those values in the range of reported $LC_{50}$s, it did not actually use them in its population model. Instead, it used a value of 1.38 µg/L, which is more than ten times higher than the lowest reported value, and very close to the value that the Pesticide Manufacturers claim is supported by Hall and Anderson (2005) (that is, 2.0 µg/L). AR 1304 (Table 3) (stating that NMFS used a "prey survival EC50" for diazinon of 1.38 µg/L). And while NMFS does not explicitly discuss Hall and Anderson (2005) in the biological opinion, it did consider it (as discussed above) and, in any event, that study did not provide any new information because it merely reported an $LC_{50}$ that was already within the range of values that NMFS had identified. AR 2262; *see also* Hawkes Decl. ¶ 13.

Finally, even if all of this was not already clear from the biological opinion and the administrative record, NMFS has provided further explanation of these issues in Dr. Hawkes' declaration. He explains that NMFS reviewed the Hall and Anderson (2005) study identified by the Pesticide Manufacturers and their claim that it proved that the $LC_{50}$ of 0.2 µg/L for diazinon was "based on a math error." Hawkes Decl. ¶ 13. NMFS rejected that claim because it found that the Hall and Anderson study tested a different species of aquatic invertebrate and thus "any difference [between their results and the results of the earlier study] might simply be due to differences between the sensitivity of the two species or test conditions." *Id.* Moreover, NMFS found that the responses of aquatic invertebrates to pesticides vary widely by species, life-stage, exposure duration, and differences in environmental conditions. *Id.* For that reason, NMFS did not rely on "any one study or species," but rather used an $LC_{50}$ of 1.38 µg/L to evaluate the effects of these pesticides on "the prey community as a whole." *Id.* The Pesticide Manufacturers have not shown that any of those determinations were "arbitrary and capricious."

### 3. The acute toxicity of chlorpyrifos to salmon

Summarizing the available studies, NMFS found that the reported $LC_{50}$s for the toxicity of chlorpyrifos to salmon and steelhead ranged from as low as 0.8 µg/L to as high as 2,200 µg/L. AR 1127. Of the ten reported values, eight were below 8.3 µg/L (and only two were higher, one at 51 µg/L and one at 2,200 µg/L). *Id.* The Pesticide Manufacturers complain that this is too "wide ranging" a spectrum and claim the CDPR submitted more recent studies identifying a narrower range of more accurate values. Pl. Mem. at 21. But as was the case with the effect of diazinon on aquatic invertebrates, NMFS found that these studies identified a wide range of toxicities for chlorpyrifos because they were done with different species, at different life-stages, and tested different formulations

under different conditions.  *See* AR 1127-28.  NMFS also noted that the toxicity of chlorpyrifos varies

widely with temperature—for example, it is more than 50 times more toxic at 18°C than 2°C.  AR 1128.

In any event, the Pesticide Manufacturers have not even attempted to show that any of these

studies were inaccurate or somehow flawed.  And once again, even if the lowest values in this range

were unreliable, that would not have changed NMFS's analysis because it did not use them in its

population models.  AR 1304 (Table 3) (stating that NMFS used a fish lethality $LC_{50}$ of 3.0 µg/L for

chlorpyrifos).  The Pesticide Manufacturers have not shown that any of these determinations were

"arbitrary and capricious."

### 4.  The salmon olfaction studies: Palm and Powell

Salmon and steelhead rely heavily on their sense of smell ("olfaction") for "detecting and

avoiding predators, recognizing kin, imprinting and homing in natal waters, and reproducing."  AR

1143.  Unfortunately, that sense is also "particularly sensitive to toxic effects of metals and other

contaminants."  *Id.*  NMFS identified three "highly relevant" studies that examined how these pesticides

affect the salmon's and steelhead's sense of smell: Moore and Waring (1996), Scholz (2000), and

Sandahl (2004).  AR 1143-45.  NMFS found that those studies, "[c]ollectively," supported the

hypothesis that these pesticides will impair the sense of smell in salmon and steelhead, thus impairing

their ability to avoid predators and to return to their natal waters and reproduce.  AR 1173.  Using a

qualitative analysis, NMFS ultimately concluded that populations of salmon and steelhead exposed to

these pesticides "are likely to have reduced abundance and productivity as a result of impaired . . .

olfactory-mediated behaviors."  AR 1188-89.

The Pesticide Manufacturers argue that NMFS should not have "placed great weight" on these

studies because they are "unreliable."  Pl. Mem. at 21-23.  They claim that Moore and Waring was

"dismissed by EPA . . . because it did not measure real-world effect," that Sandahl was unrealistic because "it assumes that salmon are exposed to chlorpyrifos for seven days," and that Scholz should have been replaced by a newer study by Palm and Powell, which NMFS allegedly "ignored." Pl. Mem. at 22-23.

But as we have already discussed, NMFS rationally concluded that these studies were "highly relevant" because they examine the effects of these specific pesticides (chlorpyrifos and diazinon) on salmon. AR 1145. The seven-day exposure used by Sandahl is not unrealistic given the half-lives of these pesticides, which, depending on water conditions, can be as long as 16 to 73 days for chlorpyrifos, 12 to 72 days for diazinon, and 2.5 to 177 days for malathion. AR 1077-78. And NMFS did consider the Palm and Powell study. AR 711, 717-719, AR 731A.[4] At the time that this biological opinion was completed, that study had not yet been published or subjected to peer review. AR 717-719. When NMFS received a pre-publication copy of the study, it found that Palm and Powell had not replicated the methods used in the earlier Scholz study, but instead had used "stimulus intensities" (that is, odors) that were about 10,000 times greater than used in Scholz and Sandahl. AR 731A. NMFS rationally concluded that the study was not useful (and did not disprove Scholz) because even a salmon rendered "almost smell-blind" by pesticides could "probably still detect that odor." *Id.* The Pesticide Manufacturers have not shown that any of these determinations were "arbitrary and capricious."

### B. NMFS rationally concluded that salmon and steelhead (and their prey) are likely to be exposed to toxic concentrations of these pesticides.

Having identified a range of doses at which toxic effects will occur, NMFS next turned to identifying the concentrations of these pesticides that salmon and steelhead are likely to be exposed to.

---

[4] The contemporaneous e-mail discussing the Palm and Powell study marked as AR 731A was inadvertently omitted from the administrative record. We attach a copy hereto as Exhibit 2 and mark it with Bates Number 731A to preserve the chronological sequence of the record.

Salmon and steelhead may be exposed to these pesticides in several ways. Rain that is not absorbed by the soil may run-off from the fields where pesticides have been applied, carrying the pesticides into streams, rivers, and other aquatic habitats used by salmon and steelhead. AR 1078. As the pesticides are being sprayed, they may remain suspended in the air and drift into those aquatic habitats through "spray drift." *Id.* Malathion that is being used to control mosquitoes may be applied directly to bodies of water where mosquitoes breed, but those bodies of water may also be habitat for salmon and steelhead (such as marshes). AR 890. And these pesticides may also reach salmon and steelhead habitat by leaching through the soil or by evaporating and later being deposited by the rain. AR 1078.

