**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

_____
                                                    )
DOW AGROSCIENCES LLC, *et al.*          )
                                                    )
              Plaintiffs,                        )
                                                    )
         v.                                       )          Case No. 8:09-cv-824-AW
                                                    )
NATIONAL MARINE FISHERIES          )
SERVICE, *et al*.,                             )
                                                    )
              Defendants.                       )
_____)


**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' AND
INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT AND REPLY IN
SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

David B. Weinberg                          Warren U. Lehrenbaum
Eric Andreas                                  David Menotti
Nick Peterson                                 CROWELL & MORING LLP
WILEY REIN LLP                            1001 Pennsylvania Ave., NW
1776 K Street, NW                          Washington, DC 20004
Washington, DC 20006                    (202) 624-2500
(202) 719-7000


September 26, 2011

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 7

I.      PLAINTIFFS HAVE STANDING. .......................................................................... 7

II.     NEITHER NMFS' NOR INTERVENORS' BRIEFS RESUSCITATES NMFS' ERRONEOUS
CONCLUSIONS REGARDING THE AMOUNT OF PESTICIDES THAT Will REACH SALMONIDS
BY VIRTUE OF EPA's ACTION. ........................................................................................ 9

    A.   Creative Lawyering Cannot Overcome NMFS' Error in Relying on Nonrepresentative Water
    Monitoring Data. ........................................................................................................ 10

    B.   NMFS Improperly Employed the PRZM-EXAMS and AgDrift Models. .................................... 18

III.    NMFS HAS NOT DEMONSTRATED THAT IT USED THE CORRECT TOXICITY DATA
OR ENDPOINTS IN DETERMINING EXPOSURE RISKS. ................................................................ 22

    A.   Malathion Acute Toxicity. .......................................................................................... 22

    B.   Diazinon Acute Toxicity. ............................................................................................ 27

    C.   Chlorpyrifos Acute Toxicity. ....................................................................................... 30

    D.   Salmon Olfaction. .................................................................................................... 31

IV.     NMFS HAS NOT JUSTIFIED ITS PREDICTIONS OF POPULATION LEVEL EFFECTS. .... 33

    A.   The Erroneous "Four Day Assumption" In NMFS' Population Model Remains Uncured. ........ 34

    B.   Nothing in the Federal Defendants' or Intervenors' Briefs Establishes that NMFS Properly
    Related The Exposures Evaluated To The Species. .............................................................. 37

V.      NMFS HAS STILL NOT DEFENDED ITS USE OF EXAGGERATED BUFFERS. .................... 39

VI.     PLAINTIFFS ARE ENTITLED TO RESPONSES TO THEIR COMMENTS. ......................... 42

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*American Tunaboat Ass'n v. Baldrige*,
    738 F.2d 1013 (9th Cir. 1984) ...................................................................18

*Bennett v. Spear*,
    520 U.S. 154 (1997)................................................................................4, 16, 40

*Beno v. Shalala*,
    30 F.3d 1057 (9th Cir. 1994) .................................................13, 17, 26, 28

*Bunker Hill Co. v. EPA*,
    572 F.2d 1286 (9th Cir. 1977) ...................................................................16

*Camp v. Pitts*,
    411 U.S. 138 (1973)......................................................................................15

*Cone Mills Corp. v. NLRB*,
    413 F.2d 445 (4th Cir. 1969) .....................................................................10

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ............................................................17, 38

Crowley's Yacht Yard, Inc. v. Pena,
    863 F. Supp. 18 (D.D.C. 1994)...............................................................6, 43

*Dillmon v. NTSB*,
    588 F.3d 1085 (D.C. Cir. 2009).................................................................12

*Dow AgroSciences LLC v. NMFS*,
    637 F.3d 259 (4th Cir. 2011) ..................................................................8, 42

*Environmental Defense Fund, Inc. v. Costle*,
    657 F.2d 275 (D.C. Cir. 1981).............................................................15, 24

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985)...................................................................................7, 15

*Gifford Pinchot Task Force v.*
    *United States Fish & Wildlife Service*,
    378 F.3d 1059 (9th Cir. 2004) .............................................................33, 42

*Greenpeace v. NMFS*,
  55 F. Supp. 2d 1248 (W.D. Wash. 1999)...................................................................41

*Humane Society of the United States v. Locke*,
  626 F.3d 1040 (9th Cir. 2010) ...............................................12, 23, 28, 37

*Idaho Farm Bureau Federation v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) .....................................................................................3

*Loma Linda University Medical Center v. Sebelius*,
  684 F. Supp. 2d 42 (D.D.C. 2010) ........................................................................6, 43

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992),
  *aff'd*, 408 F. App'x 383 (D.C. Cir. 2010) ...................................................................7

*Motor Vehicle Manufacturers Ass'n. v.*
  *State Farm Mutual Automobile Insurance Co.*,
  463 U.S. 29 (1983).................................................................................7, 10, 23, 39

*National Association of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007)..............................................................................................43

*Northern Spotted Owl v. Hodel*,
  716 F. Supp. 479 (W.D. Wash. 1988)......................................................................18

*Pacific Coast Federation of Fishermen's Ass'ns. v. Gutierrez*,
  606 F. Supp. 2d 1122 (E.D. Cal. 2008).............................................................17, 18

*Pacific Coast Federation of Fishermen's Ass'ns v.*
  *United States Bureau of Reclamation*,
  426 F.3d 1082 (9th Cir. 2005) ..............................................................................31

*Public Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ..........................................................................6, 43

*Reytblatt v. United States Regulatory Commission*,
  105 F.3d 715 (D.C. Cir. 1997) ..............................................................................44

*San Luis & Delta-Mendota Water Authority v. Salazar*,
  760 F. Supp. 2d 855 (E.D. Cal. 2010)................................................... *passim*

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).................................................................20, 28, 37

*Sierra Club v. Marsh*,
   976 F.2d 763 (1st Cir. 1992) ...................................................................................16

*Sierra Club v. United States Army Corps of Engineers*,
   701 F.2d 1011 (2d Cir. 1983) ..................................................................................18

*Sierra Club v. United States Army Corps of Engineers*,
   771 F.2d 409 (8th Cir. 1985) ...................................................................................15

*Sprint v. Corp. v. FCC*,
   315 F.3d 369 (D.C. Cir. 2003) ...................................................................................3

*Tucson Herpetological Society v. Salazar*,
   566 F.3d 870 (9th Cir. 2009) ...................................................................................16

*Yale-New Haven Hospital v. Leavitt*,
   470 F.3d 71 (2d Cir. 2006) ......................................................................................16

## FEDERAL STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(A) ....................................................................................................43

7 U.S.C. § 136h(b) ..........................................................................................................3

16 U.S.C. § 1536(b) ...............................................................................................3, 8, 43

Pub. L. No. 100-478, 102 Stat. 2306 (1988) ...............................................................40

40 C.F.R. § 2.209(c) ........................................................................................................3

50 C.F.R. § 402.02 ........................................................................................................41

50 C.F.R. § 402.14 ..........................................................................................................2

50 C.F.R. § 402.14(d) ......................................................................................................3

50 C.F.R. § 402.14(g)(5) ..............................................................................................43

Plaintiffs Dow AgroSciences LLC ("DAS"), Makhteshim Agan of North America, Inc.

("MANA"), and Cheminova, Inc. USA ("Cheminova") provide the following combined opposition to

Federal Defendants' and Intervenors' Cross Motions for Summary Judgment, which also serves as the

reply in support of Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

Between mid-January, 2008 (AR 126) and July, 2008 (AR 294) the National Marine Fisheries

Service ("NMFS") prepared an almost 500 page biological opinion ("BiOp") addressing the potential

impact of the registrations of three insecticides on salmonids in California and the Pacific Northwest.

NMFS' opinions had been requested by the U.S. Environmental Protection Agency ("EPA") in 2002 for

diazinon (AR 5019-5021), 2003 for chlorpyrifos (AR 4203-4205) and 2004 for malathion (AR 5656-

5659).  In December, 2007, EPA and NMFS agreed to define the "federal action" at issue as the

"authorization for use or uses described in labeling of a pesticide product containing a pesticide active

ingredient."  AR 108.

EPA's 2002, 2003 and 2004 requests for consultation and associated materials had informed

NMFS that major changes in permissible use patterns and practices were underway—that is, that the

Federal actions on which NMFS was being consulted were in the process of being revised.[1]  Those

changes were occurring because of EPA's "reregistration" program.  By January 2008, the changes had

been implemented for diazinon and chlorpyrifos, and were in the process of being implemented for

---

[1] *See,.e.g*., EPA was explicit about this as to diazinon and chlorpyrifos.  AR 4904-4906 (Diazinon EA) ("Diazinon has a number of uses on crops.  Some of these may be cancelled as part of the reregistration process . . . .  In addition, all aerial applications are being cancelled, all seed treatments are being cancelled, all granular formulation uses are being cancelled except for cranberries, and all foliar uses on vegetables will be cancelled except for leafhoppers on honeydew melons . . . .  There will be limits on the number of applications for some crops.  Current agricultural use labels are included as Attachment 2 and changes to these labels resulting from the reregistration effort [are] on pages 54-66 of the IRED."); AR 4081 (chlopyrifos EA).  The message was provided as to malathion by providing NMFS with a reference to EPA's recently-issued Reregistration Eligibility Document.  AR 1693 (Cheminova comments providing reference to malathion RED).

malalthion.[2]  Nonetheless, the NMFS team cavalierly chose to ignore the pending revisions in preparing its draft BiOp.[3]

As explained in our Initial Brief and below, after being informed by EPA, state agencies and Registrants of their enormous error—the massive overstatement of the amount of the pesticides at issue that may affect salmonids *as a result of the actions on which NMFS was being consulted*—the NMFS team never corrected it.  Instead, NMFS responded wholly defensively.  That is, they worked to justify their initial conclusions, rather than reconsider them in light of the facts which undercut their fundamental premises.  And, perhaps most important, they never explained—anywhere in the record— why they did not do so, or why they retained in the final BiOp the vast majority of determinations that had been based on those erroneous premises.

But these were not NMFS' only failures.  NMFS also ignored pertinent information available to them from EPA, both before and during the preparation of the draft BiOp, and after that document belatedly was shared with EPA.  For example, despite NMFS' concerns that "inert" ingredients in pesticide products (those included not as an active ingredient, but for other purposes) might increase risks to salmonids (*see, e.g.*, AR 77, 108), the NMFS team failed to review the detailed information in EPA's files that described the constituents of those products.  Details of formulations are of vital competitive importance to registrants, and therefore by statute are treated by EPA as protected

---

[2] AR 1697-1702 (Cheminova comments explaining uses); AR 1846-1847 (DAS and MANA comments explaining use changes); AR 4299-4300 (chlorpyrifos IRED); AR 5087-5089 (diazinon RED); AR 5761-5763 (malathion RED).

[3] The record contains minutes of a May, 2008 conference call during which the team decided that "NMFS will describe what is EPA's Scope of the Action based on current use of the active ingredients . . . .  As NMFS will send the draft BIOP to EPA and the plaintiffs on July 31, 08, EPA will have an opportunity to verify the scope of its registration[s] . . . ."  AR 168.  As this quotation suggests, it appears that the analysis embodied in the draft BiOp actually did not begin until late Spring, not in January.  NMFS ultimately did not initially discuss its jeopardy finding with the "plaintiffs" to which the quote refers, who were the nongovernmental organizations that had sued NMFS for not responding within the deadlines set by the ESA to EPA's consultation requests.  If NMFS had done so, it would have violated its own regulations.  50 C.F.R. § 402.14.

"confidential business information."[4] EPA can only share that information with other agency staffs that have completed training and agreed to comply with the Agency's confidentiality regulations.[5] But the NMFS team working on the BiOp did not get the training, and thus receive the CBI clearance necessary to review product constituents, until September 23, 2008. AR 770-771. Moreover, there is no evidence that NMFS ever looked at it in the few weeks before they finalized the BiOp.[6]

Nor in preparing the draft BiOp did the NMFS staff make even passing contact with the Registrants to obtain information that might be material to the Service's analysis. This failure violated both the express terms of the Endangered Species Act ("ESA") and the Services' regulations.[7] In and of itself, this is sufficient reason to vacate the BiOp. *Cf. Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392 (9th Cir. 1995); *Sprint v. Corp. v. FCC,* 315 F.3d 369, 377 (D.C. Cir. 2003) (vacating rule for failure to follow procedural requirements of APA).