Once their habitats are contaminated, salmon and steelhead are exposed to these pesticides through direct contact with the water. AR 1078. They may also be exposed when they eat dead or dying insects that have themselves absorbed these pesticides. AR 1078-79. That can be an important route of exposure because these pesticides are used to control insects that "make up a substantial portion of salmonids' diets . . . ." AR 1079.

Unfortunately, we cannot know exactly what levels of these pesticides occur in salmon and steelhead habitat because no one has undertaken a comprehensive study of that issue. So NMFS had to use the existing data to estimate the concentrations of these pesticides that salmon and steelhead are likely to be exposed to. *See, generally*, AR 1082-99. NMFS based its estimates on three lines of evidence. First, it looked at estimates that EPA prepared using the "PRZM-EXAMS" model, which simulates pesticide run-off and drift into a hypothetical farm pond. AR 1083-88. Second, NMFS used the "AgDrift" model to simulate the concentrations that will occur when these pesticides are sprayed near the shallow water habitat favored by juvenile salmon and steelhead. AR 1095-99. Third, NMFS

reviewed the available water monitoring data to determine what concentrations of these pesticides have been detected in the past. AR 1100-1110.

None of these methods is perfect; each has its advantages and its limitations, which NMFS explained at length in the biological opinion. *See, e.g.,* AR 1088-95 (discussing the limitations of these models); AR 1108-1110 (discussing the limitations of the historical monitoring data). NMFS also recognized that exposure was likely to be "highly variable among individuals and populations of listed salmon." AR 1116-17. But taking these three lines of evidence together, NMFS was able to identify a realistic range of exposures for these salmon and steelhead, and that range of exposures has a rational basis in the best scientific and technical data available. *See* AR 1158-60 (Figures 39 to 41) (identifying range of potential exposure concentrations).

### 1. NMFS rationally relied on mathematical models to develop a realistic range of exposures.

NMFS used two mathematical models (AgDrift and PRZM-EXAMS) to simulate the range of concentrations that will occur in aquatic habitats after these pesticides are applied. *See, generally*, AR 1082-99. These models, like all models, make simplifying assumptions—they cannot (and do not attempt to) account for every eddy in every stream, every possible pesticide application scenario, every configuration of every agricultural field, and every variation in wind and weather. Such a task would be impossible. But that does not mean that these models are not useful or that it was "irrational" for NMFS to rely on them. The ESA does not require NMFS to use only perfect information, if such a thing even exists—to the contrary, it expressly states that NMFS must consider "the best . . . data **available**." 16 U.S.C. § 1536(a)(2) (emphasis added).

These models, together with the monitoring data discussed below, are the best data available. They are widely-used, have been field tested and subjected to scientific "peer review," and have

"demonstrated scientific credibility." *See* AR 4075, 6299. NMFS recognized and discussed the assumptions made by these models, and their limitations, in the biological opinion. *See, e.g.,* AR 1089-95. Then it used the models to develop a realistic range of exposures. *See, generally,* AR 1082-99. Those determinations were rational and, because they are highly technical, are entitled to deference from this Court. *See, e.g., 1000 Friends*, 265 F.3d at 236-37.

### a. NMFS rationally relied on the AgDrift model.

The Pesticide Manufacturers argue that these models are wrong and also that NMFS misapplied the models. Pl. Mem. at 26-28. First, they challenge the AgDrift model. AgDrift is a "spray drift model" that simulates the concentrations of pesticides that remain suspended in the air after they are sprayed. AR 1084. The Pesticide Manufacturers argue that AgDrift has "several . . . flaws" and is "incorrect" because, for example, it assumes a "consistent high wind speed" which is not likely to occur in "real landscapes." Pl. Mem. at 26-27.

These arguments are surprising because it was the Pesticide Manufacturers that created the AgDrift model in the first place, and that model is now used extensively by EPA in the FIFRA registration process without any objection from them.[5] In any event, a peer-reviewed scientific study tested the AgDrift model and found that it accurately simulates pesticide spray drift. AR 6307 (comparing AgDrift's simulations to the data from 161 actual field trials and finding that AgDrift "predicts average field deposition levels reasonably well over the range of application conditions that are likely to be encountered in aerial agricultural applications" and that "this model appears satisfactory for

---

[5] More precisely, AgDrift was developed by the Spray Drift Task Force, "a consortium of pesticide registrants under a cooperative research agreement with EPA." AR 1084. The Pesticide Manufacturers are all members of that consortium. *See* http://www.agdrift.com/Text%20pages/members.htm (last visited Aug. 22, 2011).

regulatory evaluations . . . ."); *see, generally*, AR 6299-6308.  Based on that study, NMFS found that AgDrift "adequately predicts drift."  AR 1096.

NMFS also understood that AgDrift makes the simplifying assumption that these pesticides are being applied to "a level field with wind blowing directly toward aquatic habitats . . . ."  AR 1254.  And it recognized that "[m]any agricultural fields are not flat and wind may change directions quickly or may not be blowing directly into salmonid habitats."  *Id.*  NMFS took those limitations in account when it used the AgDrift model, together with the PRZM-EXAMS model and the monitoring data discussed below, to develop a realistic range of exposures for salmon and steelhead.  Its use of this model was not "arbitrary and capricious."

### b.  NMFS used the AgDrift model correctly.

Next, the Pesticide Manufacturers argue that NMFS "misused" the AgDrift model.  Pl. Mem. at 27.  They claim that the values that NMFS put into the model assumed "illegal" "misuse of the pesticides at issue."  Pl. Mem. at 27, 28 n.28.  In particular, they contend that NMFS used application rates for these pesticides that were too high and that do not apply to "most" crops.  Pl. Mem. at 28 n.28.  And they claim that these alleged mistakes led NMFS to use 1,000 µg/L is a "realistic exposure level" and a "benchmark for evaluating impacts on salmonids," when the maximum exposure level, according to the Pesticide Manufacturers, was really "only 66 µg/L . . . ."  Pl. Mem. at 28.

In fact, NMFS used this model correctly—it was simply modeling scenarios that the Pesticide Manufacturers would prefer to ignore.  As we discuss below, EPA provided exposure estimates for these salmon and steelhead using the PRZM-EXAMS model.  NMFS found that those estimates would be "protective for the vast majority of applications and aquatic habitats."  AR 1089.  But NMFS was also concerned that the PRZM-EXAMS model would underestimate exposure for salmon and steelhead

living in shallow water habitat.  AR 1089, 1094.  Salmon and steelhead rely extensively on "[s]mall streams," "backwaters," "sloughs," "off-channel dredge ponds," "braids," "alcoves," and other "non-main channel habitat."  AR 1094.  These shallow water habitats are populated by "[d]iverse, abundant communities of invertebrates" that salmon and steelhead rely on as prey.  *Id.*  Juvenile salmon and steelhead, in particular, may live in these kinds of shallow water habitats for months.  *Id.*

Shallow water habitats, however, have much less capacity to dilute pesticides than the main channel of a river or stream because they are shallow and because they are "protected from a river's or a stream's primary flow" and have "low to no flow."  AR 1094.  NMFS found that the PRZM-EXAMS model, because it simulates pesticide run-off and drift into a hypothetical farm pond, would not accurately model these smaller bodies of water.  AR 1095; *see also* AR 1094 (noting that the "farm pond scenario is likely a poor surrogate of certain habitats used by salmonids.").  NMFS concluded that salmon and steelhead would probably be exposed to higher concentrations of pesticides in these shallow water habitats than the estimated generated by the PRZM-EXAMS model.  AR 1094.