NMFS' failure to reach out for this available information also is, as a practical matter, truly unfathomable. Needless to say, Registrants make no secret of the fact that they sell the products at issue. They also include detailed information about their products on the internet and maintain highly expert staffs familiar with all aspects of the products' ecological effects.[8] In preparing the draft BiOp, NMFS availed itself of none of this scientific or commercial information.[9]

---

[4] 40 C.F.R § 2.209(c) (requiring receipt of a written request; notice to affected business; and agreement in writing not to disclose further); 7 U.S.C. § 136h(b). Improper disclosure of this information by government personnel is a criminal offense.

[5] S*ee* AR 710 (EPA informing NMFS that FIFRA training is required as well as the completion of certain forms).

[6] NMFS also was expressly informed by Registrants that their products did not contain inerts identified by NMFS to be a concern. *See, e.g.,* AR 1493.

[7] 16 U.S.C. § 1536(b) (discussing involvement of applicant); 50 C.F.R. § 402.14(d) (requiring opportunity for applicant to submit information).

[8] *See* http://www.manainc.com/active-ingredients/ (information about diazinon maintained by MANA); http://www.chlorpyrifos.com/ (information about chlorpyrifos maintained by DAS); and

As explained in the Memorandum in Support of Plaintiffs' Motion for Summary Judgment (Dkt. No. 58-1) ("Initial Brief"), the use changes NMFS had ignored were important.  After carefully considering what steps were necessary, EPA (with the concurrence of the Registrants) had eliminated many uses of chlorpyrifos and diazinon, and prescribed restrictions for the remaining ones specifically to limit the pesticide that reached waterways.  The Agency was in the process of doing the same for malathion. Pl. Br. at 7.  These restrictions included such things as eliminating uses, limiting numbers of pesticide applications, mandating reduced application volumes, requiring buffers, requiring that sprayers be aimed away from rivers, and prohibiting applications in windy conditions.  AR 5091-5094 (diazinon IRED); AR 4316-4320 (chlorpyrifos IRED); AR 5761-5763 (malathion RED).

There was no ambiguity as to EPA's purposes—these changes were expressly described in both EPA's widely circulated fact sheets on its requirements and in the underlying decision documents as intended to limit ecological risk.  *See, e.g.*, AR 5029 (diazinon fact sheet, listing "agricultural and ecological risk mitigation steps"); AR 5091-5094 (diazinon IRED); AR 4212, AR 4317-4322 (chlorpyrifos IRED); AR 5761-5763 (malathion RED).

All this was pointed out to NMFS by EPA, four state agencies and the Plaintiffs when they finally were given a chance to review the draft BiOp.  *See infra* at 13-14; *see also* Pl. Br. at 7.  Those

---

http://www.cheminova.com/en/insecticides/fyfanon/fyfanon.htm (information about malathion maintained by Cheminova). The Registrants ultimately made several members of their scientific teams available to meet with NMFS, including Dr. Nick Poletika, a scientist in DAS' Field Exposure and Effects Division, Dr. Robert Everich, a senior scientist with MANA, and Dr. Rick Reiss, an environmental health scientist with the consulting firm Exponent.  AR 1399 (chlopyrifos presentation); AR 1423 (diazinon presentation); and AR 1515 (malathion presentation).

[9] NMFS' argument that it had no obligation to consult the Registrants because EPA had not identified them as applicants (*see, e.g.*, AR 712-13) suggests both an unmerited self confidence, and a fundamental lack of familiarity with the pesticide registration system on which NMFS was being asked to opine.  NMFS' approach underscores the validity of the Supreme Court's warning in *Bennett v. Spear*:  courts should be watchful of the Service "zealously but unintelligently pursuing their environmental objectives."  520 U.S. 154, 177 (1997).

commentators also identified errors in NMFS' use of models developed by EPA and Plaintiffs, and in assumptions employed in the centrally-important NMFS "population model." *See infra* at 33-36. Yet, in all material respects, the final BiOp was unchanged from the draft.[10]

The limited changes between the draft and final versions of the BiOp, the fact that NMFS never explained its reasoning in many respects in the BiOp in contemporaneous documents, and the foregoing background completely undercut the efforts of the Federal Defendants and Intervenors to now justify that document and its conclusions on the basis of the "expertise" or "transparency" of the NMFS staff's efforts. The weakness of those defensive arguments is underscored by the extraordinary number of unlawful *post hoc*, non-record explanations of decisions proffered by Federal Defendants and Intervenors. *See, e.g., infra* at 11-13. Equally troubling, many of those *post hoc* justifications are directly contradicted by the record. *Id*.

The simple truth is that when the NMFS' staff finally realized the implications of EPA's changes in permissible uses of the three products at issue, and finally obtained pertinent facts from the Registrants, EPA and expert state agencies, they should have fundamentally rethought the analysis presented in the draft. But they did not. Instead, NMFS seems to have spent its time looking for ways to justify its incorrectly-determined conclusions. *See, e.g.,* AR 756 ("Tony and Scott expect that responding to the majority of comments will consist of justifying the use of some studies and explaining the rationale for not considering others, rather than repeating analyses."). In any event, NMFS never put into the record a sufficient explanation of what it did.

---

[10] NMFS' November 4, 2008 memorandum to the Director of NMFS' Office of Protected Resources describes "[w]hat has changed in the Opinion" in its exposure analysis. There are only three bullets that list changes in the description of the proposed action, tables of current uses, and the lack of monitoring data. AR 833-834.

As explained in Plaintiffs' Initial Brief and below, Plaintiffs do not believe NMFS performed several key aspects of its analysis correctly.  NMFS' predictions of the amount of pesticides reaching salmonids improperly applied models developed by others.  NMFS nonsensically used historic data as if it predicted current and future exposures.[11]  NMFS' definition of assessment endpoints—*i.e.,* what the effect of exposure on salmonids might be—ignored the best available data.  NMFS' effort to scale up purported effects on individual salmon to ESU populations as a whole also relied on facially erroneous assumptions.  And nothing in the Federal Defendants' or the Intervenors' briefs contradicts the conclusion that the buffer RPA Plaintiffs have challenged is irrational and inconsistent with statutory requirements.

As a legal matter, however, the most important fact before this Court is that NMFS never explained why it rejected the vast majority of the critical comments it received on its draft, that in many cases provided important additional data implicating significant changes in its analysis.  By not providing that explanation, NMFS made meaningful judicial review impossible.  *See, e.g., Public Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993); *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 57 (D.D.C. 2010); *Crowley's Yacht Yard, Inc. v. Pena*, 863 F. Supp. 18, 20-21 (D.D.C. 1994).  Nor did it explain why its data choices satisfied the "best available scientific data" requirement of the statute, in a vast number of situations where EPA, states, or Plaintiffs had provided new data for use in its analysis.  As a result, this Court need go no further to justify vacating and remanding the BiOp.

---

[11] NMFS' ultimate justification for reliance on data measuring the impacts of historic uses of the three products at issue, despite the fact that those uses are not permitted by the very action on which the Service was being consulted, appears in a declaration that was improperly put before this Court.  *See infra at* 15; *see also* Plaintiff's accompanying Memorandum in Support of its Motion to Strike.  It comes down to "it was the majority of the available data we had."  But this rationale is nonsense.  This interpretation of NMFS' statutory mandate would mean, for example, that if 90% of the data NMFS found had been collected using miscalibrated equipment, NMFS could still rationally rely on it.  This cannot be true.

*Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").

　　We address all these issues more fully in the remainder of this brief.  We also are filing with this reply a Motion to Strike the declarations improperly submitted to the Court.  Those materials either provide impermissible, newly formulated *post hoc* rationalizations for NMFS' actions, or are irrelevant. As more fully explained in by Plaintiffs' Motion to Strike, it is black letter law that this material is insufficient to overcome the deficiencies of the BiOp.  *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50 (1983) ("the courts may not accept appellate counsel's *post hoc* rationalizations for agency action.").  We turn first, however, to the red herring issue of standing, even though it was raised solely by Intervenors in a footnote.

## ARGUMENT

### I.　　PLAINTIFFS HAVE STANDING.

　　Intervenors challenge Plaintiffs' standing, asserting that Plaintiffs have not offered any evidence of injury resulting from the BiOp.  Intervenors' Memorandum in Support of Cross Motion for Summary Judgment at 7, n.9 (Dkt. No. 64) ("Int. Br.").   The constitutional requirements of standing are (1) that the plaintiffs have suffered an "injury in fact;" (2) the existence of a causal connection between that injury and the conduct about which plaintiffs complain; and (3) that it is likely that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992), *aff'd*, 408 F. App'x 383 (D.C. Cir. 2010).

　　Intervenors' challenge is frivolous.  Standing is easily established for persons who have rights implicated by an agency action.  *Id*. at 561-62 (stating that if the plaintiff is an object of the action "there

is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it").  And it is undisputed that this is the situation here, where Plaintiffs are "applicants" whose registrations are the subject of the BiOp, which seeks to impose costly mitigation measures.  *See, e.g.*, 16 U.S.C. § 1536(b) (requiring involvement of applicant); AR 876 (timeline showing Plaintiffs identified as applicants to NMFS after release of draft BiOp); *cf. Dow AgroSciences LLC v. NMFS,* 637 F.3d 259 (4th Cir. 2011) (recognizing that Plaintiffs as holders of the registrations for the three pesticides at issue are negatively impacted by the BiOp).

Intervenors' challenge also ignores the affidavits Plaintiffs submitted previously to this Court. Those affidavits demonstrated that Plaintiffs' customers had become reluctant to purchase products affected by the BiOp and reduced their purchases of Plaintiffs' products.  Plaintiffs must also continually make operational decisions with the specter of the challenged BiOp and its restrictive requirements hanging over their heads.  For instance, Ephi Gur, a senior executive of MANA, stated that "end users are more reluctant to purchase pesticides products, like diazinon, that are subject to intense regulatory challenges, like here, and switch quickly to alternative chemistries."  Ephi Gur Aff. ¶ 4, June 18, 2009 (Dkt. No. 30-1).  He added that MANA in 2009 was "already experiencing a decline [in sales] since the BiOp was issued" and that this decline "appears to be occurring as a result of the pending BiOp."  *Id.* Fernando Segovia of DAS echoed those concerns.  He stated that "a review of DAS' sales data for chlorpyrifos in the Northwestern United States indicates that there has already been a reduction in chlorpyrifos sales since the BiOp was issued, and that it is likely that at least part of the decrease is directly attributable to the BiOp."  Fernando Segovia Aff. ¶ 4, June 18, 2009 (Dkt. No. 30-2) .  Martin Petersen, president and chief executive officer of Cheminova's subsidiary for U.S. sales, similarly explained, "production targets for malathion technical product are established at least three to five

months in advance . . . [if Cheminova] incorrectly anticipates whether EPA will adopt any of the use

restrictions recommended in the BiOp or how those restrictions will effect demand for end-use product,

then Cheminova will likely suffer economic harm."  Martin Petersen Aff. ¶ 6, June 18, 2009 (Dkt.

No. 30-3).

Furthermore, these injuries are ongoing.  Plaintiffs continue to experience reduced sales and face

operational challenges as a result of the BiOp, and anticipate that sales in the Pacific Northwest will

decline dramatically if the no-use buffers required by the BiOp are eventually implemented.  *See*

Fernando Segovia Aff. ¶ 5, September 22, 2011 (attached as Ex. 1); *see also* Robert Ehn Aff. ¶5,

September 22, 2011 (attached as Exhibit 2); Rico Christensen Aff. ¶ 5, September 26, 2011 (attached as

Ex. 3).

These are cognizable injuries sufficient to confer standing.  Further, they are directly related to

the findings of the BiOp, and thus will be remedied if it is vacated.  Under these circumstances, there is

no question that standing exists.

## II.    NEITHER NMFS' NOR INTERVENORS' BRIEFS RESUSCITATES NMFS' ERRONEOUS CONCLUSIONS REGARDING THE AMOUNT OF PESTICIDES THAT WILL REACH SALMONIDS BY VIRTUE OF EPA'S ACTION.