So NMFS supplemented EPA's analysis by using the AgDrift model to simulate the concentrations of pesticides that are likely to occur in shallow water habitat.  AR 1095-99.  It analyzed a total of 30 different scenarios, looking at how different methods of application and different buffer zones would affect the concentrations of these pesticides occurring in shallow water habitats between 0.1 meters and 2 meters deep.  AR 1099 (Table 44) (summarizing the results of NMFS's analysis).  NMFS found that, in some scenarios, these pesticides could lawfully be applied in a way that would result in a concentration of more than 1,000 µg/L (or 1 mg/L) in shallow water habitat.  AR 1097.  Concentrations that high, NMFS concluded, "would result in substantial toxicity to aquatic life including deaths of exposed salmonids."  *Id.*

The Pesticide Manufacturers object to this analysis and claim that NMFS could reach concentrations that high only by "assum[ing] misuse of the pesticides at issue." Pl. Mem. at 27. They are wrong, and NMFS's analysis is straightforward and explained clearly in the biological opinion. AR 1097-98. For example, using the AgDrift model, NMFS found that applying one pound of these pesticides per acre by air (with a "fine-medium droplet size" and no buffer zone) would result in a concentration of 333 µg/L in shallow water habitat that was 0.1 meters deep. AR 1099. Malathion may lawfully be applied to citrus crops at a rate of 4.5 to 7.5 pounds per acre. By multiplying the concentration that occurs at an application rate of one pound per acre (333 µg/L) by the lawful application rate of 4.5 to 7.5 pounds per acre, NMFS found that this use of malathion could result in concentrations over 1,000 µg/L in shallow water habitat. AR 1097-98.

Similarly, chlorpyrifos may be applied lawfully by "airblast" at a rate of four to six pounds per acre. *See* Pl. Mem. at 27-28. Using the AgDrift model, NMFS found that each pound of chlorpyrifos applied per acre by "airblast" (with no buffer zone) would result in a concentration of 214 µg/L in a shallow water habitat that was 0.1 meters deep. AR 1099. Multiplying that concentration (214 µg/L) by the lawful rate of application (6 pounds per acre) also results in a concentration well over 1,000 µg/L, just as NMFS found. AR 1097.

The Pesticide Manufacturers object again, arguing that such an application would be unlawful because "citrus's ground use requires a 25-foot buffer between crops and waterways."[6] Pl. Mem. at 28. Many applications of these pesticides do require buffer zones, those buffer zones effectively reduce spray drift, and NMFS analyzed how buffer zones of different sizes would affect the concentrations of

---

[6] The Pesticide Manufacturers appear to have used the wrong buffer—they initially challenge NMFS's analysis of the "airblast" application of chlorpyrifos, but switch halfway through their argument to the "ground" application. *See* Pl. Mem. at 27-28. The relevant buffer for "airblast" application is 50 feet.

these pesticides in shallow water habitat. AR 1099 (Table 44) (analyzing buffer zones from 0 to 150 feet). But as NMFS expressly explained in the biological opinion, these buffer zones do not apply to all uses of these pesticides (including, for example, golf course applications). AR 1096. And more importantly, they only protect "permanent water bodies," not "intermittent streams or manmade watercourses" that may be shallow water habitat for salmon and steelhead (or that may drain into such shallow water habitat). AR 1097. Thus, despite these buffer zones, NMFS rationally concluded that the lawful application of these pesticides could result in concentrations in shallow water habitat over 1,000 μg/L.

In the end, the Pesticide Manufacturers concede as much. *See* Pl. Mem. at 28 n.28 (conceding that certain lawful applications of malathion could result in concentrations of 1,000 μg/L in shallow water habitat). They suggest that these issues are not important because some of the higher-rate applications of these pesticides are limited to certain geographic areas—for example, they note that the maximum application rate for chlorpyrifos (four to six pounds per acre) applies only in "five California counties." Pl. Mem. at 28. But they fail to mention that those five California counties include the habitat of the threatened California Central Valley Steelhead. AR 989 (Figure 25). And they do not even claim that these salmon and steelhead will somehow be protected from these higher rates of application.

Finally, the Pesticide Manufacturers argue that NMFS used this 1,000 μg/L value as its "benchmark for evaluating impacts to salmonids." Pl. Mem. at 28. This is simply not true. In its population models, for example, NMFS only considered the effects of concentrations as high as 100 μg/L for chlorpyrifos and malathion (which is close to the maximum exposure level recommended by the Pesticide Manufacturers of 66 μg/L, *see* Pl. Mem. at 28) and 400 μg/L for diazinon. AR 1179-82

(Tables 62-65). And when it analyzed the potential effects of mixtures of these pesticides, the highest concentration that NMFS used was 67.24 µg/L for diazinon, significantly less than the alleged 1,000 µg/L "benchmark." AR 1168 (Table 61). Notably, NMFS found that even those much lower concentrations could still cause nearly 98% mortality in salmon and steelhead. *Id.*

NMFS never claimed that every salmon and every steelhead is likely to be exposed to concentrations of these pesticides exceeding 1,000 µg/L. It did not use that concentration as its "benchmark." To the contrary, NMFS freely acknowledged that exposure was likely to be "highly variable" among both "individuals and populations of listed salmon." AR 1117. And that is confirmed by NMFS's AgDrift modeling itself, which shows that spray drift may result in concentrations of these pesticides in shallow water habitat ranging from as low as 0.1 µg/L to over 1,000 µg/L. AR 1097.

The purpose of NMFS's AgDrift analysis was not to determine how these pesticides will affect most salmon and steelhead. Its purpose was to analyze how these pesticides will affect salmon and steelhead in the habitat that is most vulnerable to pesticide contamination: shallow water habitat. Of course, if NMFS had ignored this vulnerable habitat, and the vulnerable juvenile salmon and steelhead that use it, and if it had ignored the highest application rates allowed by these pesticide registrations, then it might have been able to conclude, like the Pesticide Manufacturers, that these pesticides are harmless. But that would not have been consistent with NMFS's obligations under the ESA. *See* AR 1088. So it used this analysis, together with the results of EPA's PRZM-EXAMS modeling and the historical monitoring data, to identify a realistic range of exposures for these species. The Pesticide Manufacturers have not shown that any of that analysis was "irrational" or "arbitrary and capricious."

### c. NMFS rationally relied on the results of EPA's PRZM-EXAMS model.

EPA used its PRZM-EXAMS model, which simulates pesticide run-off and spray drift into a hypothetical farm pond, to generate estimates of salmon and steelhead exposure. AR 1087-88. NMFS reviewed the estimates generated by EPA's modeling and concluded that they were "generally protective estimates of exposure" for many "applications and aquatic habitats." AR 1089. But as discussed above, NMFS was also concerned that the PRZM-EXAMS model would not accurately simulate shallow water habitat, so it supplemented EPA's analysis with its own analysis using the AgDrift model. AR 1094.