The first element of NMFS' jeopardy finding was its estimate of how much of the three

pesticides at issue reaches salmonid-bearing waters.  However, as explained in Plaintiffs' Initial Brief,

the final BiOp's conclusions on this key issue rest on irrelevant water monitoring data and

misapplication of both EPA and registrant-developed runoff and spray drift models.  *See* Pls' Mem. in

Support of Mot. for Summ. J. at 23-28 (Dkt. No. 58-1) ("Pl. Br.").  In this context, it is pertinent to quote

EPA's explanation to NMFS of why the PRZM-EXAMS modeling on which NMFS relied was

inappropriate, and to note that NMFS never responded to EPA's points:

> [F]or the most part and partly excepting almonds, these modeled
> scenarios] are **quite unrealistic** for use with Pacific salmon and steelhead.
> The primary difficulty is that all except the almonds were modeled for
> areas that will have far more runoff than will occur in the Pacific states,
> even including the more mesic parts of western Oregon and Washington
> because the precipitation there, while substantial, does not typically occur
> in large runoff events.  In addition, the model is based upon the upper 10th
> percentile of runoff events.  This would not be unrealistic if the
> precipitation scenarios were based upon the Western areas being
> addressed in this analysis.  But the upper 10th percentile values further
> exacerbate the high rainfall events that occur occasionally (*e.g.,* associated
> with hurricanes, tornadoes, etc.) in the areas used for the models.

AR 4914 (emphasis added).

The Federal Defendants' and Intervenors' attempts to justify NMFS' errors fail both because they rely on unallowable *post hoc* rationalizations and are facially inconsistent with the record.  It is axiomatic that "the courts may not accept . . . counsel's *post hoc* rationalizations for agency action" and that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 50; *Cone Mills Corp. v. NLRB,* 413 F.2d 445, 452 (4th Cir. 1969). Here, the record does not support NMFS' analysis.

A.     **Creative Lawyering Cannot Overcome NMFS' Error in Relying on Nonrepresentative Water Monitoring Data.**

To a considerable extent, NMFS' conclusions about how much pesticide reaches salmon-bearing waters rely on inapplicable historical water monitoring.  NMFS says in the BiOp, for example, that it believes this historical monitoring data "represent realistic exposure levels for some individuals of the listed species" (AR 1118), and that "[w]e expect these concentrations to be representative of similar aquatic habitats where these OPs are used." AR 1168.  The footnote below provides numerous other

examples of where NMFS relied on the older no-longer-representative water monitoring data to support its analysis, including the results of its population modeling.[12]

But after the extensive use cancellations and mitigation measures that had been put in place, these data simply are not representative of impacts of the action under review, a fact that was repeatedly stressed to NMFS by EPA, the states and Plaintiffs.  Pl. Br. at 23-26; AR 1439-1448 (MANA), AR 1491-1492 (DAS), AR 1538 (Cheminova), AR 1835 (EPA), 3508 (California).  And, as explained in our Initial Brief, the BiOp provided no reasonable justification for NMFS' continued reliance on that nonrepresentative data.  Pl. Br. at 23-26.

Now, Federal Defendants and Intervenors proffer several new justifications for NMFS' error.[13]

But the simple fact is that nowhere in the record has *NMFS* provided the Court with a cogent explanation of its reliance on historic data in response to the numerous, noteworthy objections it received.  This is a

---

[12] AR 1108 ("Surface water monitoring can provide useful information regarding real-time exposure and the occurrence of environmental mixtures."); AR 1168; AR 1088-89 ("In order to ensure no likely jeopardy, we consider the highest exposure any individuals of the population are likely to be exposed to."); AR 1088 ("Monitoring data indicate that measured concentrations in aquatic habitats sometime exceed PRZM-EXAMS estimates."); AR 1089 ("However, monitoring data suggest that some individuals are likely to be exposed to concentrations greater than predicted with the PRZM-EXAMS estimates."); AR 1116 ("Concentrations of chlorpyrifos, diazinon, and malathion can occur at levels well over 100 µg/L and upwards of 1,000 µg/L based on measured environmental concentrations and exposure models.") AR 1117; ("it had "considered monitoring data presented by EPA and from other sources which indicate comparable concentrations of chlorpyrifos, diazinon, and malathion have been detected in surface waters within the four states where the listed salmon and steelhead are distributed . . . ."); AR 1118 ("We assume that the exposure estimates provided by EPA in the BEs and additional modeling and monitoring information provided above represent realistic exposure levels for some individuals of the listed species."); AR 1169 ("We expect concentration[] levels of chlorpyrifos, diazinon, and malathion in salmonid habitats will reach lethal levels based on exposure concentrations derived from monitoring data, EPA's modeling estimates, and our own modeling estimates."); AR 1178 ("When we compare the concentrations listed below to expected levels in salmonid habitats described in the exposure section, it is highly likely that some portions of, or all of the individuals within a population will be exposed at sometime in their juvenile lifestage.").

[13] *See, e.g.,* Def. Br. at 33, 36 ("This water monitoring data does not overestimate concentrations that salmon and steelhead will be exposed to," and "even if less of these pesticides [are] used in the future, that does not mean that this water monitoring data overestimates salmon and steelhead exposure," and "these water monitoring programs were not 'designed to capture'. . . peak exposure.");  Int. Br. at 26 ("annual pesticide usage frequently fluctuates based on local regulations, crop patterns, and severity of pests," and data "assisted in identifying areas where higher concentrations of these individual chemicals were likely to occur . . .  and in highlighting areas where these and other pesticides are more likely to be found together.").

fundamental, fatal flaw.  Courts "cannot gloss over the absence of a cogent explanation by the agency."

*Humane Society of the United States v. Locke*, 626 F.3d 1040, 1049 (9th Cir. 2010) (rejecting

explanations for action by NMFS raised for first time by Federal Defendants in review briefs).

   *Humane Society* is particularly instructive here.  In that case, the Ninth Circuit was faced with

deciding whether NMFS had violated the Administrative Procedure Act by failing to provide a reasoned

explanation for its decision to allow the killing of California sea lions that prey upon protected

salmonids in the Pacific Northwest.  *Id*. at 1044.   NMFS' briefs provided copious rationalizations for

the Services' actions that had not been made by the Service staff.  *Id*. at 1049-50.  The Ninth Circuit

rejected Federal Defendants' efforts, stating that it could not "gloss over the absence of a cogent

explanation by the agency by relying on the post hoc rationalizations offered by defendants in their

appellate briefs," and that "Defendants' post hoc explanations serve only to underscore the absence of an

adequate explanation in the administrative record itself," and "therefore [are] not part of our review."

*Id. at 1050*; *see also Dillmon v. NTSB*, 588 F.3d 1085 (D.C. Cir. 2009) (refusing to accept Federal

Defendants' *post hoc* rationalizations for agency action).

   The Federal Defendants' and Intervenors' briefs are replete with other mischaracterizations of

NMFS' alleged justifications of its reliance on older monitoring data.  A good example is the Federal

Defendants' characterization of an import study finding that chlorpyrifos used on a golf course likely

resulted in a fish kill in Florida.  Defs. Cross Mot. for Summ. J. at 32-34 (Dkt. No. 67) ("Def. Br."); AR

1085-1086.  Federal Defendants assert in their brief that NMFS used this study to "caution[] against

jumping" to the conclusion that if less pesticides are used, salmon will correspondingly be exposed to

lower concentrations.  Def. Br. at 33.  But that is not true.  The BiOp merely stated that because the

study was designed to measure "terrestrial" concentrations, its findings were unlikely to represent

maximum concentrations that might be observed in aquatic environments.  AR 1085.[14]  It draws no cautionary conclusion.  In fact, on the same page, after reviewing the results of this study, NMFS agreed with EPA's assessment "**that reduced rates are likely to result in corresponding reductions in exposure**."  *Id*. (emphasis added).

Another example of Federal Defendants' unlawful *post hoc* rationalizations it relies on to avoid the common sense implication that less pesticide use equates to less exposure, relates to remaining detects of diazinon in urban waters.  Def. Br. at 34.  After EPA-mandated use label changes in 2002 and 2004 (AR 1426) the percentage of agricultural detects for diazinon declined in 2006 from 14.14% to 2.5% (an 82% reduction), and urban detects declined from 71.85% to 25.4% (a 65% reduction).  AR 1442-1443.  Now, however, the Federal Defendants argue in their brief that the 25.4% remaining detects in urban waters and the use of existing stocks by past purchasers demonstrate that salmon in the future may be exposed to the higher concentrations detected in the older data.  Def. Br. at 34.[15]  But this

---

[14] The record states with regard to this study that two applications of chlorpyrifos at a rate of 4 lbs per acre occurred as part of a study to "evaluate the hazards to terrestrial, not aquatic, animals; that chlorpyrifos levels of 1.69 and 2.55 ppb (μg/L) were found in the water after the second application; and that dead fish were found in water hazards and a small pond associated with the study.  Consequently, NMFS reported, EPA thought it was "quite likely, but not certain, that chlorpyrifos was responsible."  AR 4100, AR 1085.  In contrast to NMFS, EPA—the expert agency as to this study—explicitly recognized its limitations in analyzing the issue of exposure of salmonids in California and the Pacific Northwest.  The Agency noted that the Tampa area is frequented by localized afternoon thundershowers, which are not likely to occur in the west where salmon are located, and that since the time of the study, the application rate for chlorpyrifos use on golf courses has been reduced from 4 lbs/acre to 1lb/acre.  AR 4100.  In EPA's opinion, this "four-fold reduction in application rate should result in a corresponding reduction in aquatic exposure."  *Id*.

[15] Intervenors provide a similar rationalization regarding existing stocks, stating that "historical monitoring data can be directly applicable in estimating concentrations of those pesticides until exi[s]ting stocks are depleted or uses phased out.  Int. Br. at 26-27.  Once again, however, NMFS never provided this as an explanation regarding why it continued to rely on older, irrelevant data, and Intervenors' record citations do not support their contention.  *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (A court "cannot infer an agency's reasoning from mere silence.").

was not an explanation provided by NMFS.  To the contrary, it is a mischaracterization by Federal

Defendants of information provided to NMFS by an employee of MANA.[16]

    As NMFS recognizes, "[o]utdoor residential uses of diazinon by homeowners, lawn care

operators, and pest control operators were phased out or canceled as of December 31, 2004."  AR 887.

Agricultural uses also were severely restricted.  AR 1428-1431.  Correspondingly, diazinon use in

California has decreased by 70%.  AR 1432.  And, as expected, the most recent monitoring data

available to NMFS confirm that high concentrations like those relied on in the BiOp have not occurred

since.  AR 1444-1448.[17]  And, as with diazinion, the record also shows a downward trend in use for

chlorpyrifos and malathion.  AR 1148, 1532-1539.  The BiOp provides no data or rationale to suggest

otherwise or support the conclusion that these reductions are temporary.

    Another excuse provided now by Federal Defendants for NMFS' reliance on unrepresentative

water monitoring data is that NMFS found it "useful" for evaluating exposures to "pesticide degradates

and mixtures."  Def. Br. at 36.  But the record citations provided by Federal Defendants (AR 1108,

1111) do not show this.  They simply confirm Plaintiffs' assertions that NMFS relied heavily on the

older monitoring data, and that reliance was central to NMFS' jeopardy determination.[18]

---

[16] The MANA employee explained to NMFS that continued findings of some residues in urban areas, even after the cancellation of urban uses, simply reflected the fact that some product remained in consumer hands, and that measured levels could be expected to continue to decline as those old stocks were used up.  AR 745, 749.  In fact, as the data quoted above indicate, levels in urban samples with measurable residues already had dropped by about two-thirds.

[17] For example, recent monitoring data done in Washington state show a maximum concentration in agricultural watersheds of only 0.023 ppb for diazinon.  AR 1448.

[18] NMFS citation of the BiOp at AR 1108 actually supports Plaintiffs' argument.  As it explained, "[v]ery few [monitoring studies] have been designed for the purpose of evaluating exposure in listed Pacific salmonid habitats."  AR 1109.  The next page of the record, however, reveals that the studies NMFS found "useful" for measuring "real-time exposure" to salmonids were the same modern monitoring studies that Plaintiffs had been urging NMFS to use.  AR 1108.  The BiOp also notes there that "[o]ne exception is a monitoring effort which targeted agricultural areas within Washington state (Anderson et al. 2007; Burke et al. 2006)."  Id.  As MANA pointed out in its comments, the Burke study showed that diazinon "detection frequency declined from 39% (2003) to 3% (2005) due to cancelling homeowner uses in 2004" and that in "agricultural

Further, while NMFS did express concern about the uncertainty regarding the future use of the pesticides because of variations due to "regulatory changes, market forces, cropping patterns, and pest pressure," NMFS did not use this as a rationale for relying on the historical data.  Def. Br. at 35-36; AR 1109.  Again, this rationale has been newly conjured in Federal Defendants' brief.  AR 1085.