The Pesticide Manufacturers argue that the PZRM-EXAMS model was "obvious[ly] unsuitabl[e]" here because "salmonids do not live in farm ponds." Pl. Mem. at 28-29 n.29. NMFS is fully aware that farm ponds are not the natural habitat of salmon and steelhead—it is, after all, the Nation's expert on these species. NMFS's detailed description of the habitat and status of these species occupies more than 100 pages of this biological opinion. AR 906-1023; *see also* AR 1080-82 (summarizing the "habitats occupied by listed salmonids.").

But while "salmonids do not live in farm ponds," that does not mean that the PRZM-EXAMS model does not accurately simulate some salmon and steelhead habitat. Salmon and steelhead use "a variety of freshwater habitats that vary in surface area, volume, and flows," and some of those habitats, like "first order streams," are comparable to the "farm pond" modeled in PRZM-EXAMS. Hawkes Decl. ¶ 28; *see* AR 1087. Thus, it was not "arbitrary and capricious" for NMFS to rely on this modeling.

31

## 2. NMFS also rationally relied on the available water monitoring data to develop a realistic range of exposures.

While no one has undertaken a comprehensive study of the levels of these pesticides that occur in salmon and steelhead habitat, there is a wealth of water monitoring data available. *See, generally*, AR 1100-1110. From 1992 to 2001, the United States Geological Survey ("USGS") ran the "National Water-Quality Assessment Program" (or "NAWQA"). AR 1031. As part of that program, the USGS tested water samples taken from 186 streams sites across the United States. *Id.* It also tested bed-sediment samples from 1,052 stream sites and fish from 700 stream sites. *Id.*

The USGS found that most streams "within most areas sampled with substantial agricultural or urban land uses" contained pesticides. *Id.* More than half of all agricultural streams sampled and more than three-quarters of all urban streams contained concentrations of pesticides that exceeded the benchmarks set by EPA for the protection of aquatic life. AR 1033. NMFS concluded that, where those benchmarks are being exceeded, there is "a strong probability that aquatic species are being adversely affected." *Id.*

Importantly, the three pesticides at issue in this case—chlorpyrifos, diazinon, and malathion— were among the pesticides that were most commonly detected in these samples. AR 1031. They were detected in 26%, 40%, and 6% (respectively) of the streams tested in California, Idaho, Oregon, and Washington. AR 1101. Many of those streams are habitat for salmon and steelhead. Similarly, California's "Surface Water Database" shows that chlorpyrifos was detected in 49% of California's streams, diazinon in 67%, and malathion in 6%. AR 1101. Again, many of those streams are habitat for salmon and steelhead. *Id.*

This data shows that these pesticides have contaminated rivers and streams throughout the United States in concentrations that are likely to harm fish. It refutes the Pesticide Manufacturers' claim

that these pesticides are harmless and are not likely to have any effect on salmon and steelhead.  Not surprisingly, they reject the data, arguing that it is now "outdated" and "inaccurate" because changes in the registrations for these pesticides have fixed these problems and "substantially and significantly reduced [their] use and environmental impacts . . . ."  Pl. Mem. at 24.  "All of these levels were measured years" ago, they complain, and it was irrational and "inexplicabl[e]" that NMFS even considered this data now.  Pl. Mem. at 25.

The Pesticide Manufacturers are wrong.  They have both mischaracterized NMFS's use of this data and overstated how "outdated" it is.  First, even if these pesticides will be applied in smaller quantities in the future, this water monitoring data does not overestimate the concentrations that salmon and steelhead will be exposed to.  To the contrary, NMFS found that it probably **underestimates** those concentrations.  AR 1109.  That is because the peak concentrations of these pesticides occur right after pesticides are applied, but these water monitoring programs were not "designed to capture" that "peak exposure."  *Id.* (emphasis added), 1117.  The USGS's NAWQA program, for example, was not timed so that it took samples right after pesticides were applied, AR 1109, so there is no reason to believe that it reported the highest concentrations of pesticides that occur in these aquatic habitats.  And because the USGS took many of its samples from stream, rivers, and other "flowing water habitats," where pesticides are diluted relatively quickly, NMFS was "not surpris[ed]" to find that the concentrations reported in the water monitoring data were "generally much lower" than those predicted by its models.  AR 1109.  The USGS also did not target those salmon and steelhead habitats that are "most likely to contain the greatest concentrations of pesticides."  AR 1109.

So even if less of these pesticides will be used in the future, that does not mean that this water monitoring data overestimates salmon and steelhead exposure.  NMFS cautioned against jumping to that

conclusion when it discussed a study that found that chlorpyrifos had caused a fish kill in Florida. AR 1085. That study had detected chlorpyrifos in the water at concentrations of 1.69 ppb and 2.55 pbb. *Id.* Since the study was conducted, however, the relevant application rate for chlorpyrifos has dropped from 4 pounds per acre to 1 pound per acre. *Id.* It would be easy to conclude that fish will now be exposed to only one-quarter of the concentrations identified in this study. *Id.* But while NMFS agreed that reduced application rates are likely to reduce exposure, it also found that it was "unlikely" that this study had measured the "maximum concentrations" of chlorpyrifos in the first place. AR 1085-86. After all, this study was not timed to take samples just after the pesticides had been applied—instead, those samples were simply "incidental observation[s] associated with a terrestrial field study." *Id.* Because this water monitoring data does not capture "peak exposure," NMFS rationally concluded that it does not overestimate salmon and steelhead exposure.

Second, even if the registrations for these pesticides have changed, that does not mean that the old uses of these pesticides will stop immediately. For example, all outdoor residential uses of diazinon were cancelled in 2003. AR 749. But diazinon was still detected in over one-quarter of all samples collected from urban surface waters from 2004 through 2006 under the NAWQA program. *Id.* Even after a pesticide's registration is changed, older stocks of that pesticide, with the old labels, may still be available on store shelves for years, and it will still be legal to use those pesticides at the old, higher rates of application. *Id.* And even when stores stop selling the old pesticides, consumers may still possess them and continue to use them. *Id.* So even though the registrations for these pesticides have changed, salmon and steelhead may continue to be exposed to the concentrations of pesticides identified in this water monitoring data.

Third, while changes in these pesticide registrations may eventually reduce the levels of these pesticides that salmon and steelhead are exposed to, NMFS found that we do not know how great those reductions will be (if they happen at all) because we have very little data on how these pesticides have been used. AR 1110. For example, if the pesticides were already being applied at less than their maximum application rates, then the fact that the maximum application rates have been reduced might not have any effect and might not reduce salmon and steelhead exposure. Without detailed information not only on the registrations, but also on how these pesticides have been used, NMFS found that it could not build an exact correlation between the changes in the registrations and salmon and steelhead exposure. *Id.* And without that correlation, the Pesticide Manufacturers have no basis to conclude that the existing water monitoring data is "inaccurate" or that it was "irrational" for NMFS to rely on it.