It also would be completely unreasonable for NMFS to assume, as Federal Defendants' *post hoc* rationalizations assert, that there are going to be substantial changes in use patterns that would result in increased exposure.  The fact is, NMFS relied on an assumption that use patterns would remain fairly constant in making its no jeopardy decision for the Ozette Lake Sockeye.  AR 1225 ("the existing and likely future land uses should limit the applications of chlorpyrifos, diazinon, and malathion containing pesticides").

The Federal Defendants' last ditch effort in their brief to salvage NMFS' continued reliance on unrepresentative, older data is perhaps its most dubious.  It asserts "the simple fact" is that there is not a lot of data available and, while it "may not be perfect," it is the best "available."  Def. Br. at 36.  The brief then relies on the explanation by Anthony Hawkes in his declaration, which was impermissibly put before the Court,[19] that "if NMFS ignored the older water monitoring data, it would have had almost no observational data left."  *Id*.

---

watersheds, [the] max concentration [was] 0.023 ppb out of 125 samplings; [with] no water quality exceedances."  AR 1448.  Further, as discussed in Plaintiffs' Motion to Strike, it is impermissible for Federal Defendants to rely on the Hawkes Declaration to support this rationalization.

[19]  The Memorandum in Support of Plaintiffs' Motion to Strike being filed simultaneously with this brief explains in detail why the Hawkes Declaration (Dkt. No. 67-1) cannot be used for the purposes it is cited by the Federal Defendants.  The key reasons are: (1) *Camp v. Pitts*, 411 U.S. 138 (1973) and *Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985), cited as a basis for submission of the Hawkes Declaration, hold that an explanatory affidavit can only be submitted by order of the court where an agency has so utterly failed to explain its actions that it has "frustrate[d] effective judicial review."  *Camp*, 411 U.S. at 142-43.  That is not the case here. (2) Affidavits submitted under this exception must be "merely explanatory of the original record and should contain no new rationalizations."  *Envt'l Def. Fund, Inc. v. Castle*, 657 F.2d 275, 285 (D.C. Cir. 1981) (emphasis added).  The Hawkes Declaration goes far beyond this limitation.  *See also Sierra Club v. United States Army Corps of Eng'rs*, 771 F.2d 409, 413 (8th Cir. 1985) ("Any new materials submitted should . . . be merely explanatory of

This rationalization turns the statutory requirement that NMFS rely on the best commercial and scientific data available on its head.  As noted by the Supreme Court, "[t]he obvious purpose of the requirement that each agency use the best scientific and commercial data available is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."  *Bennett v. Spear,* 520 U.S. 154, 176 (1997) (internal quotation marks omitted).  It would constitute both "speculation" and "surmise" to rely on irrelevant monitoring data that is not representative of current conditions.[20] Moreover, Congress could not have commanded NMFS to rely on such data any more than it could have intended that NMFS rely on data produced by improperly calibrated equipment, even if it were the only data available.  Reliance on historical data generated from different EPA actions (*i.e.*, earlier registration requirements) is simply beyond the pale.

It also merits note that the record establishes that the Hawkes Declaration is wrong in stating that "almost nothing would have been left" if unrepresentative historical data were set aside.  The Hawkes Declaration states that the CDPR database from 1990 to 2008 contained only two studies "more recent than 2004" and implies that this is the only data after 2004 that is available.  Def. Br. at 37.  In fact, it is not.  A study by Hall and Anderson that was completed in June 2008 and brought to NMFS' attention by MANA provided a significant amount of additional data that were indeed available after 2004.

---

the original record and should contain no new rationalizations for the agency's decision."); *Sierra Club v. Marsh*, 976 F.2d 763, 772-73 (1st Cir. 1992) (same); *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 82 (2d Cir. 2006) ("We . . . hold that to the extent that an agency may supplement the record on judicial review . . . it may do so only if the proffered evidence illuminates the original record and does not advance new rationalizations for the agency's action."); *Bunker Hill Co. v. EPA*, 572 F.2d 1286, 1292 (9th Cir. 1977) (holding that "the augmenting materials were merely explanatory of the original record" and "[n]o new rationalization . . . was offered.").

[20] In this regard, the Ninth Circuit has held that even "ambiguous studies" are insufficient to support ESA findings.  *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 879 (9th Cir. 2009).  NMFS' conclusion "that reduced rates are likely to result in corresponding reductions in exposure" essentially concedes the ambiguity inherent in the older water monitoring data.

AR 1445, 1456.  NMFS never explained why it did not rely on the data from this study.  The record also contains considerable data collected outside California after 2004.  Pl. Br. at 25.  For instance, data from Washington state from 2003 to 2005 show a major decline in detections and minimal concentrations. AR 1448.  Data were also made available by Idaho that "conducted surface water pesticide sampling in tributaries to the Clearwater River in 2004 and 2006 and [which] did not detect diazinon, chlorpyrifos, and malathion."  AR 3620.[21]  NMFS provided no explanation why it ignored this data.

The Federal Defendants' brief now justifies NMFS' failure to review the Idaho data by alleging that Idaho had "conceded" its data was limited, thus implying that it was of little value.  Def. Br. at 36, n.8.  But there is no evidence of any such concession in the record.[22]  Idaho may have told NMFS that there was "not a lot of surface water data [from 2004-2006] for the Idaho ESUs," but it made clear that the data from 2004 and 2006 was collected in salmonid habitat "and did not detect diazinon, chlorpyrifos, and malathion."  AR 3620.  Moreover, Idaho certainly never told NMFS to ignore this important data.  NMFS was arbitrary and capricious for doing so.  *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (holding an agency "cannot ignore available biological information").

At bottom, NMFS' reliance on nonrepresentative historical data use was arbitrary and capricious, both because it demonstrates that NMFS failed to use the best available data, and failed to explain why it relied on older, irrelevant data.  *See, e.g., Pac. Coast Fed'n of Fishermen's Ass'ns. v. Gutierrez*, 606 F.

---

[21] As Idaho explained:  "The percentage of land area where potential applications may occur in each Idaho ESUs is very small.  With a combination of limited or no use of these three products and limited acres for applications, we think that there is limited risk in the Idaho ESUs for these three pesticides.  The use of the most current data for these three Idaho ESUs is recommended to accurately assess the real world potential exposure in Idaho ESUs."  AR 3619-3620.

[22] After dismissing Idaho's legitimate concerns, Federal Defendants now also assert in their brief that NMFS must have reviewed the Idaho data because the letter from Idaho conveying the data is in the record.  But all the citation establishes is that data were submitted.  It does not mean the data were reviewed or considered.  *Cf. Beno*, 30 F.3d at 1075 (holding that the "district court erred in inferring that the Secretary considered plaintiffs' objections merely because plaintiffs submitted them").

Supp. 2d 1122, 1144 (E.D. Cal. 2008); *San Luis & Delta-Mendota Water Auth. v. Salazar*, 760 F. Supp. 2d 855, 870-71 (E.D. Cal. 2010).  Both errors are grounds for vacating the BiOp.

### B.   NMFS Improperly Employed the PRZM-EXAMS and AgDrift Models.

NMFS seeks to minimize the significance of its reliance on nonrepresentative water monitoring data by justifying its jeopardy findings with two predictive "models" and invocations of its expertise. Def. Br. at 24-30.  However, the true experts on those models are EPA and the Registrants, not the NMFS' BiOp staff or even any of the handful of other NMFS personnel who may have reviewed their drafts.[23]  And the record shows that EPA's and the Registrants' experts found NMFS' use of their tools inappropriate and wrong.[24]  Even if NMFS had explained the basis for its reliance on the true models, therefore, the Court could not properly defer to NMFS' "expertise."  *N. Spotted Owl v. Hodel*, 716 F. Supp. 479, 483 (W.D. Wash. 1988) (rejecting "conclusory assertions of agency 'expertise' where the agency spurns unrebutted expert opinions without itself offering a credible alternative explanation"); *Am. Tunaboat Ass'n v. Baldrige*, 738 F.2d 1013, 1016-17 (9th Cir. 1984); *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983).

For instance, the BiOp relied on the PRZM-EXAMS model (as well as inapposite old monitoring data) to predict the levels of pesticide that would reach salmonid bearing waters.  But as discussed above, *see supra* at 9-10, even NMFS admits that "EPA characterizes the PRZM-EXAMS estimates as 'worst-case' or even 'unrealistic' for listed Pacific salmonids."  AR 1088.  Similarly, EPA only uses the AgDrift model for the farm pond and index reservoir modeling scenarios, not to estimate concentrations in a flowing water body.  *See* AR 5721 (malathion RED describing use of AgDrift model); *see also*

---

[23] Def. Br. at 25-26; Int. Br. at 31.

[24] AR 1543-1544, 1460-1461, 1740-1741, 3468-3469 (comments from Plaintiffs criticizing NMFS' modeling).

AR 4275 (chlorpyrifos IRED describing how concentrations were estimated); AR 5071 (diazinon RED describing same).[25]

To its credit, in the final BiOp NMFS acknowledged some of the deficiencies of the AgDrift model.  NMFS noted, for example, that "field validation studies and research show drift is highly variable," and that while the model assumes a flat field with wind blowing directly toward salmon habitat, "[m]any agricultural fields are not flat and wind may change directions quickly or may not be blowing directly into salmonid habitats."  Def. Br. at 26; Pl. Br. at 27; AR 1096, 1254.  Nonetheless, NMFS improperly gave great weight to the model's prediction of "exposure estimates for shallow off-channel habitats . . . exceeding 1,000 µg/L for all three compounds."  AR 1117-1118.  NMFS then went on to "assume that th[os]e exposure estimates . . . represent realistic exposure levels."  AR 1118.[26]

Federal Defendants now assure the Court that its calculation of 1,000 µg/L was "explained clearly" in the BiOp.  Def. Br. at 26-30.[27]  It was not.  Most notably, Federal Defendants' explanation in their brief is incomplete:  it skips any mention of diazinon.  Moreover, while Plaintiffs do not, like Federal Defendants, condone going far outside the record, the facts in the record nevertheless demonstrate that it is **impossible** using the AgDrift model to reach a 1,000 µg/L value using legal rates for diazinon.  For example, the record shows that the maximum application rate for diazinon stated in

---

[25] EPA also offered other criticisms of NMFS' use of the AgDrift model.  AR 1835-1836.  EPA noted for example in its comments on the draft BiOp, that "the exposure modeling tables in the Draft present instantaneous concentrations in water, for applications as high as 10 lbs/acre.  The Draft does not document how NMFS determined this high application rate could be assumed from the labels of the three pesticides.  It is not clear how such high application rates were derived for all uses of all three chemicals."  AR 1835.

[26] Intervenors make essentially the same arguments as Federal Defendants with regard to NMFS' reliance on the AgDrift model.  Int. Br. 30-32.

[27] NMFS stated in the BiOp that it had "generated additional exposure estimates for shallow off-channel habitats with predicted concentrations exceeding, 1,000 µg/L for all three compounds."

the BiOp is 4 lbs/acre using "ground boom."  AR 1097.  Using the concentration of 76 µg/L for ground

boom in 0.1 meters of water (AR 1099), and multiplying that by 4 lbs/acre, results in an absolute

maximum volume of 304 µg/L.  This is less than one-third the maximum value allegedly calculated by

NMFS.

Similarly, NMFS' use of the unbuffered value for chlorpyrifos was not rational.  Federal

Defendants concede in their brief that the 1,000 µg/L value can only be reached if no buffer is used for

airblast spray.  Def. Br. at 28.  But they also concede that buffers are required in all but five counties in

California, in which only one ESU out of the 26 at issue would be potentially impacted.  Def. Br. at 29.

NMFS' lack of an explanation for correlating 1,000 µg/L to the remaining 25 ESUs is hardly "clear."

Similarly, malathion only reached 1,000 µg/L in NMFS' modeling in California, and then only

adjacent to citrus.  Pl. Br. at 28, n.28.  Both the BiOp and Federal Defendants' brief fail to mention this,

and to recognize that it precludes the rational reference to this data point in ESUs under review in Idaho,

Washington and Oregon, or to nonetheless explain the rationality of NMFS' approach.