Fourth, and finally, the Pesticide Manufacturers' arguments fail because NMFS understood and expressly acknowledged the limitations of the existing water monitoring data. AR 1108-10. NMFS repeatedly acknowledged that "[n]otable changes" had been made to the registrations for these pesticides, including "modifications to maximum labeled application rates . . . ." AR 880-881. It also noted that those registrations now "include various mitigation measures . . . ." AR 882. All of those changes were considered as part of the action under consultation here. AR 882.

NMFS recognized that, as a result of those and other changes, this water monitoring data may not be representative of the current and future uses of these pesticides. AR 1109-10. It noted that "[r]ecent data show a decrease in [the] use of chlorpyrifos and diazinon in California," which "may be associated with restrictions on residential uses of those active ingredients." *Id.* NMFS understood that pesticide use "varies annually depending on regulatory changes, market forces, cropping patterns, and

pest pressure." AR 1109. And it concluded that "[t]here is considerable uncertainty regarding the representativeness of monitoring conditions to forecast future use" of these pesticides.[7] AR 1110.

But the simple fact is that "[v]ery few" studies have been undertaken to evaluate the exposure of salmon and steelhead to these pesticides. AR 1109. So while the existing water monitoring data may not be perfect, it is the "best scientific and commercial data **available**," and it was proper for NMFS to consider it.[8] NMFS did not rely on this data exclusively—it was one of three lines of evidence that NMFS used. But for all of the reasons discussed above, NMFS rationally concluded that this data, despite its limitations, was "useful" for evaluating both salmon and steelhead exposure and for other purposes, including evaluating concentrations of pesticide degradates and mixtures. AR 1108, 1111; *see also* Hawkes Decl. ¶ 14 (stating that NMFS concluded that this data provided "useful information regarding the environmental fate of the compounds, information on pesticide use trends, and the occurrence of environmental mixtures of compounds that can cause additive and synergistic effects.").

As Dr. Hawkes explains in his declaration, if NMFS had ignored the older water monitoring data, it would have had almost no observational data left. NMFS was already concerned that this data might "substantially underestimate" the risks to salmon and steelhead—as discussed above, it does not include samples from the full "geographic distribution of salmon" and it was not designed to capture "peak aquatic concentrations." Hawkes Decl. ¶ 14. But if NMFS had used only the most recent data

---

[7] NMFS also warned that "caution should be used when extrapolating monitoring data to other sites" because the concentrations of these pesticides are influenced by an array of factors that are specific to the sites where they were measured, including, for example, "meteorological conditions, soil type, slope, and physical barriers to runoff and drift," as well as the "volume, flow, and pH" of the body of water affected. AR 1109.

[8] The Pesticide Manufacturers suggest that NMFS failed to consider more recent monitoring data reported by the Idaho Department of Agriculture. Pl. Mem. at 25. As discussed above, NMFS considered this and all of the other data that was submitted to it. The letter conveying this data is included in the administrative record. AR 3620. In any event, as even the State of Idaho conceded, this data was very limited ("there is not a lot of surface water pesticide data for [] Idaho [],") and addressed only a very narrow geographic area (the "tributaries to the Clearwater River") and time period (2004 and 2006). *Id.*

(say, water monitoring reports generated after 2005), almost nothing would have been left. *Id.* ("Relying on the smaller data set of water monitoring data . . . would further restrict a data set that was already insufficient.").

For example, of the 51 monitoring studies that the California Department of Pesticide Regulation identified from 1990 to 2008, "only two contained any monitoring data more recent than 2004."[9] *Id.* Of those, one was limited to a single location—the Yolo Bypass in California—and the other was limited to the summer of 2005 in San Joaquin County, California. *Id.* A data set that small could not account for the range of uses of these pesticides or variations in pesticide use and weather. *Id.* It simply would not have provided an "adequate spatial or temporal sampling." *Id.* So when the Pesticide Manufacturers argue that NMFS should have ignored "outdated" water monitoring data, they are really arguing that NMFS should have just ignored all of the data, and then ignored the risks that these pesticides present to salmon and steelhead. Such a result would not be consistent with the ESA, and NMFS rationally concluded that it was appropriate to consider all of the available water monitoring data.

### 3. NMFS's population models rationally assume that salmon are exposed for 96 hours.

After it identified realistic ranges for both the toxicity of these pesticides and salmon and steelhead exposure, NMFS used quantitative models to simulate how these pesticides would affect whole populations of salmon and steelhead. AR 1176-87. The results of those models are summarized in the biological opinion, *id.*, and the models themselves are discussed in detail in Appendix 1, AR 1289-1321. The models analyzed the effects of these pesticides on "generalized" or "idealized" populations of salmon and steelhead, and, like all models, they made a number of simplifying

---

[9] Dr. Hawkes also clarifies that NMFS did consider water monitoring studies submitted by the California Department of Pesticide Regulation. Hawkes Decl. ¶ 9(a). Rather than citing to the studies, however, NMFS relied instead on the underlying data from those studies, which is reported in CDPR's "Surface Water Database." *Id.*

assumptions. AR 1176, 1184. For example, the models analyzed the effects to these population by assuming that, each year, all "subyearling" juvenile salmon and steelhead were exposed to these pesticides for a single four-day (96-hour) period and then never exposed again. AR 1295.

The Pesticide Manufacturers complain that this assumption is "irrational" and that salmon and steelhead would never be exposed to these pesticides for "four continuous days" because concentrations would naturally "decline over this period of time." Pl. Mem. at 31 (emphasis omitted). As the Pesticide Manufacturers are well aware, NMFS used this 96-hour period because it is one of the standard periods for acute toxicity testing—$LC_{50}$s for pesticides are commonly reported based on a 96-hour exposure. *See* AR 1125 ("Lethality . . . is derived from the number of surviving individuals at each concentration tested following a 96 h exposure."); AR 4083-85 (summarizing available acute toxicity data for chlorpyrifos in the form of "96-hour LC50s"). Here, it is not an unrealistic assumption because these pesticides can persist in the water for more than 96 hours, and because NMFS was especially concerned with shallow water habitat where there may be no flow (or only a low flow) to dilute the pesticides. AR 1077 (citing half-lives of 16 to 73 days for chlorpyrifos, 12 to 72 days for diazinon, and 2.5 to 177 days for malathion). The concentrations of these pesticides also will not necessarily decline over time because many of them may be applied multiple times over a four-day period, possibly on adjacent tracts of land, or in combination with other organophosphate pesticides that share the same mechanism of toxicity. *See, e.g.,* AR 1093.

But more fundamentally, the Pesticide Manufacturers have misstated how NMFS used these models. NMFS recognized that the "extent" and "magnitude" of salmon and steelhead exposure would "vary temporally and spatially." AR 1191. These population models were not the final step in NMFS's analysis. Instead, they provided NMFS with a yardstick to measure the population-level effects of these

pesticides against the range of exposures that it found using the lines of evidence discussed above.  AR 1178 (explaining that NMFS "compare[d] the concentrations listed [in the population models] to expected levels in salmonid habitats described in the exposure section.").  NMFS always understood that the "degree to which an **actual** threatened or endangered population"—as opposed to the "generalized" and "idealized" populations analyzed in the models—would be affected would "depend on a host of factors including the number of individuals exposed, the duration of exposure, when they are exposed, and if individuals are exposed more than once."  AR 1184.  But it had to make some assumption about the duration of the exposure to build these models, and its 96-hour assumption was rational.