Federal Defendants' brief  also asserts that the 1,000 µg/L values are of no consequence because

NMFS only considered in its population models exposure concentrations of 100 µg/L for malathion and

chlorpyrifos and 400 µg/L for diazinon.  Def. Br. at 29.[28]  But NMFS used the 1,000 µg/L figure

elsewhere.  As NMFS made clear, "[i]n order to ensure no likely jeopardy, we consider the highest

exposure any individuals of the population are likely to be exposed to."  AR 1088.  That number was

1,000 µg/L, calculated using the AgDrift model.  AR 1096-1097.[29]  NMFS then used 1,000 µg/L as the

---

[28] While NMFS used these values, it never provided an explanation why such high concentration values were used when
available relevant monitoring data demonstrated that concentrations of this magnitude were not occurring.  Such a lack of
explanation by an agency is arbitrary and capricious.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947) (holding a court
should not be "compelled to guess at the theory underlying the agency's action.").

[29] As noted in our Initial Brief, a single value of 1,000 µg/L was reported for malathion in 1983.  Pl. Br. at 28, n.28.  That

predicted high-end exposure in the first stage of its risk analyses.  AR 1158-1160 (Figures 39-41

showing NMFS' use of 1,000 µg/L as the high-end expected exposure concentration for all three

pesticides).

NMFS cannot deny this reliance on 1,000 µg/L.  As NMFS explained in the BiOp, the first stage

of its risk analysis assesses the risk to individuals and is both "essential" and "necessary" in determining

"population level consequences:"

> As described in the *Approach to the Assessment section*, our exposure
> analysis begins at the organism (individual) level of biological
> organization.  We consider the number, age (or life stage), gender, and life
> histories of the individuals likely to be exposed.  This scale of assessment
> is **essential** as adverse effects to individuals may result in population level
> consequences, particularly for populations of extremely low abundance.
> Characterization of impacts to individuals provides **necessary** information
> to assess potential impacts to populations, and ultimately to the species.

AR 1088 (emphasis added); *see also* AR 893 ("Our risk analyses begin by identifying the probable risks

actions pose to listed individuals that are likely to be exposed to an action's effects.  The analyses then

translate individual-level effects to population level consequences.").

If what the Federal Defendants are actually asking the Court to do now is to discount a stage of

NMFS' risk analysis which the Service itself previously has described as "essential" and "necessary,"

NMFS should itself be asking the Court to vacate and remand the BiOp immediately for reconsideration,

not resisting Plaintiff's Motion.  If not, this Court should grant Plaintiffs that relief.

---

value, however, comes from a much older study that is completely nonrepresentative of current uses.

III.    **NMFS HAS NOT DEMONSTRATED THAT IT USED THE CORRECT TOXICITY DATA OR ENDPOINTS IN DETERMINING EXPOSURE RISKS.**

Neither the Federal Defendants nor Intervenors have responded with explanations by *NMFS* why it used toxicity levels in its analysis that did not reflect the best available data.  Pl. Br. at 16-22.[30] Instead, as with regard to the issues discussed above, Federal Defendants and Intervenors have presented *post hoc* lawyers' rationalizations and incorrect factual assertions.  Ultimately, those arguments come down to little more than "trust us."  As explained in this section of our brief, however, this Court cannot.

As in our Initial Brief, we address individually NMFS' errors as to the toxicology of each of the three pesticides at issue.

A.    **Malathion Acute Toxicity.**

The dispute over malathion toxicity centers around the BiOp's use of an $LC_{50}$ of 2.8 µg/L as the lower end assessment endpoint for lethal toxicity to salmon in the BiOp.  Pl. Br. at 17; Def. Br. at 16; Int. Br. at 19-20.  Federal Defendants and Intervenors argue that Plaintiffs' assertion that NMFS improperly relied on this exceedingly low value is a "straw man" and "much ado about nothing."  Int. Br. at 19-20.  "[E]ven if the Pesticide Manufacturers were right," Federal Defendants assert, "it would not have changed NMFS' analysis," because NMFS used a value of 30 µg/L and not 2.8 µg/L in its population model.  Def. Br. at 17.  In support of these arguments, Federal Defendants and Intervenors point out that the table included in an attachment to the BiOp indicates that NMFS used the value of 30 µg/L in its analysis.

This argument is both overstated and disingenuous.

---

[30] Instead of responding to Plaintiffs' actual arguments, Federal Defendants grossly mischaracterize Plaintiffs' position by stating that Plaintiffs alleged that the pesticides at issue are "harmless . . . even in large doses."  Def. Br. at 11.  As stated above, Plaintiffs instead merely contend that NMFS applied inaccurate toxicity levels in its analysis.

First, while that table exists, and includes the 30 μg/L value, the BiOp itself states when NMFS ran its population model with respect to acute toxicity, it "selected the **lowest** reported $LC_{50}$ from the available information to ensure that risk is not underestimated."  AR 1178 (emphasis added).  The BiOp reports that "the lowest reported LC50 was 2.8 μg/L" for malathion.  AR 1134, 1155 (Table 59).  Either these quotations from the BiOp are wrong, or the table is.  But neither the BiOp nor the Federal Defendants' or Intervenor's Briefs address this discrepancy.  If the Federal Defendants and Intervenors are correct that NMFS used a data point in its analysis different than the one it explained it had, this alone is enough to require remand.  *Motor Vehicle* 463 U.S. at 43 ("[an] agency must . . . articulate a satisfactory explanation for its action . . . .").

Moreover, if NMFS did use 30 μg/L in the population model, it never explained why.  This is a critical failing, because alternative values had been suggested by Cheminova (91 μg/L) and the California Department of Pesticide Regulation ("CDPR") (170 μg/L).  Pl. Br. at 17; AR 3509.  While Intervenors boldly proclaim that NMFS "rationally explained the concentrations it chose to use in subsequent modeling" (Int. Br. at 21), in fact there is no such explanation in the record.[31]  The only rationale provided by NMFS is that it selected the lowest reported $LC_{50}$ so as to not underestimate risk— a rationale that obviously does not apply to its choice of 30 μg/L, since it was not the lowest reported $LC_{50}$.  Thus, "[d]efendants' *post hoc* explanations serve only to underscore the absence of an adequate explanation in the administrative record itself."  *Humane Soc'y*, 626 F.3d at 1050 (holding that NMFS was arbitrary and capricious for failing to adequately explain its actions).

---

[31] The closest thing to a record reference are notes by NMFS' personnel found at AR 835.  But although these notes state that "applicant-submitted studies were useful," no cogent explanation was provided regarding how they were useful, or why the 30 μg/L was chosen over higher values also provided by Cheminova or the even higher values chosen by California.

Further, there is no dispute that NMFS relied on the 2.8 µg/L value at the initial stage of its risk assessment, where it used 2.8 µg/L as the low-end assessment endpoint for determining the risk to individual salmon.[32]  As NMFS explained in the BiOp, this stage of NMFS' analysis was "essential" and "necessary" to determining population level consequences.  *See supra* at 20-21.  Thus, given NMFS' foregoing characterization of the first step in its risk assessment—that the 2.8 µg/L value was put to use as both a "necessary" and "essential" step in assessing the potential impacts to salmon populations— Federal Defendants and Intervenors cannot now properly assert that NMFS' use of 2.8 µg/L in the BiOp was immaterial or meaningless.

Federal Defendants next defend the BiOp's malathion decisions with new purported facts and *post hoc* rationalizations provided in the Hawkes Declaration.  As explained in Plaintiff's Motion to Strike, this is wholly unjustifiable.  *See also, e.g.*, *Envt'l Def. Fund, Inc*. at 285 (holding that any additional affidavits ordered by a court "should be merely explanatory of the original record and should contain no new rationalizations").  For completeness, however, we address here the flaws in the reasons Hawkes asserts for NMFS' failure to credit several studies either submitted or identified by Cheminova that countered NMFS' reliance on much more restrictive toxicity values.

One of these was the Gries and Purghart study, which relied on modern formulations known to contain far fewer impurities than older products, and calculated an LC50 value of 91 µg/L for technical malathion and 740 µg/L for a formulated product.  Pl. Br. at 17.  On the basis of the Hawkes Declaration, Federal Defendants assert that Gries and Purghart "'reported an LC50 within the range already considered' and thus 'did not provide any significantly new information for the analysis.'"

---

[32] AR 1155 (Table 59 listing 2.8 µg/L as the low-end assessment endpoint for salmonid survival); AR 1156 (Figure 38 showing a schematic of the NMFS' risk characterization process); AR 1160 (Figure 41 using 2.8 µg/L in comparison of exposure concentrations to assessment endpoints for salmonid survival).

Def. Br. at 17.   But this is logically inconsistent.  A value of 91 µg/L is three times higher than the 30

µg/L value NMFS allegedly used in its population model, and 30-fold higher than the value 2.8 µg/L

that it used during the initial stage of its risk analysis.  This clearly is significant information.

Federal Defendants' brief also relies on a blatant error in the Hawkes Declaration to try to refute

Cheminova's criticism of the 40 year old study from which NMFS obtained 2.8 µg/L.  Cheminova

pointed out that (unlike the Gries and Purghard study), the study NMFS relied on employed test material

that is not representative of products now on the market.  Pl. Br. at 17; Def. Br. at 18.  The Hawkes

Declaration stated that the fact that Cheminova's technical product no longer contains pertinent

impurities is not significant, because "there are 37 other companies that hold active registrations for

more than 100 malathion products."  Def. Br. at 18; *see also* Int. Br. at 20, n.6.  But as Cheminova

directly informed NMFS after reviewing the draft BiOp—and as NMFS would have known if it had an

adequate understanding of the registration process and reviewed either EPA's list of technical

registrants, or looked at even a sampling of the product confidential statements of formulae available to

it—Cheminova "is the sole technical registrant for malathion," and every other malathion product

registered in the U.S. incorporates Cheminova's technical product.  AR 1689.  Thus, the removal of

impurities described by Cheminova is pertinent to *all* U.S. malathion products.[33]

---

[33] Federal Defendants' brief also asserts, without any suggestion that this had occurred, that the level of impurities can vary depending on how malathion is stored, and that Plaintiffs do not control this.  Def. Br. at 18.  How significant such changes might be is addressed nowhere in the record, however, and this was not an issue raised by NMFS.  It is solely a lawyers' explanation, and insufficient to justify the BiOp.  Federal Defendants also involve this issue in a new rationalization offered by Hawkes, alleging that malathion products applied in a field may contain **other** ingredients that may be toxic.  *Id*. at 18.  But the toxicity of other ingredients that may or may not be included in end-use products does not rationally relate to NMFS' refusal to acknowledge studies demonstrating that the acute toxicity of technical malathion (which is nearly pure active ingredient) is much lower than what NMFS used in the BiOp.  Moreover, information on the constituents of other end-use products was available to NMFS; it simply (and impermissibly) failed to look at the available data.  AR 683 (recognizing that obtaining clearance to review confidential business information will allow the NMFS's Pesticide Team review other ingredients in end-use products).

The Federal Defendants also rely on the Hawkes Declaration to justify their rejection of another of the studies provided to NMFS regarding the toxicity of malathion—the Kuhajda study. Pl. Br. at 18-19. This field study demonstrated that there were no significant effects on fish and prey species from malathion after a "worst-case" treatment scenario. Pl. Br. at 19. Despite being provided to NMFS, there are no references in the original record to this important study. Nevertheless, the Hawkes Declaration lists several alleged problems with it. These are, of course, all new rationalizations that cannot be credited.

In any event, this list of purported problems with the Kuhajda study are incorrect in several respects. For example, one of the criticisms is that "malathion had already been applied several times near the creek before the study even began." Def. Br. at 17-18. Yet, as the report states, this factor is well mitigated by the fact that there was in place "a wooded no-treatment buffer of 600 feet" (*i.e*., equal to two football fields) where the applications were made. AR 1563. That is, not only is the criticism of the Kuhajda study an impermissible *post hoc* rationalization not based on the original record, but it is also unfounded.[34]

Finally, Federal Defendants seek in the Hawkes Declaration to provide this Court with new rationalizations regarding its failure to give weight to the Cohle study identified by Cheminova. As explained in Plaintiffs' Initial Brief, NMFS failed to recognize this study as an important early life stage toxicity study that helped fill a data gap identified by NMFS, or to even acknowledge it in the BiOp. Pl. Br. at 18-19; AR 1134.