### 4. NMFS confirmed that salmon and steelhead are likely to be in nearby aquatic habitats when these pesticides are being applied.

Finally, the Pesticide Manufacturers claim that NMFS "did not attempt to correlate the location of the salmon to actual pesticide use . . . ."  Pl. Mem. at 12.  This argument fails because it is not true.  It is true, as NMFS found, that we have only "imperfect data on where salmonids are at any given time," and very little data on the actual use of these pesticides, which limited NMFS's ability to "place an exact number of the percentage of a population that is affected" (although NMFS also found that there was enough information to "make reasonable inferences").  AR 1188.  And it is true that the first steps in NMFS's exposure analysis—its use of modeling and its review of the water monitoring data—did not address the "temporal aspects of exposure."  AR 1157.

But later in its analysis, NMFS reviewed the life histories of all of these salmon and steelhead species to confirm that they are likely to be in the "wrong place at the wrong time"—that is, that they use aquatic habitats that are likely to be contaminated with pesticides and that they are likely to be in those aquatic habitats when these pesticides are being applied.  *See, generally*, AR 1200-44.  Reviewing the life history of the Central Valley spring-run Chinook salmon, for example, NMFS found that these

pesticides are applied to crops in this watershed, that a significant part of the land in this watershed is developed for crops (21%), and that malathion is also used in this watershed for mosquito control. AR 1203. These salmon move up the Sacramento River from March through July, which NMFS found "correspond[s] with pesticide applications." AR 1204. NMFS also found that the "[f]ry rearing and migratory periods" for this species "overlap with dormant spray periods of orchards," when chlorpyrifos and diazinon are common applied. *Id.* These facts led NMFS to conclude that "[t]he widespread uses of these materials indicate substantial overlap with" this species and that, "[g]iven fish migration along the Sacramento River . . . , we expect the proposed uses of chlorpyrifos, diazinon, and malathion pesticide[] products will lead to both individual fitness level consequences and subsequent population level consequences." *Id.* Thus, contrary to the claims of the Pesticide Manufacturers, NMFS did correlate the location of these salmon to pesticide use.[10]

Significantly, this analysis also led NMFS to conclude that one species of salmon—the Ozette Lake Sockeye salmon—is not likely to be jeopardized by EPA's registration of these pesticides. AR 1224-25. Unlike the Central Valley spring-run Chinook salmon, the area around Ozette Lake is sparsely populated and there is very little agriculture. AR 1225. Instead, the majority of the land is managed for timber production. *Id.* NMFS found that there was no data showing that these pesticides are actually being applied in this watershed. *Id.* Thus, when NMFS correlated the location of these salmon to

---

[10] These three pesticides share a common mechanism of toxicity: they are all "acetyl cholinesterase inhibitors" that kill by impairing the "neurotransmission" of the same chemical in the brain. AR 881. As a result, being exposed to a mixture of these pesticides may have the same toxic effect as a higher dose. Their toxicity may be "additive"—that is, being exposed to a mixture containing 1 µg/L of chlorpyrifos and 1 µg/L of diazinon may have the same toxic effects as being exposed to 2 µg/L—or mixtures may have even greater "synergistic" toxicity. AR 1122-24. The Pesticide Manufacturers claim that it would be "quite rare" for salmon and steelhead to be exposed to more than one of these pesticides at the same time and argue that NMFS failed "to provide a rational explanation for its assumption" that they might. Pl. Mem. at 26 n.25. But this is simply not true—NMFS explained in the biological opinion that mixtures of these pesticides have been detected and reported in the water monitoring data, and it explicitly discussed the basis for its conclusions about the salmon and steelhead exposure to "environmental mixtures." AR 1115-16.

pesticide use, it found that that "the risk posed by the proposed action to Ozette Lake sockeye salmon's survival and recovery is low," and it was able to reach a "no jeopardy" conclusion. *Id.*

### C. NMFS rationally concluded that buffers will protect salmon and steelhead from these pesticides.

In the end, NMFS found that these pesticides are likely to jeopardize the continued existence of many species of Pacific salmon and steelhead. AR 1249 (finding "jeopardy" for 27 listed salmon and steelhead). Because it found "jeopardy," the ESA required NMFS to suggest a "reasonable and prudent alternative" ("RPA") that would avoid that "jeopardy," and NMFS included such an RPA in the biological opinion. 16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(3); AR 1250-55. That RPA contains several elements. AR 1251-54. Most importantly, it requires EPA to modify the labels for these pesticides so that they may not be applied within 500 feet of salmonid habitats if they are applied by ground or within 1,000 feet of salmonid habitats if they are applied by air. AR 1251-54. These buffers apply not only to all "salmonid habitats," but also to all "intermittent streams" that connect to salmon-bearing waters and to "all known types of off-channel habitats as well as drainages, ditches, and other man-made conveyances to salmonid habitats that lack salmonid exclusion devices." AR 1251 n.14.

NMFS explained the basis for these buffers in its biological opinion. AR 1251-54. It chose buffers because they are "recognized tools to reduce pesticide loading into aquatic habitats from drift" that have been routinely used by EPA, the United States Fish and Wildlife Service, NMFS, the Courts, and State agencies. AR 1251-52; *see also* AR 1096 (noting that "[n]o-spray buffer zones (or setbacks) may significantly reduce pesticide exposure to salmon by reducing runoff and drift inputs."). To design these buffers, NMFS used the AgDrift model to test how buffers of different sizes would affect concentrations of these pesticides in shallow water habitat. AR 1252-53. It considered buffers in 100

foot increments, up to 1,000 feet, and modeled shallow water habitat that was 10 meters wide and 0.1 meters deep. *Id.* Not surprisingly, estimated pesticide concentrations decreased as the size of the buffer increased. AR 1252.

NMFS then compared the results of that model to the toxicity of these pesticides. AR 1253-54. It found that, even with a 500-foot buffer for ground application and a 1,000-foot buffer for aerial application, the use of these pesticides could still kill juvenile salmon and steelhead in shallow water habitat (and "severely affect[]" their prey). AR 1253. But it found that these buffers would "remove a substantial portion of risk attributed to pesticide drift" and that smaller buffers "would result in substantially greater risk to salmonids and salmonid prey items." AR 1253-54. NMFS ultimately concluded that these buffers were sufficient because, with these buffers, "most pesticide applications" would not result in toxic concentrations of these pesticides. *Id.*

> **1.    NMFS rationally concluded that these buffers will protect the most vulnerable salmon and steelhead habitat.**

The Pesticide Manufacturers present several arguments challenging these buffers. Pl. Mem. at 34-37. They briefly repeat their argument that NMFS's AgDrift modeling was "unrealistic," which is not true, and we have already responded at length to that argument above. *See* Pl. Mem. at 35. Their real complaint seems to be that these buffers are not necessary to protect "the vast majority of salmon habitat," but only those "small areas purportedly used by juvenile salmon." Pl. Mem. at 35. But as we have already explained, NMFS found that protecting the most vulnerable salmon and steelhead habitat— shallow water habitat—and the vulnerable juvenile salmon and steelhead that use that habitat was critical to protecting these species. NMFS rationally concluded that an RPA that did not protect shallow water habitat and juvenile salmon and steelhead would not avoid "jeopardy."