---

[34] Federal Defendants also assert in their brief that apart from the Hawkes Declaration, NMFS "received and reviewed" the Kuhajda study. Def. Br. at 17. It cites to AR 802 as evidence. At the most, AR 802 shows that the study was received and identified, not that it was "reviewed." The fact that it was submitted to the agency without more is not sufficient evidence that it was reviewed or considered by NMFS. *Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) (holding that the "district court erred in inferring that the Secretary considered plaintiffs' objections merely because plaintiffs submitted them").

This study demonstrated a chronic No Observed Effect Concentration ("NOEC") as high as 21 ppb (which is the same as 21 µg/L), and there is no dispute that chronic NOECs are always lower than acute $LC_{50}$ values.  Def. Br. at 17.  Yet Hawkes asserts that NMFS did not rely on it because it was a chronic, not an acute, study, and because it did not address "life-stage sensitivity."  Id.  This makes no sense.  At the very least, the 21 ppb data point is an indicator that a $LC_{50}$ of 2.8 µg/L is suspect.  Further, the claim that the Cohle study did not address life-stage sensitivity is misleading:  the Cohle study is an "early life stage toxicity" study on "rainbow trout," which is a salmonid, and tested the sensitivity of the trout during a particularly vulnerable life stage.  AR 1755, 1744.[35]

## B.     Diazinon Acute Toxicity.

As with malathion, Federal Defendants' and Intervenors' defend NMFS' use of the exceedingly low toxicity values of 0.03 and 0.2 µg/L for diazinon prey by citing a table that they assert shows NMFS did not use these levels in its population model, but instead used a value of 1.38 µg/L.  Def. Br. at 19.  NMFS, however, did use the exceptionally low value of 0.03 µg/L as a key diazinon assessment endpoint in the initial phase of its risk assessment process (AR 1155, 1159) which, as described above, NMFS has characterized as both "necessary" and "essential."  *See supra* at 20-21.  It is thus incomprehensible how Federal Defendants can now allege in their brief that NMFS' use of 0.03 µg/L "would not have changed NMFS' analysis."  Def. Br. at 19.

There is also nothing in the record explaining why NMFS chose to rely on 1.38 µg/L in its population model.[36]  Given the alleged importance of this value in the population model, NMFS was

---

[35] Any counterargument by NMFS that the Cohle study is irrelevant because it only addressed the early life-stage of salmonids and not later life-stages would be disingenuous.  NMFS has identified early life-stage as a critical time for salmonid survival.  AR  1189.

[36] The only clear statement in the record is that NMFS "selected the lowest reported $LC_{50}$ from the available information to ensure that risk is not underestimated" when it ran its population model.  AR 1178.  This was not, however, 1.38 µg/L.

required to discuss the reasoning of its choice openly; its failure to do so provides yet another reason to

vacate and remand the BiOp.  *Chenery Corp.*, 332 U.S. at 196-97 ("[i]t will not do for a court to be

compelled to guess at the theory underlying the agency's action."); *Beno,* 30 F.3d at 1073 (A court

"cannot infer an agency's reasoning from mere silence . . . ."); *Humane Soc'y*, 626 F.3d at 1048 (NMFS

violated the APA for failing to adequately explain "why a California sea lion predation rate of 1 percent

would have a significant negative impact on the decline or recovery of . . . salmonid populations.").

Federal Defendants make no effort in their brief to overcome NMFS' failure to explain itself, but

Intervenors do.  They assert that NMFS "explained in the BiOp" why "it chose" to use 1.38 µg/L.  Int.

Br. at 22.  In support, Intervenors cite AR 777, 1134, 1293 and 1304.  But this Court's review will reveal

that none of those pages provides an explanation of how and why NMFS selected 1.38 µg/L as the

model input for prey toxicity in its population model.  Intervenors' argument thus fails.  *Humane Soc'y*

at 1049 ("We cannot gloss over the absence of a cogent explanation by the agency by relying on . . . post

hoc rationalizations,").

Finally, as to the 2005 Hall and Anderson study that identified 2.0 µg/L as the more reliable

value, Federal Defendants now assert, based on the Hawkes Declaration, that that study "merely

reported an LC$_{50}$ that was already within the range of values that NMFS had identified."  Def. Br. at 19.

On its face, this claim makes no sense:  if NMFS had concluded, as it should have, that the Hall and

Anderson study was the "best available science," it would have disregarded the 0.03 data point.  If it had

done this, 2.0 µg/L would no longer be buried somewhere "within" the range of values—it would have

---

While the Hawkes Declaration does appear to provide a rationale for NMFS' choice of 1.38 µg/L (Hawkes Decl. ¶ 13 (Dkt.
No. 67-1)), that rationale is wholly after-the-fact and not based on the original record.

been the lowest, and thus most significant acute toxicity value.  NMFS thus would not have used a value

of 1.38 µg/L as it did, and the model results would be different.

Federal Defendants also disparage the Hall and Anderson in their brief because Hawkes says it

"tested a different species" of prey.  Def. Br. at 20.  But this argument is refuted by the study itself,

which explained that the test species were "closely related" to each other and the approach used thus

"well grounded:"

> G. pseudolimnaeus is a closely related species in the same genus as G.
> fasciatus, and was tested as a surrogate for G. fasciatus because G.
> fasciatus is not commercially available. This approach is **well grounded**
> as Suter et al (1993) have documented that closely related species (i.e.,
> species within the same genus) are expected to demonstrate similar
> sensitivity to chemical stressors.  The Stephen et al. (1985) guidelines for
> developing water quality criteria also recognize that closely related species
> exhibit similar sensitivity to chemical stressors by using "genus mean
> acute values" (a geometric mean of all species within the same genus) in
> the calculation of a final acute value.

AR 2262.

As a final justification for NMFS' irrationality, Federal Defendants seek to assuage this Court's

concerns about NMFS' use of 1.38 µg/L instead of the 2.0 µg/L, by saying the numbers are "very

close."  Def. Br. at 19.  This may be true to a layman—or a lawyer—but in fact the jump from 1.38 µg/L

is to 2.0 µg/L is a 31% increase.  No basis exists in the record to believe this increase is trivial.[37]

---

[37] Intervenors cite AR 796-97 as providing proof that NMFS "thoroughly considered the Hall study . . . ."  Int. Br. at 21, n.8.
The discussion recounted on AR 796-797, however, is not about Hall and Anderson (2005), but about a different study
entirely.  The study at issue on these pages is: Hall, Jr., L.W. Killen, W.D., Alden III, R.W. 2007.  Relationship of farm level
pesticide use and physical habitat on benthic community status in a California agricultural stream.  HERA 13: 843-869.
AR 1504.  This is obvious because the discussion was about the paper Hall authored regarding the "physical and pesticide
stressors in Orestimba Creek, CA" with the goal being to determine "spatial and temporal variability." AR 776.  Hall and
Anderson (2005) does not involve this locality or goal.  AR 2262.

C.      Chlorpyrifos Acute Toxicity.

As with malathion and diazinon, Plaintiffs criticized NMFS' incorrect use of acute toxicity

values for chlorpyrifos.  Particularly at issue was NMFS' use of 0.8 µg/L as the low-end assessment

endpoint for salmonid acute toxicity, and not the more realistic $LC_{50}$ value of 10 ppb (µg/L),

recommended by California Department of Pesticide Regulation ("CDPR"), as being based on more

reliable and modern studies.  AR 3509.

Federal Defendants now rationalize NMFS' decision not to heed CDPR because "NMFS found

that [the CDPR] studies identified a wide range of toxicities for chlorpyrifos because they were done

with different species, at different life-stages, and tested different formulations under different

conditions," and because chlorpyrifos purportedly is more toxic at higher temperatures.  Def. Br. at 20-

21.  In support, the Federal Defendants cite two pages in the BiOp, AR 1127-1128.  In fact, however,

these pages say nothing about why *NMFS* chose to ignore the 10 µg/L value identified by CDPR.

Federal Defendants and Intervenors also argue again, as with malathion and chlorpyrifos, that it

is irrelevant that NMFS used 0.8 µg/L as an assessment endpoint because the oft-cited table shows

NMFS used a value of 3.0 µg/L in its population model.  Def. Br. at 21; Int. Br. at 23.[38]  But the same

problems that undercut their malathion and diazinon arguments apply here.  NMFS used 0.8 µg/L in the

"essential" and "necessary" first step in its risk assessment process.  AR 1127, 1155 (Table 59 listing 0.8

µg/L), AR 1158 (Figure 39 using 0.8 µg/L is assessing exposure to individual salmonids); *see also supra*

at 20-21.  Further, NMFS clearly stated in the BiOp that it "selected the lowest reported $LC_{50}$ from the

---

[38] Intervenors also argue along the same lines that NMFS used a higher $EC_{50}$ value of 2.3. µg/L for chlorpyrifos in modeling impacts to prey.  Int. Br. at 23.  Plaintiffs' same arguments apply with regard to this value as well.

available information to ensure that risk is not underestimated" when it ran its population model (AR 1178), but 0.8 µg/L, not 3.0 µg/L, was NMFS' lowest reported $LC_{50}$.

Nor is there any explanation for NMFS' rejection of the 10 µg/L value advocated by CDPR.  As with the other two pesticides, this failure to provide a cogent explanation for its choice violates the APA: "[i]t is a basic principle of administrative law that the agency must articulate the reason or reasons for its decision."  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005).

### D.    Salmon Olfaction.

Plaintiffs were highly critical in their comments on the draft BiOp of NMFS' conclusions about the impact of organophosphate pesticides on salmonid sense of smell ("olfaction"), and explained in our Initial Brief why NMFS' failure to revise the final BiOp in response to those comments was unlawful. Pl. Br. at 21-23.  The issue was what conclusions could be drawn from the four studies that purported to address this area.

The most recent study on this topic, by Palm and Powell, undercuts conclusions based on the earlier studies.  Pl. Br. at 21-22.  At the time Plaintiffs submitted their brief, there was no evidence in the record that NMFS had actually considered Palm and Powell.  Now, however, Federal Defendants assert that NMFS considered Palm and Powell and rejected it because it did not replicate methods in an earlier study, and because the "stimulus intensities" used were considerably higher than used in the prior studies.  Def. Br. at 22.  For this, Federal Defendants rely on an email attached to their brief not included in the certified record.  Dkt. No. 67-2; AR 731A; Def. Br. at 22, n.4.[39]  But this document does not show

---

[39]  The legal status of this document is unclear.  It is not part of the record, and NMFS has not moved to include it in the record.  For the reasons stated in the text, this issue may be moot, however, since the document does not provide the factual basis for which the Federal Defendants cite it.

that NMFS carefully reviewed Palm and Powell.  To the contrary, it shows only that the NMFS review

team "quickly looked over the paper, but [didn't] have a lot of time . . . to do a thorough reading."  *Id.*

Beyond that, the email simply confirms that another individual at NOAA (the agency within which

NMFS is lodged) expected that NMFS "will likely address [the Palm and Powell study] in the biop," and

urged that the BiOp team member "double-check" his numbers.  Nothing in the record indicates that any

of this was done.

    If anything, therefore, all this email shows is that NMFS did not carefully consider the Palm and

Powell study or its implications—even though the study was performed by recognized experts, and

called into question the very basis for NMFS' conclusion that the pesticides here "are likely to have

reduced abundance and productivity as a result of impaired . . . olfactory-mediated behaviors."

AR 1189; Def. Br. at 21.[40]

    Plaintiffs also criticized a second olfaction study used by NMFS, the Sandahl study, because it

assumed a constant seven-day long exposure to chlorpyrifos that is unjustifiable and has never been

explained.  Pl. Br. at 22-23; AR 1501.  Again, there is no response to this concern in the record.