### 2. NMFS rationally concluded that these buffers must protect not only salmon habitat, but also waterways that drain into salmon habitat.

These buffers apply not only to "salmonid habitat," but also to other waterways that drain into salmon and steelhead habitat, including "intermittent streams," "drainages, ditches, and other man-made conveyances to salmonid habitats that lack salmonid exclusion devices." AR 1251 n.14. The Pesticide Manufacturers complain that NMFS defined these waterways "far too expansively," Pl. Mem. at 36, but they make no attempt to show that buffers that applied less "expansively" would protect shallow water habitat and juvenile salmon and steelhead and thus avoid "jeopardy." As discussed above, NMFS found that all of these salmon and steelhead rely on shallow water habitats at some point in their life cycle, some for several months, including the kinds of "off-channel" habitats protected by these buffers. AR 908. NMFS included the other waterways because it found that pesticide runoff and drift are "likely to reach streams and other aquatic sites when they are applied to . . . ditches, off-channel habitats, and intermittent streams." AR 1257. The Pesticide Manufacturers do not dispute any of this, and they have not shown that it was "irrational" or "arbitrary and capricious" for NMFS to conclude that these measures are necessary to avoid jeopardy.

### 3. NMFS was not required to analyze the economic effects of these buffers on the Pesticide Manufacturers.

Finally, the Pesticide Manufacturers claim that these buffers "substantially threaten[] the value of these products to growers, and thus sales by Plaintiffs." Pl. Mem. at 35. They wrongly argue that the ESA's regulations (and binding Supreme Court precedent) required NMFS to analyze the potential economic effects of these buffers and that the agency failed to undertake that analysis. Pl. Mem. at 37. At the outset, it is worth noting that NMFS asked the Pesticide Manufacturers "for their advice on the development of RPAs," precisely because it was concerned that these buffers might not be practical, but

they refused to participate.  AR 777, 876.  Regardless, the Pesticide Manufacturers' argument fails because the ESA and its regulations do not require such an economic analysis (and neither does the Supreme Court).  To the contrary, because Congress has found that the value of these species is "incalculable," Section 7 of the ESA sharply limits consideration of these economic issues and requires Federal agencies to avoid jeopardy "whatever the cost."  *TVA v. Hill*, 437 U.S. 153, 184, 187-88 (1978).

The ESA itself certainly did not require NMFS to undertake an economic analysis of these buffers.  In fact, the ESA says very little about RPAs.  It requires action agencies (like EPA) to consult with NMFS, 16 U.S.C. § 1536(a)(2), and where NMFS reaches a "jeopardy" conclusion, it requires NMFS to "suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by the Federal agency or applicant in implementing the agency action."  16 U.S.C. § 1536(b)(3)(A).  But the statute does not define the term "reasonable and prudent alternative," and it certainly does not say that NMFS must analyze the economic effects of an RPA.

This is significant because, when Congress wants an economic analysis, it has said so.  In 1982, Congress amended Section 4 of the ESA (the "listing" provisions, which are not at issue here), so that NMFS may only designate critical habitat after it has taken "into consideration the economic impact . . . of specifying any particular area as critical habitat."  16 U.S.C. § 1533(b)(2); Pub. L. 97-304, 96 Stat. 1411 (Oct. 13, 1982).  But Congress did not include any language about "economic impact" in Section 7 of the ESA.

The ESA's regulations also did not require NMFS to undertake an economic analysis of these buffers.  The regulations state that an RPA "refer[s]" to an "alternative action[]" that (1) "can be implemented in a manner consistent with the intended purpose of the action"; (2) "can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction"; (3) is "economically

44

and technologically feasible"; and (4) "that the Director [of NMFS] believes would avoid the likelihood of jeopardizing the continued existence of listed species . . . ."  50 C.F.R. § 402.02 (definition of "reasonable and prudent alternatives").  This definition does require RPAs to be "economically feasible," but "feasible" does not mean "practical" or "cost-effective."  It simply means "capable of being accomplished or brought about; possible."  American Heritage Dictionary (2d Ed. 1982).  These buffers are feasible because EPA has the economic resources necessary to modify the labels for these pesticides and thus implement the RPA.  The fact that the Pesticide Manufacturers may sell less of their pesticides does not make the RPA "infeasible."  And that reading of the regulations is confirmed by the ESA itself, which requires NMFS to "suggest" RPAs that avoid jeopardy and that "**can be taken** by the Federal agency or applicant in implementing the agency action."  16 U.S.C. § 1536(b)(3)(A) (emphasis added).  By requiring an RPA to be "economically feasible," the regulations ensure that it will meet the statutory requirement that it "can be taken . . . ."  *Id.*

Significantly, the regulations also define both NMFS's responsibilities during consultation and the elements that must be included in a biological opinion, and they do not require NMFS to undertake an economic analysis of its RPAs.  *See* 50 C.F.R. §§ 402.14(g), (h).  For example, the regulations require a biological opinion to include "[a] detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h)(2).  But they say nothing about any economic analysis.  *See id.*  Instead, they merely state that a jeopardy biological opinion "shall include reasonable and prudent alternatives, if any."  50 C.F.R. § 402.14(h)(3).

So nothing in the ESA or its regulations required NMFS to analyze the economic effects of these buffers on the Pesticide Manufacturers.  And the Pesticide Manufacturers do not cite any court that has ever required such an analysis.  They claim that the Supreme Court has "directly spoken to this

requirement," but that is flatly untrue. *See* Pl. Mem. at 37 (citing *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997)). The decision in *Bennett* relates to standing and not to RPAs. 520 U.S. at 176-77. The Supreme Court did suggest that the requirement that NMFS rely on the "best scientific and commercial data available" was included in the ESA to prevent "needless economic dislocation." *Id.* But that is a conclusion about the intent of a provision of the statute; the provision itself does not require NMFS to conduct any economic analysis, and neither does the cited dicta from the Supreme Court. The Pesticide Manufacturers also fail to mention that several courts have already rejected their argument. *See Greenpeace v. NMFS*, 55 F. Supp. 2d 1248, 1268 (W.D. Wash. 1999) (rejecting the argument that an RPA was "arbitrary and capricious" because it was "not economically and technically feasible for the fishing industry."); *Kandra v. United States*, 145 F. Supp. 2d 1192, 1207 (D. Or. 2001) (holding that, "[r]ead in context, [] the RPAs must be economically and technically feasible for the government to implement."); *In re: Operation of the Missouri River Sys. Litig.*, 363 F. Supp. 2d 1145, 1161 (D. Minn. 2004), *aff'd in part, vacated in part on grounds of mootness*, 421 F.3d 618 (8th Cir. 2005) (holding that the regulations "only require[] that the [action agency] have the resources and technology necessary to implement the RPA.").