    In their brief, however, Federal Defendants present a new, *post hoc* explanation:  the seven days

used in Sandahl is not unrealistic because the half-lives for the three pesticides in water can be much

greater than seven days.  Def. Br. at 22.  Besides being an impermissible explanation in post-decisional

briefing, this explanation in inapt.  The question of concern is not how long pesticides take to degrade in

---

[40] Federal Defendants and Intervenors also point to AR 711, 717-719 as proof that NMFS considered the Palm and Powell study.  Def. Br. at 22; Int. Br. at 24.  These references, however, do not evidence that NMFS actually reviewed the Palm and Powell study.  The notes on AR 711 summarize a presentation by MANA personnel during an August 29, 2008 meeting with NMFS that discusses a presentation by Dr. Palm regarding the effects of diazinon on olfaction.  There is no indication that the actual study in its entirety had been analyzed and considered by NMFS.  There is also no discussion why the Palm and Powell study, even if it did not attempt to replicate Sholz (2002), which was not the stated goal of the study (AR 3010), was somehow not valid in its own right.  Likewise, AR 717-719 show only that NMFS received a copy of the study, not that it reviewed it.

the water, but whether one might realistically expect salmon to be exposed in the environment to any unchanged concentration of pesticide for seven straight days.  One does not have to be an expert to recognize that rivers—and even off channel portions of rivers—flow over time, and that ambient conditions are subject to considerable natural variation.  It was the implication of the uniformity of exposure that DAS pointed out as undercutting the value of the study, and the argument by Federal Defendants does not address that issue.

By not relying on the Palm and Powell study, and not explaining why it did not do so, or why it did rely on the Sandahl study despite problems flagged by Plaintiffs, NMFS has squarely violated the APA.  *San Luis & Delta-Mendota Water Auth.*, 760 F. Supp. 2d at 890 (holding that Service was arbitrary and capricious for failing to use the best available data and explain why it did not); *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1072 n.9 (9th Cir. 2004) ("We cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals.  Rather, an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (internal quotations omitted).  This is yet another reason the BiOp should be vacated and remanded.

## IV.  NMFS HAS NOT JUSTIFIED ITS PREDICTIONS OF POPULATION LEVEL EFFECTS.

As noted in Plaintiffs' Initial Brief, another area in which the BiOp fails to meet legal requirements is in scaling up from purported effects of pesticide exposures of individual salmonids to population (species) level effects.  Here, again, neither Federal Defendants' nor Intervenors' briefs offer a valid rebuttal to Plaintiffs' arguments.

A.     The Erroneous "Four Day Assumption" In NMFS' Population Model Remains
       Uncured.

As the Federal Defendants repeatedly emphasize in their brief, the Service's population model

played a large part in NMFS' jeopardy finding.  Def. Br. at 17, 19, 21, 29, 38; *see also* AR 1178 ("These

results [from the model] indicate that salmonid populations exposed to chlorpyrifos, diazinon, or

malathion for 4 days at the reported LC50s would have severe consequences to the population's growth

rate.").  But nowhere are the *post hoc* rationalizations of Federal Defendants and Intervenors more

brazen than in their defense of the assumption NMFS used in that model that all juvenile salmonids in

the four states of concern are exposed to uniform and consistent high levels of all three pesticides for

four straight days.

This assumption was revealed in the draft BiOp, and after reviewing it, both EPA and the

Plaintiffs complained that it made no sense and must be explained.  *See* AR 1749-1751, 1835-1837.

NMFS never bothered to respond.  The closest thing to an explanation in the record is a statement in a

NMFS memoranda on a November, 2007 team meeting—two months before work on the OP BiOp

began—that "[t]here was discussion on a 4-day exposure duration for juveniles as the metric for

growth."  AR 10.  The memo provides no further explanation why that choice would have been rational,

nor does any part of the final BiOp.

Nonetheless, in their brief Federal Defendants now proclaim that EPA and Plaintiffs were "well

aware" of the basis for the four day assumption.  According to Federal Defendants' brief, it was that four

days is "one of the standard periods for acute toxicity testing."  Def. Br. at 38.  The brief also asserts that

the assumption is not unrealistic because "pesticides can persist in the water for more than 96 hours,"

and that NMFS was concerned about "shallow water habitat where there may be no flow (or only a low

flow) to dilute the pesticides."  *Id.*  These *post hoc* rationalizations by counsel, however, do not withstand scrutiny.

The fact that tests designed to measure toxicity of exposures of fish to chemicals are run for four days, with a constant specified level of pesticide maintained in the water, does not mean that the assumption of continuous exposure to the concentration used in the experiment for this period is representative of anything in the field.  To the contrary, as EPA—an agency with considerable experience with ecological risk analysis—explained to NMFS, the four-day assumption is unreasonable because "[i]t is more likely that the peak concentrations detected from monitoring decline over this period of time."  AR 1836.  Indeed, EPA underlined the fact that this fault was not corrected in the final BiOp by complaining, when the second draft salmonid BiOp was released,[41] that it had still not been provided with any explanation by NMFS as to the basis of the four-day assumption.  Pl. Br. at 32-33.

Federal Defendants cite in their brief two parts of the record—AR 1125 and AR 4083-4085—in support of their *post hoc* rationalizations.  However, references are incomplete and unavailing.  First, Federal Defendants quote from AR 1125 that "[l]ethality . . . is derived from the number of surviving individuals at each concentration tested following a 96 h exposure."  Def. Br. at 38.  But their brief fails to mention that just above that quote NMFS had explained that the 96 hour test is used to measure lethality for "individuals," not populations, and that the test occurs "in laboratories under controlled conditions (temperature, pH, light, salinity, etc.)," not in natural conditions.  AR 1125.  In context, the reference does nothing to explain why it is rational to rely on the assumption of continuous exposure to a

---

[41] As noted in Plaintiffs' Initial Brief, the BiOp at issue in this case is only the first in a series relating to effects of pesticides on salmon in the Pacific Northwest. Pl. Br. at 32.  Thus far, NMFS has completed four such BiOps addressing 24 active ingredients.  *See* http://www.nmfs.noaa.gov/pr/consultation/pesticides.htm.

consistent concentration as in laboratory toxicity studies as a basis for predicting population exposure or survival in the field.

The Federal Defendants' brief also tries to support the four-day assumption by quoting three pages from EPA's Biological Evaluation for chlorpyrifos. Def. Br. at 38 (citing AR 4083-4085). These pages provide a list of 96-hour $LC_{50}$ values. But the Biological Evaluation does not recommend these values as potential inputs to a population model; they simply appear in this list as a measure of potential toxicity. (Much as NMFS provided data in the initial stage of its exposure assessment.) And, as noted above, EPA repeatedly has made it clear that it considered NMFS' assumption of four-day exposures to a consistent concentration to be unreasonable. AR 1836; Pl. Br. at 32-33.

Federal Defendants also assert in their brief that the four-day assumption makes sense because, in its modeling, "NMFS was especially concerned with shallow water habitat where there may be no flow (or only low flow)." Def. Br. at 38. But nowhere in NMFS' explanation of its population model does NMFS state that the four-day exposure to a consistent concentration occurs solely or primarily in shallow water where there is "no flow (or only low flow)."[42] To the contrary, the BiOp states that NMFS' population model does not target such shallow water habitat. Instead, the BiOp explains that NMFS sought to model salmon life history consisting "of hatching and rearing in freshwater, smoltification in estuaries, migration to the ocean, maturation at sea, and returning to the natal freshwater stream for spawning followed shortly by death." AR 1177.

---

[42] Another example of the unsuccessful *post hoc* rationalization of the Federal Defendants' brief is its assertion that one reason "pesticides also will not necessarily decline over time" is that farmers "may" make multiple applications over four days, and "possibly" on adjacent land. Def. Br. at 38. Federal Defendants rely on AR 1093 as a supporting citation. While this page of the BiOp discusses "co-application" or "sequential applications of other pesticide products," it states nothing about why one should expect pesticide concentrations not to decline over four days. Thus, this attempt by Federal Defendants to provide a rationalization for NMFS is not supported by the record itself.

It may well be that, in order to undertake any population modeling, NMFS had to make some assumption about the duration of expected exposures at peak concentrations. Def. Br. at 39. But that is not an excuse for arbitrariness. NMFS also had an obligation under the law to make a rational assumption, and to explain it. *Chenery*, 332 U.S. at 196-97. Belated explanations in court pleadings are no substitute. *Humane Soc'y,* 626 F.3d at 1049.[43]

**B.      Nothing in the Federal Defendants' or Intervenors' Briefs Establishes that NMFS Properly Related The Exposures Evaluated To The Species.**

As explained in our Initial Brief, EPA, the states, and Plaintiffs complained to NMFS to no avail that the Service had not adequately correlated pesticide use to salmon location. Pl. Br. 29-31. Federal Defendants counter in their brief that NMFS in fact did this, and provide the Central Valley Chinook salmon as an example. Def. Br. At 39-40. As evidence, they state that NMFS found that 21% of the land in that Central Valley Spring-run Chinook salmon habitat is developed for crops, and that malathion is used for mosquito control. Def. Br. at 40. However, all the BiOp says is that the overlap in pesticide use and fish migration will have "population level consequences." AR 1204. It includes no attempt, as EPA requested, to correlate "the exposure evaluated to the species." AR 1837; Pl. Br. at 29. Instead, NMFS just broadly correlated pesticide use to potential location of members of the species,

---

[43] Intervenors also offer many *post hoc* explanations for NMFS that the Service never made itself. Int. Br. 32-34. They rationalize for example, that NMFS must have used 96 hours because it is a "common metric" for evaluating toxicity to fish, and that it is used by EPA as part of its risk analysis process. *Id.* at 32. First, it is odd that Intervenors turn to EPA's risk assessment process for support after dedicating an entire section in their brief to excoriating that process. *Id.* at 14-16. Second, EPA did not use 96 hours in a population model, like NMFS, that was designed to quantitatively calculate population-level impacts at peak concentrations. Intervenors also reason that NMFS "appropriately chose" to use four days in its modeling "[t]o account for the fact that a model cannot incorporate the precise pattern of shifting exposures salmonids experience, including multiple exposures of changing concentrations and duration at various life stages . . . ." *Id.* at 33. This appears to be an argument that the four-day assumption should be accepted because it probably provides rough justice. In fact, we will never actually know why NMFS chose to do what it did unless NMFS—not Intervenors—provides an explanation. *See Humane Soc'y,* 626 F.3d at 1049 (refusing to accept *post hoc* rationalizations by counsel where NMFS itself had not provided an explanation).

without any regard for where the exposures of concern evaluated for the three pesticides are expected to occur.

The simple fact is that NMFS' projection of population level effects is based on the population model, and the population model—as explained in Federal Defendants' brief—uses exposure values as high as 100 to 400 µg/L.  Def. Br. at 29.  Thus, for an analysis of the species level effects to be meaningful, some correlation must be made between the presence of fish and the occurrence of such high concentrations.  It is not enough to simply allege that 21% of a particular ESU habitat is agricultural, and thus may have been treated with one of the three pesticides at issue, and that malathion is used to control mosquitoes, without having some idea where and when that use occurs, and whether it is expected to produce exposure concentrations of the type evaluated by NMFS at a time when salmonids are present.

Importantly, California informed NMFS that it had data that could be used in this regard.  Pl. Br. at 30.  NMFS appears not to have used it, however.  This failure also violates the requirement by NMFS to use the best available data.  *Conner*, 848 F.2d at 1454 ("We hold that the FWS violated the ESA by failing to use the best information available to prepare comprehensive biological opinions.").

Even if NMFS' overall process for correlating pesticide exposures at the species level was not flawed, the record demonstrates instances where the conclusions NMFS reached using its own methodology were arbitrary and capricious.  For example, even NMFS recognized that its jeopardy determination for Chum salmon (which includes both Columbia River Chum Salmon and Hood Canal Summer Run Chum Salmon) was "counterintuitive" because they "were not modeled."  AR 838; *see also* AR 1177 (explaining Chum salmon were not included in the population model "because they migrate to marine systems soon after emerging . . . .").  There is more than just this fact, however, that

38

makes NMFS' jeopardy call counterintuitive.  As the BiOp explained for the Hood Canal population, "[t]he majority (64%) of the . . . land cover is evergreen forest [and] [t]here is no cultivated crop land and less than 6% of the ESU is developed."  AR 1217.

Despite such sparse impact, NMFS alleged that the land use data "may be misleading" and pointed to two studies allegedly showing "elevated levels of pesticides in the Puget Sound area where they migrate to soon after hatching.  AR 1218.  But there is a problem with NMFS' reliance on these studies—**neither mentions chlorpyrifos, diazinon, or malathion.**  *See, e.g.,* AR 14587-14591.  They are thus completely irrelevant.  The bottom line is that NMFS' finding that Chum salmon are in jeopardy is not supported by the population model, the land use, or the studies NMFS cites.  Not only is this a classic example where an agency has failed to articulate a "rational connection between the facts found and the choice made," *Motor Vehicle*, 463 U.S. at 43, it also illustrates once again how NMFS has engaged in a pattern of "zealously but unintelligently pursuing [its] environmental objectives."  *Bennett*, 520 U.S. at 176.