It is important to remember that the ESA does not allow EPA, NMFS, the Pesticide Manufacturers, or this Court to balance the survival of these species against the potential economic effects of this RPA. Congress passed the ESA because it concluded that the value of these threatened and endangered species is "incalculable" and that their extinction must be stopped, "whatever the cost." *TVA v. Hill*, 437 U.S. at 184, 187-88. When the ESA stopped the completion of the Tellico Dam, on which Congress had already spent more than $100 million, the Supreme Court observed that "[i]t may seem curious to some that the survival of a relatively small number of three-inch fish among all the

countless millions of species extant would require the permanent halting of a virtually completed dam . . . ." *Id.* at 172. But the Court concluded that the "explicit provisions of the Endangered Species Act require[d] precisely that result." *Id.* at 172-73.

The Congressional command that Federal agencies must avoid jeopardy, "whatever the cost," is "reflected . . . in literally every section of the statute." *Id.* at 184. Section 7 of the ESA includes no "qualifying language" and "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer . . . ." *TVA v. Hill*, 437 U.S. at 173, 185. Its strict terms reveal "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies," *id.* at 185, within the limits of the agency's discretion. The Supreme Court has specifically rejected the argument that the courts may craft an exception from Section 7 based on "common sense and the public weal." *Id.* at 194-95. To the contrary, the ESA allows only the "Endangered Species Committee"—a panel of Cabinet-level Federal officials more commonly known as the "God Squad"—to grant an exemption from its prohibition against jeopardy. *See* 16 U.S.C. §§ 1536(e), (g), (h).

The limited role that economics play under Section 7 of the ESA is consistent with Congress's goal of avoiding jeopardy, "whatever the cost," and with its frank acknowledgement that many species "have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation . . . ." 16 U.S.C. § 1531(a)(1). And it makes sense because consultation is a process where NMFS provides its expertise on the biology of threatened and endangered species to action agencies to help them to meet their obligations under the ESA. It is not a process that is intended to generate a detailed analysis of the potential economic effects. Moreover, the ESA does not allow NMFS to balance the survival of these species against the potential economic costs of an RPA—Congress has already struck that balance "in favor of affording endangered species the

highest of priorities . . . ." *TVA v. Hill*, 437 U.S. at 194. For all of these reasons, NMFS was not required to undertake an economic analysis of these buffers, and the Pesticide Manufacturers' argument fails.[11]

### D. NMFS was not required to respond to the Pesticide Manufacturers' comments.

The Pesticide Manufacturers' final argument is that NMFS unlawfully failed to respond to the comments that they and others provided. Pl. Mem. at 38-40. But that argument fails because there is no legal requirement to respond to comments on a biological opinion. Instead, NMFS was required to base its decision on the best scientific and commercial data available and provide a rational explanation for its decision. NMFS did so here, and the biological opinion should be upheld.

The public notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553, do not apply to consultations undertaken pursuant to ESA § 7(a)(2).[12] *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 660 n.6 (2007) ("Nor is there any independent right to public comment with regard to consultations conducted under § 7(a)(2)"). NMFS has agreed to provide draft biological opinions to permit or license applicants upon request and to accept comments from such applicants where, as here, an agency action involves a permit or license applicant.[13] 50 C.F.R. §

---

[11] NMFS proposed that EPA implement these buffers within one year. AR 1255. The Pesticide Manufacturers weakly suggest that "[t]he fact that NMFS saw no need that these restrictions be more promptly implemented suggests that, as a practical matter, NMFS realized that its recommendations were not of critical importance to salmonid survival." Pl. Mem. at 12 n.11. This is nonsense—NMFS simply recognized that these are long term issues. In fact, NMFS expressly found that jeopardy would not occur "in the year between issuance of this Opinion and EPA's implementation of the RPA" because these pesticides "have been in use for some time" and, while they "have contributed to ESU declines," they have not done so "to the extent that one year of additional use as now authorized would lead to likely jeopardy or adverse modification." AR 1255.

[12] Accordingly, the Pesticide Manufacturers' citations are inapposite because they faulted agencies for failing to respond to comments where this procedural right was required by the APA. Pls.' Br. at 38-39.

[13] Furthermore, an action agency (such as EPA) may provide for notice and comment on a biological opinion as part of its own, separate regulatory process. *Home Builders*, 551 U.S. at 660 n.6; 51 Fed. Reg. 19,926, 19,928 (June 3, 1986) ("Public participation may be provided within the Federal agency's decisionmaking process. However, that is a function of the agency's regulations or substantive legislation and not an issue to be raised in the context of consultation.").

402.14(g)(5); *see also* ESA Section 7 Consultation Handbook at 1-12 & 2-13. But neither the ESA, nor the Section 7 regulations, require NMFS to provide a response to those comments. *See San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 957 (E.D. Cal. 2010) ("Neither the ESA nor its implementing regulations require an opportunity for public comment or that [the Services] respond to any comments received.") (citations omitted). Since the law did not require NMFS to respond to these comments, the biological opinion cannot be found unlawful for not doing so.[14] *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978) ("reviewing courts are generally not free to impose [additional procedural rights] if the agencies have not chosen to grant them.").

Here, NMFS complied with the procedural requirements set out in the ESA's regulations. NMFS provided the draft biological opinion to the Pesticide Manufacturers, accepted comments from the Pesticide Manufacturers on that draft biological opinion, and met with the Pesticide Manufacturers to discuss the draft biological opinion and RPA with them and EPA. In fact, NMFS met or conferred by phone with the Pesticide Manufacturers on four separate days, and at these meetings NMFS discussed the reports and scientific studies they identified. AR 876-879. EPA also posted the draft biological opinion on a public docket as part of its FIFRA licensing process and accepted comments, which it passed on to NMFS. NMFS considered all of the comments that it received and modified its draft in response, as appropriate. This is expressly stated in the biological opinion. *See, e.g.,* AR 872 ("NMFS also considered information and comments provided by EPA and by the Registrants identified as applicants by EPA. [NMFS] also considered comments on the draft Opinion provided to EPA by others after review of the draft opinion.").

---

[14] In addition, the fact that NMFS may have chosen to respond to an applicants' comments in the context of a different biological opinion (*see* Pl. Mem. at 39-40) does not establish a requirement that NMFS do so in every case.

Thus, NMFS complied with the requirements of the statute and the regulations in providing an opportunity to comment and accepting and considering comments provided by the Pesticide Manufacturers. While NMFS is not required to respond to comments, even if it were, the biological opinion here comports with this requirement because it is well-established that an agency need not address every comment. *1000 Friends*, 265 F.3d at 238 ("There is no obligation to make references in the agency explanation to all the specific issues raised in comments. The agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.") (quoting *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 886 (4th Cir. 1983)).

## V.    CONCLUSION

For all of the reasons discussed above, the Plaintiffs' motion for summary judgment should be denied and summary judgment should be granted, on all claims, in favor of the Federal Defendants.

Respectfully submitted this 22nd day of August, 2011,

IGNACIA S. MORENO, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN, Assistant Chief

/s/ James A. Maysonett
_____
JAMES A. MAYSONETT, Trial Attorney (D.C. Bar No. 463856)
Wildlife & Marine Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7369
Washington, D.C. 20044-7369
Tel:  (202) 305-0216 | Fax:  (202) 305-0275
Email:  james.a.maysonett@usdoj.gov

Attorneys for the Federal Defendants