## V.  NMFS HAS STILL NOT DEFENDED ITS USE OF EXAGGERATED BUFFERS.

Plaintiffs' attention to the deficiencies inherent in NMFS' choice of reasonable and prudent alternatives ("RPA") has focused on NMFS' requirement for no-use buffers.  These, as explained in our Initial Brief, are vastly larger than would be appropriate, and far too inflexible.  Pl. Br. 35-36.  Where necessary, buffers should vary according to channel depth and width and the potential presence of salmonids.  The fact of the matter is that NMFS has never explained why buffers it set using the AgDrift model are appropriate for all watershed areas, regardless of their characteristics, as the RPA would require.[44]

---

[44] Intervenors argue that the buffers were "not based on [the] model alone."  Int. Br. 36.  This is at odds with the plain

Nor does the BiOp provide any rational explanation why buffers set to limit concentrations in salmonid habit should be applied to drainages from which water might some day reach salmonid habitat. But Federal Defendant's brief does:  it seeks to defend NMFS' imposition of buffers around intermittent streams and drainage ditches by rationalizing that they drain into "shallow water habitat."  Def. Br. at 43.  In support, their brief quotes from the BiOp:  pesticide drift is "most likely to reach streams and other aquatic sites when they are applied to crops and other land use setting located adjacent to wetlands, riparian areas, ditches, off-channel habitats, and intermittent streams."  AR 1256-1257.  Even if this is true, it does not explain why a pesticide level safe for waterway areas in which salmonids are found must be maintained in a source that does not contain salmonids, but only sometimes may contribute water to such an area.  And it is solely to protect salmonid habitat—that is, the places where salmonids are found—that the buffers are set.

Both the Federal Defendants and Intervenors also challenge Plaintiffs' assertion that the ESA requires NMFS to consider the economic implications of including buffers as an element of the RPA. Def. Br. 43-48; Int. Br. 36-38.  But their arguments run counter to the language of the ESA, as squarely interpreted by the United States Supreme Court in *Bennett*, 520 U.S. at 177 ("[E]conomic consequences are an explicit concern of the ESA . . . .").[45]

---

language in the BiOp:  "NMFS generated estimated environmental concentrations for the three OPs for off channel habitats using the AgDrift model (set to EPA Tier 1 simulation defaults).  NMFS generated values for a range of buffer sizes in 100 ft increments for ground applications (0 -1,000 ft), and aerial applications (0 – 1,000 ft)."  AR 1252.  Moreover, it speaks volumes that NMFS first proposed banning the pesticides; then proposed buffers as large as 2,600 feet.  Int. Br. at 36.  This shows a pattern of overreaching by an agency "zealously but unintelligently pursuing [its] environmental objectives."  *Bennett*, 520 U.S. at 176.

[45] As CropLife America noted in its *amicus* brief, NMFS' position is also inconsistent with the fact that Congress explicitly recognized economic interests at stake in the pesticide registration process and mandated that when EPA faced ESA compliance issues, it "minimize the impacts to persons engaged in agricultural food and fiber commodity production and other affected pesticide users and applicators." Pub. L. No. 100-478 § 1010(b), 102 Stat. 2306, 2313-14 (1988).  *See Amicus Curiae* Brief of Croplife America in Support of Plaintiffs' Motion for Summary Judgment (Dkt. No. 61-1) at 7, 18.

Furthermore, the Service's failure to consider economic implications violates its own regulations. They provide that an RPA be an alternative action that (1) "can be implemented in a manner consistent with the intended purpose of the action;" (2) "can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction;" (3) is "economically and technologically feasible;" and (4) "would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.02. The regulations thus provide "four distinct requirements for any valid RPA," *Greenpeace v. NMFS*, 55 F. Supp. 2d 1248, 1264 (W.D. Wash. 1999), one of which is economic feasibility.

For its buffer requirement to be lawful, NMFS must have explained in the record how it is consistent with these four factors, including the requirement that RPAs are economically and technologically feasible. NMFS is "ultimately responsible to ensure that the record supports the RPA." *San Luis & Delta-Mendota Water Auth.,* 760 F. Supp. 2d at 956 (granting summary judgment due to FWS' failure to articulate how an RPA met the factors outlined in 50 C.F.R. § 402.02). The record in this case contains no such explanation. That should be the end of the matter.

Once again, however, the Federal Defendants offer a handful of *post hoc* rationalizations in their brief for NMFS' decision. Def. Br. 45. Even if permissible, which they are not, none is correct. For example, the Federal Defendants note that the ESA and its implementing regulations do not require NMFS to conduct an economic analysis. Def. Br. 45-46. The issue, however, is not whether an economic analysis is required. What must be determined is how NMFS reached the conclusion that an RPA was economically and technologically feasible. It is NMFS' failure to do this, in any way, that Plaintiffs challenge as arbitrary and capricious.

Similarly, both the Federal Defendants and Intervenors raise a red herring in discussing whether NMFS is permitted to balance economic impairment against any alleged jeopardy to an endangered species.  Def. Br. 46-47; Int. Br. 37.[46]  Plaintiffs have not argued that NMFS should have weighed the costs of implementing buffers against any alleged cost to the species.  Plaintiffs merely seek to know the basis for NMFS' conclusion that uniform buffers throughout the rivers, streams, drainage ditches, and intermittent waterways of California, Washington, Oregon, and Idaho are economically feasible.  *See San Luis & Delta-Mendota Water Auth.*, 760 F. Supp. 2d at 957 (stating that "the public is entitled under law to receive, some exposition in the record of why the agency concluded (if it did so at all) that all four regulatory requirements for a valid RPA were satisfied.").  At that point, Plaintiffs may or may not agree with NMFS' analysis.  To date, they have not been given that opportunity.  This is unlawful. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv*., 378 F.3d 1059, 1072 n.9 (9th Cir. 2004) (stating that a court "cannot infer an agency's reasoning from mere silence . . . .").

## VI.   PLAINTIFFS ARE ENTITLED TO RESPONSES TO THEIR COMMENTS.

The Federal Defendants argue in their brief that NMFS was not required to respond to any of the nearly 130 studies or other information identified or provided to NMFS by Plaintiffs, EPA, or the States. Def. Br. 48-50.

Now that the Court of Appeals has confirmed that the BiOp must be reviewed under APA standards, however, the Federal Defendants' argument fails.  *Dow AgroSciences* LLC, 637 F.3d at 268.

NMFS essentially claims that it has no duty to respond to any comments it receives relating to a biological opinion because the ESA and its implementing regulations do not contain a specific provision

---

[46] Along these lines, Intervenors have impermissibly submitted to the Court the Declaration of Ed Whitelaw.  As explained in Plaintiffs' Motion to Strike, the Whitelaw Declaration is irrelevant and should be struck.

mandating a response.  *Id.*  Whether those regulations comply with all applicable legal requirements has never been adjudicated, however.  Moreover, even though comments are not required under the ESA, such a response is required under the APA to ensure that the agency's decision is not arbitrary and capricious.  5 U.S.C. § 706(2)(A).  Inherent in the requirement that agency action not be arbitrary and capricious is "a requirement that the agency adequately explain its results and respond to 'relevant' and 'significant' public comments."  *Pub. Citizen, Inc.*, 988 F.2d at 197 (internal citations omitted).  This NMFS did not do.  Such an explanation is necessary as to enable a reviewing court to effectively evaluate the agency's decision.  *See Loma Linda Univ. Med. Ctr.*, 684 F. Supp. 2d at 57 (finding that the record did not show that the Department of Health and Human Services had responded to plaintiff hospital's comments nor that the record otherwise supported the agency's action); *see also Crowley's Yacht Yard, Inc.*, 863 F. Supp. at 20-21 (holding the Department of Transportation violated the APA when it issued a rule by failing to respond to major comments and reaching conclusions without providing an explanation).  Thus, NMFS' failure to respond to the relevant and significant comments is arbitrary and capricious.

NMFS not only ignores the importance of the APA, it inappositely cites to *National Ass'n of Home* Builders, 551 U.S. 644 and *San Luis & Delta-Mendota Water Auth.,* 760 F. Supp. 2d 855, for the proposition that the ESA does not require NMFS to respond to comments. Def. Br. at 48-49.  These cases, however, are inapplicable to the present situation because neither addresses a consultation involving an applicant.  The ESA and the implementing regulations provide a distinct role for applicants during agency consultation and the drafting of a biological opinion.  50 C.F.R. § 402.14(g)(5); *see also* 16 U.S.C. § 1536(b).  Because applicants are specifically provided a role in the formulation of a biological opinion, the APA requires the agency to respond to significant and relevant comments.  *See*

*generally Reytblatt v. U.S. Nuclear Regulatory Comm'n,* 105 F.3d 715, 722 (D.C. Cir. 1997) (noting that the APA requires an agency to "respond in a reasoned manner to those [comments] that raise significant problems.") (citation omitted).

For their part, Intervenors do not challenge Plaintiffs' contention that NMFS was required to respond to substantive comments.  Instead, Intervenors claim that NMFS actually did satisfy this duty. The few instances that Intervenors cite where NMFS acknowledged changing the draft BiOp to address comments are insufficient, however, to prove that NMFS satisfied the requirements of the APA.  Int. Br. at 39.  Plaintiffs offered comments directed at many aspects of NMFS' analysis.  The record is silent as to whether NMFS actually considered the issues raised by most of these comments.

Intervenors also attempt to relieve NMFS of its responsibility to respond to substantive comments by dismissing the unaddressed comments submitted by Plaintiffs as irrelevant.  *Id.* at 39-40. But this is yet another *post hoc* rationalization provided by Intervenors to explain a failure on the part of NMFS.  Federal Defendants, in fact, stridently proclaim (albeit without any convincing evidence outside the Hawkes Declaration) that it considered everything.  Def. Br. at 11-16.  Even if this is true, however, "consideration" without explaining and justifying on the record the conclusions reached is an empty gesture and legally insufficient.  Moreover, nothing in the record shows that NMFS disregarded any of the comments received because NMFS believed the comments were irrelevant.  In fact, as explained previously by Plaintiffs, much of the materials submitted by Plaintiffs were highly relevant, yet still ignored by NMFS.  Pl. Br. 15-34.

The bottom line is that Plaintiffs are challenging NMFS' BiOp under the APA, which requires NMFS to explain its conclusions and respond to relevant and significant comments.  NMFS did not do this for the BiOp.  Plaintiffs and others provided NMFS with numerous comments, studies, and data that

raised significant criticisms of the BiOp.  NMFS failed to respond to many of these comments or even

address the criticisms raised.  Accordingly, the BiOp is arbitrary and capricious.

## **CONCLUSION**

For the foregoing reasons, Federal Defendants' and Intervenors' Cross-Motions for Summary

Judgment should be dismissed, Plaintiffs' Motion for Summary Judgment should be granted, and the

BiOp vacated and set aside.

Respectfully submitted,

_____/s/ *David B. Weinberg*_____
David B. Weinberg (Bar # 29485)
Eric Andreas (*pro hac vice*)
Nick Peterson
Wiley Rein LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000
(202) 719-7049 (fax)

Joseph R. Alberts, Esq.
Michael Grisham, Esq.
Dow AgroSciences, LLC
9330 Zionsville Road
Indianapolis, IN 46268

*Of Federal Defendants for DOW
AGROSCIENCES LLC*

*Attorneys for Plaintiffs DOW AGROSCIENCES
LLC and MAKHTESHIM AGAN OF NORTH
AMERICA, INC.*

Mark Hough, Esq.
Makhteshim Agan of North America, Inc.
4515 Falls of Neuse Road
Suite 300
Raleigh, NC 27609

*Of Federal Defendants for MAKHTESHIM
AGAN OF NORTH AMERICA, INC.*

_____/s/ *Warren U. Lehrenbaum*_____
Warren U. Lehrenbaum (Bar #28924)
David Menotti (*pro hac vice*)
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
(202) 624-2500
(202) 628-5116 (fax)

September 26, 2011

*Attorney for Plaintiff CHEMINOVA, INC. USA*